# Exhibit B

Declaration of David Hardy,

dated August 9, 2019

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LEOPOLD & BUZZFEED, INC.,                )
                                         )
    Plaintiffs,                          )
                                         )
            v.                        )   Civil Action No. 19-cv-1278
                                         )
U.S. DEPARTMENT OF JUSTICE *et al.*,     )
                                         )
    Defendants.                          )
                                         )

## FIRST DECLARATION OF DAVID M. HARDY

(1)      I am the Section Chief of the Record/Information Dissemination Section

("RIDS"), Information Management Division ("IMD"), in Winchester, Virginia. I have held this

position since August 1, 2002. Prior to my joining the Federal Bureau of Investigation ("FBI"),

from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for

Civil Law. In that capacity, I had direct oversight of Freedom of Information Act ("FOIA")

policy, procedures, appeals, and litigation for the Navy. From October 1, 1980 to April 30,

2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA

matters. I am also an attorney who has been licensed to practice law in the State of Texas since

1980.

(2)      In my official capacity as Section Chief of RIDS, I supervise approximately 245

employees who staff a total of twelve Federal Bureau of Investigation Headquarters ("FBIHQ")

units and three field operational service center units whose collective mission is to effectively

plan, develop, direct, and manage responses to requests for access to FBI records and

information pursuant to the FOIA as amended by the OPEN Government Act of 2007, the OPEN

FOIA Act of 2009, and FOIA Improvement Act of 2016; the Privacy Act of 1974; Executive

Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial

decisions; and Presidential and Congressional directives. My responsibilities also include the

review of FBI information for classification purposes as mandated by Executive Order 13526, 75

Fed. Reg. 707 (Jan. 5, 2010), and the preparation of declarations in support of Exemption (b)(1)

claims asserted under the FOIA. I have been designated by the Attorney General of the United

States as an original classification authority and a declassification authority pursuant to

Executive Order 13526, §§ 1.3 and 3.1. The statements contained in this declaration are based

upon my personal knowledge, upon information provided to me in my official capacity, and

upon conclusions and determinations reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the resources available

to and procedures followed by the FBI in responding to requests for information from its files

pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a. I

am also familiar with the files of the Special Counsel's Office ("SCO") that are maintained in the

FBI's Central Records System.

(4)     The Department of Justice ("DOJ"), and its components including the FBI, have

received a lawsuit under the FOIA involving a request seeking all records of the Special

Counsel's Office. The purpose of this declaration is to demonstrate that this request is overbroad

and unduly burdensome.

## FOIA REQUESTS

### *Leopold & Buzzfeed, Inc. v. DOJ et al.*, 19-cv-1278 (D.D.C.)

(5)     One of the FOIA requests at issue in this lawsuit, which was submitted to DOJ,

seeks "[a]ll documents and records collected, maintained and stored by the Office of Special

Counsel Robert Mueller since May 17, 2017 during the Office's investigation into: [(i)] any

links and/or coordination between the Russian government and individuals associated with the

campaign of President Trump; and (ii) any matters that arose or may arise directly from the

investigation; and (iii) any other matters within the scope of 28 C.F.R. § 600.4(a)." Both DOJ

and the FBI are responsible for maintaining portions of the SCO record collection, with FBI

retaining the investigative records housed in its Central Records System. So although this

request was not addressed directly to the FBI, because Leopold is seeking *all* SCO records, the

portion of this request seeking investigative records (other than the 302s that Leopold requested

directly from the FBI) has been routed to the FBI for processing.[1]

(6)     This request for all SCO records is overly broad and given the volume of

materials in those files, processing them in their entireties would impose significant, undue

burdens on the FBI, as well as other DOJ components and Federal agencies.

(7)     The FBI is continuing to work on collecting responsive records, converting them

to file types compatible with the FBI's electronic FOIA Document Processing System ("FDPS"),

and ascertaining the volume of records potentially responsive to FOIA requests for the entirety of

the SCO investigative file collection. To date, it has identified all responsive files; substantially

completed conversion of two investigative files into file formats compatible with FDPS; and

---

[1] Two of the requests at issue in this lawsuit were sent directly to the FBI. One request
sought "[a]ll FBI 302s maintained/stored/in possession of the FBI relating or referring to all of
the individuals who were questioned and interviewed by FBI agents working for the Office of
Special Counsel Robert Mueller during his investigation into: [(i)] any links and/or coordination
between the Russian government and individuals associated with the campaign of President
Donald Trump; and (ii) any matters that arose or may arise directly from the investigation; and
(iii) any other matters within the scope of 28 C.F.R. § 600.4(a)." The FBI identified this request
as FOIPA No. 1432673-000. Any records responsive to this request would be encompassed
within Plaintiffs' request for all SCO records. The other request sought records from the FBI
that are not encompassed within Plaintiffs' request for all SCO records.

collected and is continuing to collect media (CDs, DVDs, thumb drives, and hard drives) maintained in all of the investigative files.

## FBI FILE ORGANIZATION OVERVIEW

(8)     Before discussing the FBI's current estimate of the volume of responsive records and the burdens of processing those records, an overview of how the FBI organizes and maintains its files will be helpful.

(9)     FBI files are, generally speaking, organized into (1) a main file; (2) sub-files; and (3) files referred to as 1As.

(a)     Main Files are the main part in an FBI file. Every FBI file has a main file, at a minimum.

(b)     Sub-Files are separate files established under a main file to facilitate the efficient retrieval of pertinent information. They are established on a case-by-case basis and opened as the need arises. Examples of common sub-files include: Sub-302; Sub-CART (Computer Analysis Response Team); and Sub-GJ (grand jury).

(c)     1As are generally used to hold documents, non-evidentiary items, and non-chain-of-custody property pertinent to an investigation. For example, agents' handwritten interview notes and exhibits shown to witnesses during interviews generally are maintained in 1As, as are materials provided in response to grand jury subpoenas.[2]

---

[2] Historically, when investigative files were exclusively or almost exclusively comprised of paper materials, records that would normally be maintained in a 1A file but that were bulky were instead maintained in 1C files. The only difference between 1As and 1Cs is where and how they were physically stored. Since bulky records can now be produced to the FBI on electronic media or converted by the FBI onto electronic media for storage, 1Cs are not as common.

Investigative files may also contain 1Bs and 1Ds, which are short-term repositories for physical and digital evidence, respectively.

(10)    Each document placed in an FBI file is numbered in sequence and is referred to as a "serial." Thus, each type of file listed above (main, sub, 1A) will contain sequentially-numbered serials.

### ESTIMATED VOLUME OF SCO FILES IN THE FBI'S CENTRAL RECORDS SYSTEM

(11)    As previously noted, the FBI retains custody of the SCO files that are housed in its Central Records System ("CRS") and accessed through its Sentinel system.[3] There are 45 SCO files maintained in the CRS.

(12)    **Main and Sub-Files**: In order to estimate the number of pages in the SCO files in the CRS, the FBI must first download each serial from Sentinel, convert them into a file format compatible with FDPS (if they are not already compatible), and then import them into FDPS because FDPS and Sentinel do not directly interface with one another. To date, the FBI has completed that process for two files, except with regard to any links to attachments contained within serials, which are discussed below. The two files that have been completed are the obstruction investigation file and the original file opened in the Russian interference investigation.[4] The estimated volume for these two files is **91,027 pages**. However, there are 54 serials between the two files that could not be downloaded electronically, because for example, they are password protected and thus will need to be manually converted. If the FBI is able to

---

[3]    Sentinel is the FBI's next generation case management system. After July 1, 2012, all FBI generated records are created electronically in case files via Sentinel. Sentinel is the portal used to access records maintained in the CRS, which is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI in the course of fulfilling its integrated missions and functions as a law enforcement, counterterrorism, and intelligence agency to include performance of administrative and personnel functions. The CRS spans the entire FBI organization and encompasses the records of FBI Headquarters, FBI Field Offices, and FBI Legal Attaché Offices worldwide.

[4]    Separate files were opened on different targets in that investigation.

make those conversions, the volume will increase. Moreover, some file materials do not exist in soft copy in Sentinel but rather are maintained in physical, hard copy form in FBI storage facilities. Those materials will need to be scanned to a file type compatible with FDPS and uploaded into the system.

(13)    There are 43 more SCO files (primarily from the SCO's Russian interference investigation). Assuming an average of 45,000 pages per file, which is roughly the average between the two files that the FBI has already mostly converted, the estimated volume of records in the main and sub-files of the SCO files is **in excess of 2 million pages**. This does not include attachments or 1A files, which are discussed below.

(14)    **Attachments/Links in Serials**: Many main and sub-file serials in the two files that the FBI has mostly converted contain links to attachments. That is, within an individual serial are links to multiple attachments. In order to get any sort of reliable estimate of the volume of these records embedded within a serial, the FBI would have to follow thousands of links; then the document(s) at the end of each link would have to be downloaded, converted to a file type compatible with FDPS, associated with the pertinent serial, and imported into FDPS. Completing these steps would require substantial time and resources. The FBI has not yet begun this laborious task, but has instead devoted resources to the other activities described herein, as well as to start processing the 302s referenced in the report issued by Special Counsel Mueller and other matters. At this time, the FBI does not have an estimate of the volume of pages in these attachments.

(15)    **1As**: These files generally house a wide variety of materials, including electronic media devices (*e.g.,* CDs, DVDs, thumb drives, hard drives) containing various types of

information/data/documents, and non-media items such as handwritten notes, exhibits shown during interviews, productions in response to subpoenas, etc.

(a) Non-Media Items: Where materials were uploaded electronically into a 1A file in Sentinel as .PDFs or other file types, the FBI estimated the volume of potentially responsive pages using the same process it used with main and sub-file serials; *i.e.*, it downloaded each 1A serial from Sentinel, converted each serial into a file format compatible with FDPS (if it was not already compatible), and then imported it into FDPS. In some instances, 1A materials do not exist in soft copy in Sentinel but rather are maintained in physical, hard copy form in FBI storage facilities. Those materials will need to be scanned to a file type compatible with FDPS and uploaded into the system. The FBI is working to complete these processes for the non-media contents of 1As in the SCO files. To date, the FBI has converted non-media items in the 1As of 26 files. The current estimated volume of non-media contents in the 1As for these files is **144,415 pages**. If this total is averaged and then assumed for all SCO files in the CRS, the number of pages would be **approximately 250,000**.

(b) Media Items: To date, the FBI has identified over 2,300 pieces of media (CDs, DVDs, thumb drives, hard drives) in the 1As of the SCO files, and is working to complete a full inventory of the media items. In order to estimate the actual storage used on these media, each piece would have to be connected to an FBI computer; depending on the nature of the device and its origins, this could be as simple as an employee inserting a CD into their computer or far more complicated (*e.g.,* securing passwords for protected documents, working with proprietary encryption software, establishing all required hardware modifications, working with unknown file storage and/or operating systems). Following whatever process would need to be utilized to make the device operable/accessible, raw data would need to be extracted from each

piece and digitally converted to a desired output format (.PDF or .TIFF) before the actual volume

of page counts of data/documents on the devices can be ascertained. The FBI currently estimates

that it would take the FBI's Information Management Division's entire Digital Conversion Unit

("DCU") staff months to years to extract the data and convert all of the items.[5] However, based

on the potential storage capacity (in bytes) of the 2,300 pieces of media identified to date, the

FBI has determined that they have a combined maximum storage capacity of approximately 240

terabytes ("TBs"). For conversion purposes, 1 TB is generally estimated to equal approximately

75 million pages. Thus, the media devices in the 1As potentially contain more than **18 billion**

**pages**.

     (16)    The FBI is continuing to work on gathering, downloading, converting, and

importing records from the SCO files. What is reported above are estimates extrapolated from

the data that is currently available, and thus is subject to modification and refinement.

Nevertheless, the current estimated volume of potentially responsive records is **2,144,415 to**

**2,250,000 pages** plus the attachments to serials in main and sub-files and the contents of the

electronic devices in the 1As. As previously noted, RIDS has not completed the work to reliably

estimate the volume of records in attachments and on media devices at this time because it is

unduly burdensome and would require the diversion of significant resources for months.

### FBI's FOIA PROCESSING RESOURCES AND STANDARD PROCESSING PRACTICE

     (17)    The FBI currently employs 245 Government Information Specialists ("GISs"),

with support from 75 contractors, to process requests for FBI information under the FOIA and

---

[5] DCU is part of the Record and Information Management Section of IMD. It manages, consolidates, and operates the conversion of digitally captured (*e.g.*, photographed, scanned, microfilmed) and "digitally born" files stored on various media types to required file formats to ease accessibility and usability for investigative, administrative, FOIA, and records management purposes.

Privacy Acts and conduct classification and declassification reviews, *inter alia*.  RIDS staff are assigned to the following units:

      (a)     RIDS Front Office;

      (b)     the Classification Units ("CU"), which review and make national security classification determinations pursuant to Executive Order 13526 in response to a variety of requests, and also conduct mandatory and systematic declassification reviews;

      (c)     FOIA/Privacy Act ("FOIPA") Units, which process requests for records under the FOIA and Privacy Act;

      (d)     the FOIA Support Unit ("FSU"), which serves as RIDS's Public Information Office and provides administrative assistance and support to the other RIDS units;

      (e)     the Litigation Support Unit ("LSU"), which assists the FBI Office of General Counsel's FOIA Litigation Unit in handling all FOIPA lawsuits against the FBI or involving FBI records and information by reviewing, researching, and justifying the FBI's response to FOIPA requests, and preparing detailed declarations to support motions for summary judgment;

      (f)     the National Security Unit ("NSU"), which provides expert guidance and direction regarding FOIPA requests pertaining to national security matters, and develops and manages responses to requests for access to sensitive national security information in FBI records; and

(g)     the Work Process Unit ("WPU"), which receives and opens new FOIPA requests, initiates searches for records responsive to FOIPA requests, makes responsiveness determinations, and ensures that responsive material is scanned and imported into FDPS.[6]

(18)    With limited exceptions not relevant here, perfected FOIPA requests are worked by at least two units and multiple employees during their lifecycle.  Requests generally start in WPU; those that include classified information move to CU and may also undergo review by the NSU; once CU and NSU have completed their reviews, the requests move to a FOIPA Unit for processing; and if a request is in litigation, LSU will be involved throughout the process.[7]

(19)    RIDS's standard business practice is to review/process records in 500 page increments per month per request.  By processing and making interim responses based on 500-page work items, the FBI is able to provide more pages to more requesters, thus avoiding a system where a few large requests monopolize finite processing resources and where fewer requesters' requests are being fulfilled.[8]  By working in 500 page increments, the FBI has found that more pages get processed, reviewed, and released to more requesters each month because processors can work on 500-page work items for several requests in a month.  Also, 500-page

---

[6] Some FOIPA Units are "single station" units, and perform the intake and initial processing work (*e.g.*, searches) instead of WPU, as well as processing for FOIA exemptions.

[7] This only addresses RIDS's process.  As part of the FBI's FOIA process, subject matter experts and other stakeholders within the FBI are consulted prior to release of records, and if other agencies' records or equities are implicated, the FBI consults with those agencies and/or refers records to them for processing prior to any final decisions about release or withholding under the FOIA.

[8] The FOIA encourages agencies to develop multi-track processing with the goal of responding to more requests.  *See, e.g.*, 5 U.S.C. § 552(a)(6)(D).  As a result, the FBI has established four processing queues for small requests (1-50 pages), medium requests (51-950 pages), large requests (951-8,000 pages), and extra-large requests (more than 8,000 pages).

work items are more manageable for the subject matter experts ("SMEs") outside of RIDS who

review the materials to ensure that FBI equities are properly addressed and who juggle these

FOIPA reviews with their regularly-assigned work.[9]  Finally, it is more efficient to run required

information security protocols on FOIPA releases of 500 pages or less.  Because many FBI

records contain classified information and because all FBI records are processed on a classified

computer enclave, records can only be disclosed after being run through security software that

scans for particular information to ensure that it is not improperly disclosed.  The time required

to run security protocols and resolve any issues that may arise increases as pages are added.

### APPLICATION OF FBI'S FOIA STANDARD PROCESSING PRACTICES TO THE SCO RECORDS COLLECTION

(20)    The following is a summary of what the FBI's standard business practice would

look like as applied to the SCO files.

(a)    Given the nature of the SCO records, processing will begin in CU.  That

is, a 500-page work item will be assigned in FDPS to a GIS in CU, who will review the records

to determine whether they are classified and if so, to ensure that any classified information meets

the procedural and substantive requirements of E.O. 13526, which currently governs the

classification of information.  This is a page-by-page, line-by-line review that involves, at a

minimum, consultation with the appropriate classification guide and may also require additional

research from a variety of sources.  The CU GIS will mark classified information for redaction.

---

[9] SMEs can include special agents and intelligence analysts who worked on particular investigations; special agents, intelligence analysts, or other employees who are experts in particular operational or technical subject matters, such as cyber or foreign intelligence threats or CART examinations; and attorneys.

(b)     Once CU's review is completed, the 500-page work item will be reassigned in FDPS to a GIS in a FOIPA Unit, who will conduct another page-by-page, line-by-line review of the records to apply FOIA exemptions, redact exempt information, and reasonably segregate non-exempt information. In the context of these particular records, substantial research will likely be required during processing because of (a) the amount of information that has been publicly reported about the SCO investigation, to determine whether such reports were the result of official, documented public disclosures (which would constitute waivers of FOIA exemptions), and (b) the numerous prosecutions and various pending investigations, which must be considered to ensure that disclosure will not adversely affect them. Moreover, new official disclosures about the SCO investigation and related matters are being made on almost a daily basis through the criminal prosecutions and otherwise, which will require the processing GISs to update their research regularly and may require them to go back through records to modify previous processing decisions.

(c)     Expert GISs or Supervisory GISs in both CU and FOIPA will review the work done by the GISs in those units to ensure accuracy, consistency, and compliance with standards and processes.

(d)     Once the FOIA exemption review is completed, the 500-page work item will be converted to .PDF files and distributed to the relevant SMEs within the FBI, who will review the proposed processing by RIDS to ensure that operational equities are properly addressed.

(e)     Given the nature of the records here, the FBI anticipates that it will have to consult on all or nearly all records with various other DOJ components and Federal agencies.

The FBI generally does not receive consultation responses back in the same month that they are sent. The FBI cannot release any records until all consultation responses are received.

(f)     Once all consultation responses are received and necessary edits are incorporated, the pages proposed for release are run through security protocols in preparation for release. After making any changes identified during the security scan, the release package is prepared. If no consultations are necessary, then this process is completed after SME reviews are completed and any resulting edits to the processing are incorporated.

(21)    Given the complexities and interconnectivity of these records, RIDS has designated a specialized team whose mission is to handle all requests for SCO records and related matters, and to process SCO and SCO-related records. This team is responsible for initial processing (including searches) through the end of the processing.[10] Centralizing processing into this a single, specialized team allows this group of employees to develop a bird's eye view of all requests related to SCO records to ensure consistency in responses and avoid unnecessary duplication of efforts, and to build expertise in the records and prior processing decisions, which also leads to consistency and efficiency. It has taken many months for this team to develop expertise in responding to the wide array of interconnected SCO investigations and investigative issues. Indeed, the core of this team has been working on SCO matters since 2017, and so has had years to develop their expertise. This approach also allows the FBI to manage the number of people who have access to and are handling this sensitive group of records. The team handling SCO records requests currently has 11 GISs who are responsible for processing records (as well as handling various initial processing tasks, such as conducting searches).

---

[10] The records must still be reviewed by CU.

13

### PROCESSING ALL SCO INVESTIGATIVE RECORDS WOULD BE UNDULY BURDENSOME

(22)    Processing all SCO records under the FOIA as requested by the plaintiffs in this case presents an undue burden to the FBI, as well as other DOJ components and Federal agencies that will be responsible for responding to consultation requests or referrals.

(23)    By its nature, FOIA processing requires analysis by human beings to determine whether information is, based on content and context, exempt or non-exempt. A person – and in fact, multiple people – must read each responsive page. So, while the FBI has automated certain steps in the process, the FBI's ability to process these – or any – records under the FOIA ultimately devolves to a question of the ability of human beings to complete the work.

(24)    As stated above, the current estimated volume of potentially responsive records is **2,144,415 to 2,250,000 pages** plus the attachments to serials in main and sub-files and the contents of the electronic devices in the 1As. FBI simply cannot process this massive volume of records. And added to that number, although we are unable to accurately predict the total number of pages contained on the 2,300 media devices at this time, based on their potential storage capacity, the media devices in the 1As potentially contain more than **18 billion pages**. It is simply impossible for FBI to process that volume of records.

(25)    FBI does not have the resources to process this FOIA request. The RIDS staff must continue to process the FOIA requests received by FBI both before and after Plaintiffs' request was submitted. [11]

---

[11] Over the past five years, the FBI has experienced an 84% increase in intake of new FOIPA requests, and a 69% increase in the total number of pages pending processing (which is currently 8.3 million pages).

(26)    Processing the entirety of the SCO records collection would place additional burdens on the Classification Units, which must also review the records. CU does not have similar resources available for these reviews.[12]  Moreover, CU conducts classification reviews for a variety of purposes across the FBI, including in responding to civil and criminal discovery requests.  Realigning CU resources to classification reviews of SCO records in order to respond to plaintiffs' FOIA requests and away from other classification reviews would severely disrupt other FBI activities.

(27)    Processing the entirety of the SCO records collection would place additional burdens on the SMEs responsible for reviewing records.  SMEs, by definition, are a limited universe of employees who, based on training or experience, have a particular expertise in the subject matters, investigations, and/or records at issue.  SMEs must be available to work on numerous FOIA requests.

(28)    The FBI would need to consult with and/or refer records to other DOJ components and Federal agencies.  These other agencies likely do not have the resources necessary to handle monthly requests totaling thousands of pages for decades to come.

### CONCLUSION

(29)    For the reasons discussed above, plaintiffs' requests for all SCO records are overly broad and processing the responsive records under the FOIA and in the context of this pending litigation would pose significant undue burdens not only on the FBI but also on other agencies.

---

[12]  CU GISs are specially trained to handle classification reviews.  Accordingly, the classification reviews of SCO records would not be able to be assigned immediately to non-CU GISs.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed this ⁹ᵗʰ day of August, 2019.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia

16