# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JASON LEOPOLD and**<br>**BUZZFEED, INC.,**<br><br>    **Plaintiff,**<br><br>v.<br><br>**UNITED STATES DEPARTMENT OF**<br>**JUSTICE, <u>et al.</u>**<br><br>    **Defendants.** | |
| **CABLE NEWS NETWORK, INC.,**<br><br>    **Plaintiff,**<br><br>v.<br><br>**FEDERAL BUREAU OF INVESTIGATION,**<br><br>    **Defendant.** | **Case No: 1:19-cv-01278-RBW** |

## MEMORANDUM IN SUPPORT OF
## <u>PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ................................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND .................................................................. 3

      A.     Plaintiffs' FOIA Requests for FBI Interview Memoranda ..................................... 3

      B.     DOJ's Overreliance on Exemption 5 ...................................................................... 4

ARGUMENT .......................................................................................................................... 5

I.      FOIA REQUIRES REASONABLY FORESEEABLE HARM TO THE
INTERESTS PROTECTED BY EXEMPTION 5 .................................................................. 5

II.     DOJ IMPROPERLY RELIED ON EXEMPTION 5 TO WITHHOLD AND
REDACT RESPONSIVE INFORMATION IN ITS PRODUCTIONS TO
PLAINTIFFS ..................................................................................................................... 7

      A.     Work Product Privilege............................................................................................ 9

            1.     DOJ Waived the Attorney Work Product Privilege for
Material Officially Acknowledged in the Muller Report ......................... 10

            2.     Information Provided in Witness Proffer Statements Is Not
Attorney Work Product ............................................................................ 14

            3.     Even if DOJ Did Not Waive the Work Product Privilege, DOJ
Must Still Produce the Redacted Material Because of the
"Governmental Misconduct" Exception .................................................... 16

      B.     Deliberative Process Privilege ............................................................................... 19

      C.     Presidential Communications Privilege.................................................................. 21

CONCLUSION........................................................................................................................ 24

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abtew v. Department of Homeland Security*,
   808 F.3d 895 (D.C. Cir. 2015) ...................................................................................7

*BuzzFeed, Inc. v. DOJ*,
   2019 U.S. Dist. LEXIS 208770 (D.D.C. Dec. 4, 2019) ...........................................20

*\*Coastal States Gas Corp. v. Department of Energy*,
   617 F.2d 854 (D.C. Cir. 1980) .......................................................................18, 19, 20

*Cornucopia Inst. v. Department of Agriculture*,
   2018 U.S. Dist. LEXIS 166173 (D.D.C. Sept. 27, 2018) .........................................20

*Cottone v. Reno*,
   193 F.3d 550 (D.C. Cir. 1999) .............................................................................10, 11

*Center for Effective Government v. Department of State*,
   7 F. Supp. 3d 16 (D.D.C. 2013) ...............................................................................22

*\*Center for Investigative Reporting v. U.S. Customs & Border Protection*,
   2019 U.S. Dist. LEXIS 223077 (D.D.C. Dec. 31, 2019) ................................6, 7, 16

*\*Department of Interior v. Klamath Water Users Protective Association*,
   532 U.S. 1 (2001) .............................................................................................5, 8, 9, 19

*DOJ v. Reporters Committee for Freedom of Press*,
   489 U.S. 749 (1989) ....................................................................................................6

*Ellis v. DOJ*,
   110 F. Supp. 3d 99 (D.D.C. 2015) ...........................................................................16

*FTC v. Grolier, Inc.*,
   462 U.S. 19 (1983) ......................................................................................................8

*Gold Anti-Trust Action Committee, Inc. v. Board of Governors of the Federal
   Reserve System*,
   762 F. Supp. 2d 123 (D.D.C. 2011) .........................................................................21

*\*Judicial Watch, Inc. v. Department of Defense*,
   913 F.3d 1106 (D.C. Cir. 2019) ...............................................................................21

*Judicial Watch, Inc. v. DOJ*,
   2019 U.S. Dist. LEXIS 163473 (D.D.C. Sept. 24, 2019) ..........................................8

*Judicial Watch, Inc. v. DOJ*,
  391 F. Supp. 3d 43 (D.D.C. 2019) ................................................................8

*Judicial Watch, Inc. v. Department of Commerce*,
  375 F. Supp. 3d 93 (D.D.C. 2019) ................................................................6

*\*Mobley v. CIA*,
  806 F.3d 568 (D.C. Cir. 2015) ............................................................10, 11

*National Archives & Records Administration v. Favish*,
  541 U.S. 157 (2004) ....................................................................................5

*National Whistleblower Center v. Department of Health & Human Services*,
  849 F. Supp. 2d 13 (D.D.C. 2012) ..............................................................21

*\*Neighborhood Assistance Corp. of America v. Department of Housing and Urban Development*,
  19 F. Supp. 3d 1 (D.D.C. 2013) ..........................................................16, 17

*NLRB v. Robbins Tire & Rubber Co.*,
  437 U.S. 214 (1978) ....................................................................................5

*\*NLRB v. Sears, Roebuck & Co.*,
  421 U.S. 132 (1975) ............................................................................8, 9, 19

*Pinson v. DOJ*,
  236 F. Supp. 3d 338 (D.D.C. 2017) ............................................................5

*Playboy Enterprises Inc. v. DOJ*,
  677 F.2d 931 (D.C. Cir. 1982) ..................................................................20

*Protect Democracy Project, Inc. v. Department of Defense*,
  320 F. Supp. 3d 162 (D.D.C. 2018) ..........................................................21

*Rosenberg v. Department of Defense*,
  342 F. Supp. 3d 62 (D.D.C. 2018) ..............................................................8

*Russell v. Department of Air Force*,
  682 F.2d 1045 (D.C. Cir. 1982) ................................................................20

*In re Sealed Case*,
  121 F.3d 729 (D.C. Cir. 1997) ............................................................21, 22

*\*In re Sealed Case*,
  29 F.3d 715 (D.C. Cir. 1994) ..............................................................14, 16

*In re Sealed Case*,
  877 F.2d 976 (D.C. Cir. 1989) ..................................................................14

*Wolfe v. Department of Health & Human Services*,
    839 F.2d 768 (D.C. Cir. 1988) ........................................................................................19, 20

**Statutes**

5 U.S.C. § 552 ................................................................................................................2, 5, 6, 7

**Other Authorities**

28 C.F.R. § 600.4(a) .........................................................................................................17

162 Cong. Rec. H3717 (2016) .........................................................................................7

S. Rep. No. 114–4 (2015) ................................................................................................7

Plaintiffs Cable News Network, Inc. ("CNN"), Jason Leopold, and BuzzFeed, Inc., through counsel, hereby move this Court for partial summary judgment regarding Defendants United States Department of Justice's ("DOJ") and the Federal Bureau of Investigation's ("FBI") redactions and withholdings under Freedom of Information Act Exemption 5.

## INTRODUCTION

As the Court knows, these cases involve government records of the highest public importance: documents related to the investigation by Special Counsel Robert S. Mueller III into Russian interference with the 2016 elections, the possible involvement of officials with President Donald Trump's campaign in that interference, and the President's possible obstruction of justice during the course of the investigation. Over more than eighteen months, the Special Counsel's Office interviewed hundreds of witnesses, generating more than 1,000 interviews memorialized in FBI interview reports called FD-302 forms.

In March 2019, the Special Counsel's Office released its report summarizing the findings of its investigation. ("Mueller Report"). That same month, reporters at BuzzFeed, Inc. and CNN filed Freedom of Information Act ("FOIA") requests with DOJ seeking access to records related to the Special Counsel's investigation, including the 302 forms recording the information provided by witnesses in the probe.

The Special Counsel investigation is unique in the history of modern America, spawning criminal investigations in several jurisdictions, including the federal criminal prosecutions of the chairman of the Trump campaign and his top deputy, President Trump's first National Security Adviser, Trump's former personal attorney, others more peripherally involved in the Trump campaign, and Russian nationals involved in its intelligence agencies' attacks on our democracy. The investigation led, in part, to only the third impeachment of a U.S. President, and, in turn, to

the ongoing impeachment trial of President Trump before the U.S. Senate.  And yet, many of the details surrounding the Special Counsel's investigation remain hidden through various assertions of privilege and the White House's refusal to cooperate with the ongoing impeachment inquiry.

Journalists, including Plaintiffs, have used FOIA to attempt to pierce that veil of government secrecy – the very purpose for which the statute was enacted more than 50 years ago.  Still, those journalists, in what seems to be an increasingly routine course of business, must petition the courts to release information owed them under the terms of FOIA.

These cases are another example of the difficulties the public faces in vindicating the right to government information under FOIA.  In their productions to date to Plaintiffs, DOJ and FBI entirely withheld nearly 40 percent of the responsive material, and heavily redacted nearly 75 percent of the remaining pages.  The agencies justify their secrecy by relying most heavily on Exemption 5 to FOIA – a discretionary exemption – which protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).

Plaintiffs carefully reviewed the productions, and much of the justification for the massive invocation of Exemption 5 appears, to put it bluntly, highly suspicious.  The agencies claim to have relied on the attorney work product privilege, deliberative process privilege, and presidential communications privilege to withhold factual information that has already been made public in the Mueller Report and in open court proceedings or offered by witnesses pursuant to proffer agreements.  This factual information details the activities of President Trump and his campaign, associates and administration, including much that suggests evidence of extreme government misconduct.

Such reliance on Exemption 5 cannot be allowed to stand.  And, given the historic importance of the impeachment inquiry and rapidly approaching Presidential election, the American public's need for this information could not be greater.  For the reasons articulated below, Plaintiffs respectfully urge this Court to uphold the purpose of FOIA so that the public may review the information for themselves, check against corruption, and hold the highest levels of government accountable.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  Plaintiffs' FOIA Requests for FBI Interview Memoranda

Plaintiffs in this action each filed FOIA requests seeking materials related to Special Counsel Robert Muller's investigation of Russian interference in the 2016 Presidential election, whether anyone from President Trump's campaign was involved, and whether the President obstructed justice related to the investigation.  On March 21, 2019, BuzzFeed Inc. and reporter Jason Leopold submitted a FOIA request to DOJ seeking, in part, FBI interview memoranda and related materials.  On March 26, 2019, CNN Reporter Katelyn Polantz submitted a FOIA request to DOJ seeking copies of "FBI memoranda, such as 302s, from any and all of the interviews of the 'approximately 500 witnesses' in the Mueller investigation," as well as "any and all case files" related to those interviews.

Having received no response from the FBI, Plaintiffs filed separate lawsuits seeking release of materials responsive to their requests.  *See* Compl., Case No. 1:10-cv-01278 (May 2, 2019), Dkt. 1 (BuzzFeed and Leopold complaint); Compl., Case No. 1:19-cv-01626 (June 4, 2019), Dkt. 1 (CNN complaint).

On October 3, 2019, this Court consolidated these matters to the extent Plaintiffs sought FBI 302 forms related to the Special Counsel's investigation.  *See* Order, Case No. 1:10-cv-

01278-RBW (Oct. 3, 2019), Dkt. 33.  This Court further ordered that, beginning on or before November 1, 2019, DOJ process at least 500 pages of "records responsive to the plaintiffs' request for FBI FD-302 forms" and produce to Plaintiffs, "on the 1st day of every month . . . the non-exempt portions of all responsive records."  *Id.*  At the January 30, 2020 status conference, the Court ordered DOJ to begin processing responsive materials at an increased rate of at least 800 pages per month, beginning with the March 1, 2020 production.

### B. DOJ's Overreliance on Exemption 5

Beginning with its November 2, 2019 production and continuing through its January 17, 2020 production, DOJ has processed – at the Court's direction – 1,661 pages responsive to Plaintiffs' FOIA requests and has produced to Plaintiffs 1,015 pages of material.  Thus far, DOJ has only produced approximately 100 302s for roughly 42 witnesses – a fraction of the more than 1,000 302s generated from approximately 500 witnesses interviewed in the Special Counsel's investigation.[1]

Of all the pages processed, DOJ withheld in their entirety 646 pages of responsive materials, including 396 pages, withheld at least in part, pursuant to Exemption 5.  These 396 pages represent more than 60 percent of all pages withheld and nearly 24 percent of the total pages processed as of the January 17, 2020 production.  Of the pages produced, roughly 74 percent contain at least some redactions pursuant to Exemption 5, the majority of which are heavily, or entirely, redacted pursuant to that exemption.

---

[1] Although DOJ produced, pursuant to this Court's order (Dkt. 47), a list of the witnesses interviewed as part of the Special Counsel's investigation, DOJ withheld the names for roughly two-thirds of the total universe of 302s, making it impossible for Plaintiffs to deduce the total number of witnesses interviewed by the Special Counsel's office.  Plaintiffs therefore rely on the Special Counsel's Report, which notes that investigators "interviewed approximately 500 witnesses."  *See* 1 Mueller Report at 13.

At the current Court-ordered rate of 800 pages per month, Plaintiffs anticipate that DOJ will complete the processing and production of the 302 forms no later than August 1, 2020.[2]

## ARGUMENT

## I.   FOIA REQUIRES REASONABLY FORESEEABLE HARM TO THE INTERESTS PROTECTED BY EXEMPTION 5

The Freedom of Information Act ("FOIA") requires federal agencies to make agency records promptly available to any member of the public upon request, unless those records fall within one of nine narrowly construed exemptions.  5 U.S.C. § 552(a)(3), (b).  As the Supreme Court explained, because it provides "a means for citizens to know 'what the Government is up to,'" FOIA represents "a structural necessity in a real democracy."  *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171-72 (2004) (citation omitted).  Exemption 5 and most other FOIA exemptions are discretionary, meaning that agencies can withhold information if they choose but are not required to do so.  *Pinson v. DOJ*, 236 F. Supp. 3d 338, 359 (D.D.C. 2017).

None of these exemptions alters the basic purpose of FOIA, which is "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."  *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).  Nor do these exemptions "obscure the basic policy that disclosure, not secrecy, is the dominant objective of [FOIA]."  *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 7-8 (2001).  An agency withholding material bears the

_____

[2] Plaintiffs estimate that after today's production of 500 responsive pages, approximately 4,200 pages with remain for DOJ to process and produce.  Following the parties' January 23, 2020 court-mandated meet-and-confer, Plaintiffs provided to DOJ a list of twenty-two 302s included on DOJ's January 3 list of interviewees that appear to be duplicate entries.  These forms total 222 pages.  If these 302s are, as Plaintiffs suspect, duplicate entries, Plaintiffs expect that DOJ will not produce duplicates and complete the processing and production of all 302 forms by its July 1, 2020 production.

burden "to sustain its action," and courts are directed to "determine the matter de novo." *DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 755 & n.6 (1989) (internal quotations omitted).

In 2016, Congress passed the FOIA Improvement Act, which placed an additional burden on agencies when withholding information subject to a discretionary exemption like Exemption 5. The Act provided that an agency may only withhold information if "(I) the agency reasonably foresees that disclosure would harm an interest protected by an exemption . . . or (II) disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i). In passing this Act, "Congress was especially concerned about agencies' reliance on Exemption 5 and the deliberative process privilege." *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 2019 U.S. Dist. LEXIS 223077, at *20 (D.D.C. Dec. 31, 2019) (denying the government's withholdings for failing to meet the increased burden under Exemption 5). This was "based on the recognition that 'from the beginning, agencies have taken advantage of these exemptions to withhold any information that might technically fit.'" *Judicial Watch, Inc. v. Dep't of Commerce*, 375 F. Supp. 3d 93, 100 (D.D.C. 2019) (quoting 162 Cong. Rec. H3714-01, H3717162 (2016) (noting that although some agencies "have made an effort to comply with the letter of the law, very few have complied with the spirit of the law")).

"Foreseeable harm," as the court in *Center for Investigative Reporting* said, "imposes an independent and meaningful burden on agencies," and requires agencies to "identify specific harms to the relevant protected interests that it can reasonably foresee would actually ensue from disclosure of the withheld materials and connect the harms in a meaningful way to the information withheld." 2019 U.S. Dist. LEXIS 223077, at *23-24 (internal marks and quotations omitted). "Boiler plate language," for example, will not satisfy the foreseeable harm standard.

*Id*. at *25.  Similarly, the Senate Report for the bill explains that "mere speculative or abstract fears . . . are an insufficient basis for withholding information."  S. Rep. No. 114–4, at 8 (2015) (internal marks omitted).  And in the House, Republican Rep. Mark Meadows said that "[u]nder the presumption of openness, agencies may no longer withhold information that is embarrassing or could possibly paint the agency in a negative light simply because an exemption may technically apply.  This will go a long way toward getting rid of the withhold-it-because-you-want-to exemption."  162 Cong. Rec. H3717 (2016).

For the reasons below, DOJ's Exemption 5 redactions and withholdings to date are outside of the exemption's narrow scope and do not protect any reasonably foreseeable harm to the interests protected by Exemption 5.

## II.    DOJ IMPROPERLY RELIED ON EXEMPTION 5 TO WITHHOLD AND REDACT RESPONSIVE INFORMATION IN ITS PRODUCTIONS TO PLAINTIFFS

Exemption 5 is one of the FOIA's most over-used and abused exemptions.  By statute, Exemption 5 provides a discretionary exemption for "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  Courts have interpreted it to include traditional civil litigation privileges including attorney-client communications, attorney work product, the deliberative process privilege, the state secrets privilege and executive privilege. *See, e.g.*, *Abtew v. Dep't of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015).  But Exemption 5 does not simply provide a blanket exemption.  Instead, in order to withhold a document under Exemption 5, the government must demonstrate that the document satisfies two conditions: "[1] its source must be a Government agency, and [2] it must fall within the ambit of a privilege

against discovery under judicial standards that would govern litigation against the agency that holds it." *Klamath*, 532 U.S. at 8.

Because Exemption 5 is a "discretionary" exemption, DOJ must demonstrate that disclosure will foreseeably harm the interest protected by the specific privilege claimed. *See Rosenberg v. Dep't of Def.*, 342 F. Supp. 3d 62, 77 (D.D.C. 2018). And where, as here, DOJ withholds entire documents, or particular pieces of information in a document, under Exemption 5, DOJ must justify each invocation of the exemption. *See Judicial Watch, Inc. v. DOJ*, 2019 U.S. Dist. LEXIS 163473, at *20 (D.D.C. Sept. 24, 2019) (stating that where DOJ withheld individual entries on the basis of work product, and "[b]ecause each entry differs in its subject matter and DOJ invokes the privilege as to each withheld entry, DOJ must provide enough information for the Court to evaluate whether each of the withheld summaries was appropriately withheld as attorney work product.").

Congress intended Exemption 5 to be "as narrow as is consistent with efficient Government operation." *FTC v. Grolier, Inc.*, 462 U.S. 19, 23 (1983) (internal marks omitted); *see also Klamath*, 532 U.S. at 9 (the "point" of Exemption 5 "is not to protect Government secrecy pure and simple"). FOIA requesters are to receive information that would be routinely disclosed in litigation. *See, e.g.*, *NLRB v. Sears, Roebuck & Co. ("NLRB")*, 421 U.S. 132, 148-49 (1975) ("[S]ince the Act clearly intended to give any member of the public as much right to disclosure as one with a special interest therein, it is reasonable to construe Exemption 5 to exempt those documents, and only those documents, normally privileged in the civil discovery context.") (citations omitted); *see also Judicial Watch, Inc. v. DOJ*, 391 F. Supp. 3d 43, 49-50 (D.D.C. 2019).

In this action, DOJ represented to Plaintiffs that it withheld material from its productions based on Exemption 5's protection of (1) attorney work product; (2) deliberative process privilege, and (3) presidential communications privilege.  *See* Email from Courtney D. Enlow to Matt Topic, *et al.*, Attachment 2020.1.13 List of b5 Withholdings, Jan. 13, 2020 (Attached as Exhibit A).[3]  Within each of these claimed privileges, DOJ impermissibly withheld responsive materials.

### A.  Work Product Privilege

The work product privilege protects "memoranda prepared by an attorney in contemplation of litigation which set forth the attorney's theory of the case and his litigation strategy."  *NLRB*, 421 U.S. at 154.  Congress intended this narrow exemption to protect the mental impressions of lawyers.  *See Klamath*, 532 U.S. at 8 ("Work product protects 'mental processes of the attorney." (quoting *United States v. Nobles*, 422 U.S. 225, 238 (1975)).

DOJ represented that twelve of the 302s produced to Plaintiffs contain Exemption 5 redactions based exclusively on claims of work product.  *See* Exhibit A.  Exemption 5 redactions in another twenty 302s were premised in part on the work product privilege.  *Id*.  (DOJ also redacted these twenty 302s on the basis of presidential communications privilege and deliberative process privilege).  As with all of the records at issue here, these 302s detail the factual information from witnesses whom government agents interviewed as part of the Special Counsel's investigation.

---

[3] DOJ provided this list before its January 17, 2020 production.  Because of that, Plaintiffs do not specifically address the 302s produced on January 17 in this brief.  Plaintiffs anticipate, however, addressing the January 17 production in their reply brief.

Plaintiffs reviewed eight reports redacted under the work product privilege.[4]  DOJ, however, waived that privilege with respect to much of these redactions, either because: (1) DOJ officially acknowledged the information in other contexts or (2) a witness provided the material to government agents pursuant to a proffer agreement.  In the event the Court determines DOJ did not waive this privilege, DOJ must still disclose the information because it provides evidence of extreme governmental misconduct.  Particularly in light of the burden DOJ carries to articulate a reasonably foreseeable harm in order to justify withholding this information, the Court should order DOJ to reprocess and produce these materials.  No foreseeable harm can exist in disclosing information that is already public, voluntarily disclosed or reflects extreme government misconduct.

1. **DOJ Waived the Attorney Work Product Privilege for Material Officially Acknowledged in the Mueller Report**

"When information has been 'officially acknowledged,' its disclosure may be compelled even over an agency's otherwise valid exemption claim."  *Mobley v. CIA*, 806 F.3d 568, 583 (D.C. Cir. 2015) (internal quotation omitted); *see also Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999) ("Under our public-domain doctrine, materials normally immunized from disclosure under FOIA lose their protective cloak once disclosed and preserved in a permanent public record.").

In determining whether an agency officially acknowledged information responsive to a FOIA request, courts employ a three-part test: "(1) the information requested must be as specific

---

[4] Yet another discrepancy in the government's productions: Although DOJ represented that it produced twelve 302 forms that the FBI redacted exclusively pursuant to the work product privilege, Plaintiffs have not received four of these 302 forms.  The missing 302s include two interviews of Richard Gerson, a New York hedge fund manager and associate of Jared Kushner, and two additional interviewees whose names DOJ withheld.

as the information previously released; (2) the information requested must match the information previously disclosed, and (3) the information requested must already have been made public through an official and documented disclosure." *Mobley*, 806 F.3d at 583 (internal quotation omitted). Plaintiffs bear the initial burden to show that the material sought was officially acknowledged. *See Cottone*, 193 F.3d at 556. But once Plaintiffs meet that burden, "it is up to the government, if it so chooses, to rebut the plaintiff's proof by demonstrating that the specific . . . records identified have since been . . . removed from the public domain." *Id*.

The Mueller Report cites material from seven of the eight 302s redacted exclusively pursuant to work product – and <u>nearly all of the material cited in the Report is redacted from the records provided to Plaintiffs</u>.[5] The material cited in the Mueller Report includes substantial information about the dealings between the Trump Organization and the Trump Administration, and Russian business and government officials. It also includes extensive information about the Trump Tower Moscow project and the June 9, 2016 meeting at Trump Tower between Donald Trump Jr., Paul Manafort, and Russian lawyer Natalia Veselnitskaya regarding supposed "dirt" on Hillary Clinton. The Mueller Report also discusses relationships between individuals in the Trump orbit and Russian contacts regarding U.S.-Russian relations. The following is a non-exhaustive list of some of the key, substantive information the DOJ improperly redacted from these forms[6]:

---

[5] The eighth 302, in which every line was redacted, is for John Mashburn, a Trump Administration official and former policy director to the Trump Campaign. Although the Mueller Report did not cite this 302, for reasons discussed below, these withholdings are still improper. *See infra* Part (A)(2).

[6] Plaintiffs reviewed all 302s that contain Exemption 5 redactions for productions through January 2, 2020. For completeness, and ease of the Court's consideration, Plaintiffs have attached a spreadsheet detailing each found instance of material that is redacted from these 302s but is cited in the Mueller Report. *See* Exhibit B.

- Dimitri Simes, president and chief executive officer of Center for the National Interest (CNI), March 8, 2018 interview: Simes spoke with Jared Kushner about CNI "hosting a foreign policy speech by candidate Trump" and agreed to provide behind-the-scenes input on the substance of the speech. *See* 1 Mueller Report at 105 (citing Simes at 7, 8-11). On the day of the speech, Simes witnessed a meeting between Trump and Sergey Kislyak, then the Russian ambassador to the United States. *Id*. at 106 (citing Simes at 21). Following the April 2016 speech and the presidential election, Simes and Kushner had "both in-person meetings and phone conversations." *Id.* at 108 (citing Simes at 27). During an August 17, 2016 meeting, "Simes provided Kushner the Clinton-related information that he had promised." *Id*. at 109 (citing Simes at 29-30). Attached as Ex. C.

- Dimitri Simes, March 27, 2018 interview: Richard Burt, a former U.S. ambassador on CNI's board, asked Simes "if he could arrange a meeting with Kushner to discuss setting up a high-level communications channel between Putin and the incoming Administration. Simes told the Office that he declined and stated to Burt that setting up such a channel was not a good idea in light of the media attention surrounding Russian influence in the U.S. presidential election. According to Simes, he understood that Burt was seeking a secret channel." 1 Mueller Report at 164 (citing Simes at 4, 5). Attached as Ex. D.

- Roman Beniaminov, Russian real estate developer who worked with Aras Agalarov, January 6, 2018 interview: a publicist for Emin Agalarov, Robert Goldstone, "facilitated the ongoing contact between Trumps and the Agalarovs— including an invitation that Trump sent to Putin to attend the 2013 Miss Universe Pageant in Moscow." *See* 1 Mueller Report at 111 (citing Beniaminov at 3). Attached as Ex. E.

- Ike Thomas Kaveladze, vice president of Russian development company Crocus Group and Aras Agalarov's deputy in the United States, November 16, 2017 interview: detailed how "Donald J. Trump, Jr. served as the primary negotiator on behalf of the Trump Organization" for the Trump Tower Moscow project, Mueller Report at 67 (citing Kaveladze at 2, 4-6); how the "relationship continued over time, as the parties pursued the Trump Moscow project in 2013-2014 and exchanged gifts and letters in 2016," *id*. at 111 (citing Kaveladze at 5-6); and about how, at a lunch before the June 9, 2016 meeting at Trump Tower, Russian attorney Natalia "Veselnitskaya showed Akhmetshin a document alleging financial misconduct by Bill Browder and the Ziff brothers (Americans with business in Russia), and those individuals subsequently making political donations to the DNC," *id*. at 117 (citing Kaveladze at 7). Attached as Ex. F.

- Giorgi Rtskhiladze, businessman involved with Michael Cohen and the Trump Tower Moscow project, May 10, 2018 interview: told investigators that he spoke with Cohen because "Rtskhiladze had pursued business ventures in Moscow, including a licensing deal with the Agalarov-owned Crocus group." 1 Mueller Report at 70 (citing Rtskhiladze at 1). Attached as Ex. G.

The Mueller Report even cites two interviews with Richard Gerson – which DOJ withheld in their entirety from the January 2, 2020 production – a combined 17 times:

- Richard Gerson, June 5, 2018 interview: In "late November 2016, the UAE national security advisor introduced [Kirill] Dmitriev to Rick Gerson, a friend of Jared Kushner who runs a hedge fund in New York." *See* 1 Mueller Report at 156 (citing Gerson at 1, 3); Dmitriev asked Gerson "who he should meet with in the incoming Administration" to talk about "improved economic cooperation between the United States and Russia." *Id*. at 157 (citing Gerson at 3). Gerson and Dmitriev worked on a "U.S.-Russia reconciliation" plan that Gerson gave to Kushner. *Id*. at 158 (citing Gerson 6/5/18 at 3; Gerson 6/15/18 at 2). Kushner told Gerson "he would get it to the right people." *Id*. at 158 (citing Gerson at 3).

- Richard Gerson, June 15, 2018 interview: Dmitriev told Gerson that he had been "tasked by Putin to develop and execute a reconciliation plan between the United States and Russia," 1 Mueller Report at 157 (citing Gerson at 1); Gerson told Dmitriev that he gave the reconciliation plan to Kushner, *id*. at 158 (citing Gerson at 2).

The Special Counsel's Office acted at the direction of DOJ. *See* Special Counsel Appointment. The Mueller Report is thus DOJ's official acknowledgment of all the information it contains. As the prior examples show, DOJ improperly withheld and redacted extensive information that it previously officially acknowledged. On this record, the withholding of information exceeds the narrow protection afforded by Exemption 5, and it certainly will not protect against any foreseeable harm. The Court should order DOJ to reprocess the 302 forms provided to Plaintiffs thus far and process 302s on a going-forward basis under the narrow strictures of the exemption.[7]

---

[7] DOJ's presentations at the various criminal trials stemming from the Special Counsel's investigation also represent official acknowledgements of information contained in the 302s at issue. DOJ should be directed to provide this information as well.

**2. Information Provided in Witness Proffer Statements Is Not Attorney Work Product**

Of the eight 302s that DOJ purportedly redacted for attorney work product, four reflect information provided to investigators pursuant to a proffer agreement, including those for John Mashburn, Felix Sater and Dimitri Simes.  Factual information provided by a witness under a proffer agreement cannot constitute the work product of a <u>government</u> attorney, since by definition that information came from the witness, not the attorney.

Moreover, when entering into a proffer agreement and disclosing information to investigators, witnesses waive any privilege that might exist in the information provided.  *See In re Sealed Case*, 877 F.2d 976, 980 (D.C. Cir. 1989).  This waiver "extends to all other communications relating to the same subject matter."  *In re Sealed Case*, 29 F.3d 715, 719 (D.C. Cir. 1994).

Although DOJ has not produced to Plaintiffs these specific proffer agreements,[8] DOJ previously produced two other proffer agreements for Steve Bannon and Michael Cohen, which are identical in terms of the scope of the agreement and the commitments the government made in exchange for the witness's testimony.  *See* Bannon Proffer, Jan. 18, 2019, attached as Exhibit H; *see also* Cohen Proffer, Aug. 6, 2018, attached as Exhibit I.  The Court reasonably can conclude that the proffers entered into by Mashburn, Sater and Simes also contain similar, if not identical, provisions.

These proffer agreements make clear that the witnesses knew they were waiving any privilege they may have had in the material.  The agreements include language that allows the government to "make derivative use of any statements" of the witnesses, or information provided

---

[8] DOJ provided these 302s to Plaintiffs in the January 2 production, which was the first production that prioritized production of the 302 forms over related materials.

by them, during the meeting; states that the witnesses "knowingly and voluntarily" waived any

right they may have had "under Fed. R. Evid. 410, Fed. R. Crim. P. 11(f), or otherwise, to

prohibit the use against Client of statements made or information provided during the meeting";

and permits the government to "disclose the fact of the meeting or the information provided by

Client during the meeting to the extent the government determines in its sole discretion that

disclosure would be in furtherance of its discharge of its duties and responsibilities or is

otherwise required by law."  See Ex. H, at Bates # 635, (4), (6) and (9); see Ex. I, at Bates # 502,

(4) (6) and (9).

Despite these waivers, nearly every line of these four 302s is redacted:

- Every line of the six-page 302 reflecting an interview with John Mashburn, a
  Trump Administration official and former policy director to the Trump
  Campaign, is redacted under Exemption 5, even though the 302 says Mashburn
  "signed the attached proffer letter and then provided the following information."
  *See* Mashburn 8/2/18 302 at 1.  Attached as Ex. J.

- In the 20-page 302 reflecting the 3/27/2018 interview with Dimitri Simes, only
  five lines of text are visible.  The rest of the 20 pages are redacted almost
  exclusively under Exemption 5, even though the 302 also begins by noting that
  "in the presence of his attorneys, Simes executed the proffer agreement,
  whereupon he provided the following information."  *See* Ex. D at 1; *see also* Ex.
  C at 1 (nearly every line of Simes' 3/8/2018 302 is redacted pursuant to
  Exemption 5, and again, Simes provided the information pursuant to a proffer
  agreement).

- The eight-page 302 reflecting a 9/19/2017 interview with Felix Sater begins by
  noting that Sater received a proffer letter, reviewed it, signed it, and then provided
  information in the 302.  Only four lines of text are visible.  Sater 9/19/2017 302 at
  1.  Attached as Ex. K.

Put simply, information provided to investigators pursuant to a proffer agreement does

not reflect the attorney work product of those investigators.  Further, the witness waived any

privilege that may have existed when the witness signed the proffer agreement.  DOJ cannot now

redact this material under a claimed work product privilege.  Nor can DOJ claim that, despite the

witnesses' acknowledgment that DOJ could disclose the information in furtherance of its

obligations under the law, concealing this information protects against any "relevant protected interests" of the witnesses. *See Ctr. for Investigative Reporting*, 2019 U.S. Dist. LEXIS 223077, at *23-24.

DOJ has, therefore, improperly redacted information that it officially acknowledged and/or received from witnesses pursuant to proffer agreements. However, the inquiry is not complete, even if DOJ reprocesses these specific 302s, because waiver "extends to all other communications relating to the same subject matter." *In re Sealed Case*, 29 F.3d at 719. Therefore, to the extent other 302s and related materials yet to be processed address the same information, no attorney work product privilege exists over that information, and the material must be produced to Plaintiffs.

### 3. Even if DOJ Did Not Waive the Work Product Privilege, DOJ Must Still Produce the Redacted Material Because of the "Governmental Misconduct" Exception

In certain circumstances, information that the government could otherwise withhold under Exemption 5 loses its protection because of the "government misconduct exception." The type of government misconduct that will void Exemption 5 "must be severe enough to qualify as nefarious or extreme government wrongdoing." *Neighborhood Assistance Corp. of Am. v. Dep't of Housing and Urban Devel.*, 19 F. Supp. 3d 1, 14 (D.D.C. 2013); *see also Ellis v. DOJ*, 110 F. Supp. 3d 99, 110 (D.D.C. 2015) (noting that while the "government-misconduct exception" has been traditionally applied to the deliberative process privilege, if the exception applies in the work product privilege context, it should be invoked "in cases of extreme government wrongdoing").

Another court in this district highlighted examples of "extreme government wrongdoing" including documents related to (1) "misuse of a government personnel file to discredit a witness in an ongoing investigation of the Clinton administration," (2) a "recommendation to use the

powers of the IRS in a discriminatory fashion against 'enemies' of the Nixon administration,"
and (3) "unlawful discrimination against non-liturgical chaplains—the core issue of the dispute."
*Neighborhood Assistance Corp. of Am.*, 19 F. Supp. 3d at 14.

The details recounted in these 302s concern allegations of the most extreme government
misconduct and go to the very heart of the Special Counsel's Office charge to investigate "(i) any
links and/or coordination between the Russian government and individuals associated with the
campaign of President Donald Trump, and (ii) any matters that arose or may arise directly from
the investigation; and (iii) any other matters within the scope of 28 C.F.R. § 600.4(a)," which
includes the authority to "prosecute federal crimes committed in the course of, and with intent to
interfere with, the Special Counsel's investigation, such as perjury, obstruction of justice,
destruction of evidence, and intimidation of witnesses."  Special Counsel Appointment; 28
C.F.R. § 600.4(a).

As detailed above, much of the withheld information officially acknowledged in the
Mueller Report relates specifically to the Trump Tower Moscow project and the June 9, 2016
Trump Tower meeting.  These events are at the center not only of the Special Counsel's
investigation, but also Congress's inquiries into President Trump's Administration, its ties to
Russia, and the ongoing impeachment inquiry (which, given DOJ's pace of production will
likely conclude before DOJ completes production of the 302 forms, and will certainly conclude
before DOJ completes production of the related materials that are also responsive to Plaintiffs'
requests).

Indeed, one possible instance of obstruction of justice cited in the Mueller Report is
President Trump's efforts to prevent disclosure of emails about the June 9, 2016 Trump Tower

meeting and his role in creating misleading public statements about that meeting.  *See* 2 Muller

Report at 98-107.

　　　Plaintiffs are also especially concerned by DOJ's pattern of redacting negative

information while disclosing to Plaintiffs information favorable or benign to the Trump

Administration.  For example:

- In the 302 form for the Rtskhiladze interview, the only information visible in the entire seven-page 302 is beneficial to President Trump: "[redacted] a salacious tape regarding Donald Trump. On the same day [redacted] says they're fake. After hearing this, Rtzkhiladze did not contact Cohen to tell him [redacted] believed they were fake."  *See* Ex. G at 7.  As noted above, the Muller Report shows that this interview details Rtskhiladze's contacts with President Trump's personal lawyer regarding the Trump Tower Moscow project.

- In the 302 form for the Simes 3/8/2018 interview, Plaintiffs received benign details about an April 2016 foreign policy speech by Trump, *see* Ex. C at 12-13, but were denied material concerning CNI's behind-the-scenes input and logistics help on the speech, various communications between Simes and Jared Kushner, Simes' providing Clinton-related information to Kushner, and Donald Trump meeting then-Russian Ambassador Kislyak.

- In the 302 form for the Simes 3/27/2018 interview, Plaintiffs could see that "the last thing Simes wanted was for CNI to be seen as an intermediary between the Russian government and a U.S. Presidential administration," *see* Ex. D at 5, but DOJ redacted information that former U.S. ambassador Richard Burt approached Simes about setting up a meeting with Kushner to arrange for high-level communications between Putin and the Trump Administration, and that Simes thought Burt wanted a secret back channel.  Plaintiffs also did not receive details about a meeting between Simes and Kushner on August 17, 2016 when Simes provided Kushner information related to Clinton.

　　　Selective disclosures of favorable information to a government official is plainly

unlawful under FOIA.  The attorney work product privilege "is not to protect any interest of the

attorney, who is no more entitled to privacy or protection than any other person, but to protect

the adversary trial process itself."  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854,

864 (D.C. Cir. 1980).  When the government withholds material  pursuant to this privilege that it

previously officially acknowledged, obtained through proffer agreements, and/or concerns

allegations of extreme governmental misconduct, it would be a perversion of the purpose of FOIA to permit the government to conceal that information from the public.  Hiding this information from the American public protects against no relevant harms.

### B.  Deliberative Process Privilege

Exemption 5 also permits an agency to withhold records subject to the deliberative process privilege, which is intended to protect the integrity of the federal government's decision-making process.  *NLRB*, 421 U.S. at 150-51; *Wolfe v. Dep't of Health & Human Servs.*, 839 F.2d 768, 773-74 (D.C. Cir. 1988).  To qualify for the deliberative process privilege, the material at issue must be both "predecisional and deliberative," meaning that it must have been "generated before the adoption of an agency policy" and "reflect[] the give-and-take of the consultative process."  *Coastal States*, 617 F.2d at 866.  Like all FOIA exemptions, the agency has the burden of proving the exemption applies, and courts must give Exemption 5 a narrow scope, keeping in mind "the basic policy that disclosure, not secrecy, is the dominant objective of" FOIA. *Klamath*, 532 U.S. at 7-8 (internal marks omitted); *Coastal States*, 617 F.2d at 868 (Exemption 5 "is to be applied 'as narrowly as consistent with efficient Government operation.'" (citation omitted)).

Here, DOJ redacted 27 responsive 302 reports in part because of the deliberative process privilege.  *See* Ex. A (DOJ list of Exemption 5 withholdings).[9]  But DOJ cannot meet its burden to show that the 302 reports are "deliberative," because they do not contain any analysis, suggestions, or recommendations regarding any governmental decision.  Instead, they record the

---

[9] As with the 302s redacted pursuant to work product, DOJ has not yet produced to Plaintiffs three of the 302s that it claims to have redacted in part pursuant to the deliberative process privilege.  These missing 302s include one for Jared Kushner, reflecting the interview on 4/11/2018, and two 302s for individuals whose names DOJ withheld from Plaintiffs.

factual statements of third-party witnesses, not government employees.  In other words, they do not "reflect[] the give-and-take of the consultative process."  *Coastal States*, 617 F.2d at 866.

It is well settled that "agency communications containing purely factual material are generally not protected by" the deliberative process privilege.  *Russell v. Dep't of Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982).  Thus, "Exemption 5 disputes can often be resolved by the simple test that factual material must be disclosed but advice and recommendations may be withheld."  *Wolfe*, 839 F.2d at 774.  Moreover, "a report does not become a part of the deliberative process merely because it contains only those facts which the person making the report thinks material," so the general rule is that "compilations of facts, devoid of any conclusions, recommendations, opinions or advice" cannot be withheld.  *Playboy Enters. Inc. v. DOJ*, 677 F.2d 931, 935-36 (D.C. Cir. 1982).

Here, the FBI 302 reports at issue are factual accounts of what each interviewee said during questioning.  They do not reflect any analysis or recommendations of agents or prosecutors regarding the information provided.  The 302 reports consist of "'raw facts with informational value in their own rights,' not those that 'serve primarily to reveal the 'evaluative' process by which different members of the decision-making chain arrive at their conclusions and what those pre-decisional conclusions are.'"  *BuzzFeed, Inc. v. DOJ*, 2019 U.S. Dist. LEXIS 208770, at *13 (D.D.C. Dec. 4, 2019) (citation omitted) (noting that "the mere collection of facts does not constitute a privileged decision.").  Accordingly, courts in this Circuit have repeatedly held that the government may not withhold under Exemption 5 factual compilations such as narrative accounts of witness interviews even if the agency compiled the facts as part of its process to determine whether to file criminal charges or impose administrative sanctions.  *See, e.g.*, *Cornucopia Inst. v. Dep't of Agric.*, 2018 U.S. Dist. LEXIS 166173, at *18-19 (D.D.C. Sept.

27, 2018) (photographs taken to aid agency in evaluating compliance with its regulations were not deliberative); *Nat'l Whistleblower Ctr. v. Dep't of Health & Human Servs.*, 849 F. Supp. 2d 13, 38 (D.D.C. 2012) ("handwritten notes describing a meeting, phone call, or interview" by HHS Office of Inspector General agents were not deliberative); *Gold Anti-Trust Action Comm., Inc. v. Bd. of Governors of the Federal Reserve Sys.*, 762 F. Supp. 2d 123, 137 (D.D.C. 2011) (staffer's meeting notes "detailing what each of the participants said" were not deliberative).

Additionally, information that appeared in the Mueller Report or that has been otherwise officially acknowledged by the government cannot be withheld under the deliberative process privilege. *Protect Democracy Project, Inc. v. Dep't of Def.*, 320 F. Supp. 3d 162, 177 (D.D.C. 2018).

### C. Presidential Communications Privilege

DOJ also claimed the presidential communications privilege under Exemption 5 for information redacted in the same twenty-seven 302s that it redacted pursuant to the deliberative process privilege. The presidential communications privilege applies only to communications among the President or his close advisors in aid of a decision to be made by the President. *Judicial Watch, Inc. v. Dep't of Def.*, 913 F.3d 1106, 1113-14 (D.C. Cir. 2019). Further, "the presidential communications privilege should be construed as narrowly as is consistent with ensuring that the confidentiality of the President's decision-making process is adequately protected." *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997). "[N]o court has suggested that the mere fact that a President's direct involvement in a communication, either as an author

or a recipient, renders it automatically protected." *Ctr. for Effective Gov't v. Dep't of State*, 7 F.

Supp. 3d 16, 28 (D.D.C. 2013).

The government can make no credible claim that information collected by a Special

Counsel's office – <u>during an investigation of the President</u> – is subject to the privilege designed

to help the President make decisions.  While the government has yet to provide any tangible

justification for this claim, several deficiencies are obvious.  First, it is not clear how the

privilege could possibly be retained given that the Special Counsel's Office obtained the

information during its investigation into allegations of misconduct by the President.  *See*

*generally In re Sealed Case*, 121 F.3d at 741 (executive privileges can be waived).  Second,

several of the 302s redacted pursuant to the privilege reflect interviews with people like Michael

Cohen,[10] Chris Christie, or Chris Ruddy (CEO of Newsmax Media)—who are not, and never

have been, federal government officials.  Third, it is difficult to imagine how any of these

communications relate to a protectable presidential decision.  Fourth, in the text that Plaintiffs

can see in these 302s, much of the communications concern activities that took place during the

2016 presidential race – when Donald Trump was merely a <u>candidate</u> for president.

For example:

- Michael Cohen, former personal attorney to Donald Trump, August 7, 2018 interview: "Trump Junior said to Trump that he was setting up a meeting in order to get dirt on Hillary Clinton."; "Regarding the timing of the meeting, Cohen thought it was prior to June 9th, 2016 by a couple of days."; "Cohen heard [redacted] Trump said, 'oh good, alright.'"  Cohen 8/7/18 Interview at 4, 5, 8, 15. Attached as Ex. L.

---

[10] Each of the interviews Cohen gave to investigators occurred pursuant to a proffer agreement.  For the reasons explained above, *see supra* Part (A)(2), the Court should be especially skeptical of claims of privilege in these records.  Cohen voluntarily provided information to investigators, and in doing so, knowingly permitted the government to make derivative use of the information and to otherwise disclose the information he provided.

- Cohen, September 18, 2018 interview: "The use of the Trump Org's 'party line' with respect to Russia went earlier than the closing of Trump Tower Batumi and Trump Tower Moscow. [Redacted.]"; "Cohen previously talked about this script with Trump.  Cohen did not tell Trump he thought the script was untrue because Trump already knew it was untrue."; "It was not Cohen's idea to write a letter to congress about Trump Tower Moscow.  The statement was put out to piggyback off of Jared Kushner putting out a statement before.  The release was to shape the narrative and to let other people who might be witnesses know that Cohen was saying to keep the same message.  This was Kushner's approach to public messaging."; "Cohen had a second conversation with Trump [redacted] in Trump's office very soon after Friday, July 22, 2016.[11] Trump said to Cohen [redacted.]"; "Cohen was trying to be loyal.  The investigation was not supposed to have taken us to where we are today.  Cohen was told if he stayed on message, the President had his back, the President loves you."  Cohen 9/18/2018 Interview at 3, 6, 7, 10, 11.  Attached as Ex. M.

- Chris Christie, former governor of New Jersey, February 13, 2019 interview: Michael Flynn called Jared Kushner, and "Christie heard Kushner say something like, 'You know the President respects you.  The President cares about you.  I'll get the President to send out a positive tweet about you later.'  Kushner looked at Trump when he said the last part, and Trump nodded his assent. [Redacted.] Trump said, 'Now that we fired Flynn, the Russia thing is over,' and Christie laughed."; "Toward the end of the February 14, 2017 lunch, Trump asked Christie if he was still friendly with (then FBI Director James) Comey, and Christie said that he was.  Trump told Christie to call Comey and tell him 'I really like him.  Tell him he's part of the team.  I really like him.'  At the end of the lunch, Trump repeated that Christie should talk to Comey.  Christie thought the request was 'nonsensical' and that he was never going to do it.  Christie just sat there when Trump made the request.  He would not put Comey in the position of having to receive that telephone call. [Redacted.]  Christie said it would have been uncomfortable to pass on that message. [Redacted.]"  Christie 2/13/19 Interview at 3, 4-5.  Attached as Ex. N.

- Chris Ruddy, chief executive of Newsmax Media, June 6, 2018 interview: "The day of the PBS interview, Ruddy had a meeting scheduled at the White House with Bannon [redacted] Ruddy, Bannon, [redacted] met, [redacted] Priebus [redacted] joined at some point [redacted.]  In the meeting, Priebus and Bannon told Ruddy that Trump was strongly considering firing Mueller [redacted] feared Trump would fire Mueller one day and not tell anyone about it."; "Ruddy heard

---

[11] Wikileaks released nearly 20,000 emails hacked from the Democratic National Committee on July 22, 2016.  *See* Tom Hamburger and Karen Tumulty, *WikiLeaks releases thousands of documents about Clinton and internal emails*, Washington Post (July 22, 2016) https://www.washingtonpost.com/news/post-politics/wp/2016/07/22/on-eve-of-democratic-convention-wikileaks-releases-thousands-of-documents-about-clinton-the-campaign-and-internal-deliberations/.

from friends in the media that Trump [redacted] were upset about Ruddy's statements.  [Redacted] told Ruddy that Trump was upset with him [redacted.]" Ruddy Interview at 5-6.  Attached as Ex. O.

DOJ cannot withhold information from Plaintiffs merely because of candidate, President-elect, or even President Donald Trump's direct or indirect involvement in the information or communications regarding it.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that this Court enter partial summary judgment in their favor and enter an Order directing Defendants to release all records and redacted information improperly withheld under Exemption 5 and to conform any withholdings and redactions from future productions to the requirements of Exemption 5 as set forth in the Court's Order.

Dated: February 3, 2020                    Respectfully submitted,

*/s/ Charles D. Tobin*
Charles D. Tobin (D.C. Bar No. 455593)
tobinc@balladspahr.com
Matthew E. Kelley (D.C. Bar No. 1018126)
kelleym@ballardspahr.com
BALLARD SPAHR LLP
1909 K Street, NW
Washington, D.C. 20006-1157
T: (202) 661-2200
F: (202) 661-2299
*Counsel for Cable News Network, Inc.*

*/s/ Matthew V. Topic*
Matthew Topic
(E-Mail:  foia@loevy.com)
LOEVY & LOEVY
311 N. Aberdeen, Third Floor
Chicago, Illinois 60607
Tel.: (312) 243-5900
Fax: (312) 243-5902
DC Bar No. IL0037
*Counsel for Leopold and BuzzFeed, Inc.*

24

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this date, I caused the foregoing to be filed and served

electronically via the Court's ECF System upon counsel of record.


Dated:  February 3, 2020                    /s/ *Charles D. Tobin*
                                            Charles D. Tobin