**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————————————————————

JASON LEOPOLD, BUZZFEED, INC. )
                                     )

         Plaintiffs, )

                                  )

        v. )     Civil Action No. 19-cv-1278 (RBW)

                                  )

UNITED STATES DEPARTMENT OF )
JUSTICE, et al., )

                                  )

        Defendants. )

———————————————————————  )

CABLE NEWS NETWORK, )

                                  )

         Plaintiff, )

                                  )

        v. )     Civil Action No. 19-cv-1626 (RBW)

                                  )

FEDERAL BUREAU OF )
INVESTIGATION )

                                  )

        Defendant. )

———————————————————————  )

**DEPARTMENT OF JUSTICE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT IN *LEOPOLD v. DEPARTMENT OF JUSTICE* AND
*CABLE NEWS NETWORK v. FEDERAL BUREAU OF INVESTIGATION***

Defendant, the United States Department of Justice, moves for partial summary judgment

pursuant to Federal Rule of Civil Procedure 56.[1]  In support of this motion, the Court is respectfully

referred to Defendant's accompanying memorandum of points and authorities and attached

exhibits.

———————————————

[1] Pursuant to the Court's Order, this motion pertains only to "the Department's withholding of information under Exemption 5 of the Freedom of Information Act" and does not address the Department's withholding of information under any other FOIA exemption.  Order at 2, Dkt. 53.

Dated: February 24, 2020                Respectfully submitted,

                                        ETHAN P. DAVIS
                                        Principal Deputy Assistant Attorney General
                                        Civil Division

                                        ELIZABETH J. SHAPIRO
                                        Deputy Director
                                        Federal Programs Branch

                                        */s/ Courtney D. Enlow*
                                        COURTNEY D. ENLOW
                                        Trial Attorney
                                        United States Department of Justice
                                        Civil Division, Federal Programs Branch
                                        1100 L Street, N.W.
                                        Room 12102
                                        Washington, D.C. 20005
                                        Tel: (202) 616-8467
                                        Email: courtney.d.enlow@usdoj.gov

                                        *Counsel for Defendant*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| _____ | ) | |
| JASON LEOPOLD, BUZZFEED, INC. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 19-cv-1278 (RBW) |
| | ) | |
| UNITED STATES DEPARTMENT OF JUSTICE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| CABLE NEWS NETWORK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 19-cv-1626 (RBW) |
| | ) | |
| FEDERAL BUREAU OF INVESTIGATION | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE DEPARTMENT OF JUSTICE'S MOTION FOR PARTIAL SUMMARY JUDGMENT IN**
***LEOPOLD v. DEPARTMENT OF JUSTICE* AND**
***CABLE NEWS NETWORK v. FEDERAL BUREAU OF INVESTIGATION***

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES…………………………………………………………………………………..iii

TABLE OF EXHIBITS………………………………………………………………………………………vii

INTRODUCTION ........................................................................................................................ 1

BACKGROUND .......................................................................................................................... 2

I.     The Department of Justice's Investigation into Russian Interference in the 2016 Presidential Election ............................................................................................... 2

II.    Plaintiffs' FOIA Requests.................................................................................... 7

III.   The Instant Litigation........................................................................................... 8

STANDARD OF REVIEW .......................................................................................................... 9

ARGUMENT .............................................................................................................................. 10

I.     DOJ AND FBI PROPERLY WITHHELD INFORMATION PURSUANT TO EXEMPTION 5. ............................................................................................... 10

    A.    The FD-302s Are Subject to Exemption 5 Because They Constitute Attorney Work Product. ................................................................................11

    B.    DOJ Properly Withheld Information Conveyed to SCO Because it is Protected by the Presidential Communications Privilege Under Exemption 5................. 18

        1.    Communications Between Government Officials or Staff During the Administration Concerning Presidential Decision-making......................20

        2.    Communications Between Transition Officials or Staff Concerning Potential Presidential Decisions after the Inauguration ............................21

        3.    Communications Including One or More Private Parties Concerning Presidential Decision-making..........................................................................23

    C.    DOJ and FBI Properly Withheld Deliberative Information Contained Within the Narratives of the FD-302s or Attached to the FD-302s Under Exemption 5..................................................................................................................................25

        1.    DOJ Properly Withheld Deliberative Information Conveyed to SCO Personnel by Government Employees During Interviews. .......................26

        2.    The FBI Properly Withheld Deliberative Draft Talking Points that were Attached to the McCord FD-302 Under Exemption 5. ..............................29

II.   DOJ AND FBI COMPLIED WITH THE FORESEEABLE HARM STANDARD IN
      THE FOIA IMPROVEMENT ACT OF 2016 .................................................................. 31

III.  EXEMPTION 5 IS NEITHER OVERCOME NOR WAIVED ........................................ 35

      A.   DOJ Has Not Withheld Information That Has Been Officially Acknowledged
           in the Mueller Report. ............................................................................................. 35

      B.   The Government Misconduct Exception Neither Applies in FOIA Cases Nor
           Vitiates DOJ's and FBI's Assertion of Exemption 5 ............................................. 37

      C.   Interviews Conducted Pursuant to a Witness Proffer Constitute Attorney
           Work Product. .......................................................................................................... 42

IV.   DOJ AND FBI RELEASED ALL REASONABLY SEGREGABLE, NON-EXEMPT
      INFORMATION ........................................................................................................... 44

CONCLUSION .................................................................................................................... 45

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Access Reports v. Dep't of Justice,*
  926 F.2d 1192 (D.C. Cir. 1991).............................................................. 30

*ACLU v. Dep't of Def.,*
  628 F.3d 612 (D.C. Cir. 2011).............................................................. 11

*Agility Public Warehousing Co. v. Dep't of Defense,*
  110 F. Supp. 3d 215 (D.D.C. 2015)...................................................... 30

*Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton,*
  997 F.2d 898 (D.C. Cir. 1993).............................................................. 24

*Bagwell v. Dep't of Justice,*
  311 F. Supp. 3d 223 (D.D.C. 2018)...................................................... 12

*Citizens for Responsibility & Ethics in Wash. v. Dep't of Homeland Sec.,*
  514 F. Supp. 2d 36 (D.D.C. 2007)........................................................ 18

*Citizens for Responsibility & Ethics in Wash. v. Dep't of Homeland Sec.,*
  No. 06-0173, 2008 WL 2872183 (D.D.C. July 22, 2008) ...................... 19

*Coastal States Gas Corp. v. Dep't of Energy,*
  617 F.2d 854 (D.C. Cir. 1980)....................................................... *passim*

*Colorado Wild Horse & Burro Coal., Inc. v. Kempthorne,*
  571 F. Supp. 2d 71 (D.D.C. 2008)........................................................ 28

*Competitive Enter. Inst. v. U.S. Envtl. Prot. Agency,*
  232 F. Supp. 3d 172 (D.D.C. 2017)...................................................... 15

*Cottone v. Reno,*
  193 F.3d 550 (D.C. Cir. 1999).............................................................. 37

*Defs. of Wildlife v. U.S. Border Patrol,*
  623 F. Supp. 2d 83 (D.D.C. 2009).......................................................... 9

*Democratic Nat. Comm. v. Dep't of Justice,*
  539 F. Supp. 2d 363 (D.D.C. 2008)...................................................... 29

*Dep't of the Interior v. Klamath Water Users Protective Ass'n,*
  532 U.S. 1 (2001) ....................................................................... 10, 32

*Diamond v. Atwood,*
  43 F.3d 1538 (D.C. Cir. 1995)................................................................ 9

*Durham v. Dep't of Justice,*
    829 F. Supp. 428 (D.D.C. 1993).........................................................................17

*FBI v. Abramson,*
    456 U.S. 615 (1982) ........................................................................................10

*Fitzgibbon v. CIA,*
    911 F.2d 755 (D.C. Cir. 1990)..........................................................................37

*FTC v. Grolier Inc.,*
    462 U.S. 19 (1983) .....................................................................................12, 38

*Fund for Constitutional Gov't v. Nat'l Archives and Records Serv.,*
    485 F. Supp. 1 (D.D.C. 1978).............................................................................33

*Hickman v. Taylor,*
    329 U.S. 495 (1947) ...................................................................................12, 14

*In re Sealed Case,*
    121 F.3d 729 (D.C. Cir. 1997).................................................................. *passim*

*Juarez v. Dep't of Justice,*
    518 F.3d 54 (D.C. Cir. 2008)............................................................................45

*Judicial Watch of Fla., Inc. v. Dep't of Justice,*
    102 F. Supp. 2d 6 (D.D.C. 2000).......................................................................40

*Judicial Watch v. Dep't of Justice,*
    391 F. Supp. 3d 43 (D.D.C. 2019), *appeal filed*, No. 19-5218
    (D.C. Cir. Aug. 14, 2019) ....................................................................15, 16, 17

*Judicial Watch, Inc. v. CFPB,*
    60 F. Supp. 3d 1 (D.D.C. 2014)....................................................................29, 30

*Judicial Watch, Inc. v. Dep't of Commerce,*
    No. 15-cv-2088-CRC, 2017 WL 3822733 (D.D.C. Aug. 21, 2017) .........................39

*Judicial Watch, Inc. v. Dep't of Homeland Sec.,*
    926 F. Supp. 2d 121 (D.D.C. 2013)....................................................................11

*Judicial Watch, Inc. v. Dep't of Justice,*
    365 F.3d 1108 (D.C. Cir. 2004)...................................................................18, 21

*Judicial Watch, Inc. v. Dep't of Justice,*
    432 F.3d 366 (D.C. Cir. 2005)..........................................................................12

*Judicial Watch, Inc. v. Dep't of Justice,*
    800 F. Supp. 2d 202 (D.D.C. 2011)....................................................................17

*Judicial Watch, Inc. v. Dep't of State*,
   235 F. Supp. 3d 310 (D.D.C. 2017) ........................................................ 41

*Judicial Watch, Inc. v. Dep't of State*,
   241 F. Supp. 3d 174 (D.D.C.), *amended on reconsideration*, 282 F. Supp. 3d 338
   (D.D.C. 2017) ........................................................................................ 38

*Judicial Watch, Inc. v. Dep't of State*,
   285 F. Supp. 3d 249 (D.D.C. 2018) ........................................................ 39

*Larson v. Dep't of State*,
   565 F.3d 857 (D.C. Cir. 2009) ........................................................ 10, 11

*Latif v. Obama*,
   677 F.3d 1175 (D.C. Cir. 2012) ...................................................... 41, 42

*Loving v. Dep't of Def.*,
   550 F.3d 32 (D.C. Cir. 2008) ................................................... 10, 18, 32

*Martin v. Office of Special Counsel, Merit Sys. Prot. Bd.*,
   819 F.2d 1181 (D.C. Cir. 1987) .................................................. *passim*

*Mead Data Cent., Inc. v. Dep't of the Air Force*,
   566 F.2d 242 (D.C. Cir. 1977) ............................................................ 44

*N.Y. Times Co. v. Dep't of Justice*,
   138 F. Supp. 3d 462 (S.D.N.Y. 2015) ............................................. 15, 16

*Nat'l Sec. Archive Fund, Inc. v. CIA*,
   402 F. Supp. 2d 211 (D.D.C. 2005) ..................................................... 45

*Nat'l Whistleblower Ctr. v. Dep't of Health & Human Servs.*,
   903 F. Supp. 2d. 59 (D.D.C. 2012) ...................................................... 40

*Neighborhood Assistance Corp. of Am. v. U.S. Dep't of Hous. & Urban Dev.*,
   19 F. Supp. 3d 1 (D.D.C. 2013) ..................................................... 39, 40

*Nixon v. Adm'r of Gen. Servs.*,
   433 U.S. 425 (1977) ....................................................................... 18, 23

*NLRB v. Sears, Roebuck & Co.*,
   421 U.S. 132 (1975) ........................................................... 25, 28, 32, 38

*Overby v. United States Fid. & Guar. Co.*,
   224 F.2d 158 (5th Cir. 1955) ............................................................... 44

*Patino-Restrepo v. Dep't of Justice*,
   246 F. Supp. 3d 233 (D.D.C. 2017), *aff'd*, 2019 WL 1250497 (D.C. Cir. Mar. 14, 2019) ....... 14

*Pub. Citizen v. Dep't of State*,
   11 F.3d 198 (D.C. Cir. 1993) ........................................................................... 37

*Rockwell Int'l Corp. v. Dep't of Justice*,
   235 F.3d 598 (D.C. Cir. 2001) ......................................................................... 32

*Rush v. Dep't of State*,
   748 F. Supp. 1548 (S.D. Fla. 1990) ................................................................. 44

*Russell v. Dep't of the Air Force*,
   682 F.2d 1045 (D.C. Cir. 1982) ................................................................ 25, 32

*SafeCard Servs., Inc. v. SEC*,
   926 F.2d 1197 (D.C. Cir. 1991) ....................................................................... 12

*Sierra Club v. Dep't of the Interior*,
   384 F. Supp. 2d 1 (D.D.C. 2004) ..................................................................... 30

*Sussman v. U.S. Marshals Serv.*,
   494 F.3d 1106 (D.C. Cir. 2007) ................................................................. 41, 45

*Tax Analysts v. IRS*,
   117 F.3d 607 (D.C. Cir. 1997) ............................................................. 11, 13, 16

*Thelen v. Dep't of Justice*,
   169 F. Supp. 3d 128 (D.D.C. 2016) ................................................................. 25

*Toensing v. Dep't of Justice*,
   999 F. Supp. 2d 50 (D.D.C. 2013) ................................................................... 17

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*,
   489 U.S. 749 (1989) .................................................................................... 38, 39

*United States v. Nixon*,
   418 U.S. 683 (1974) ......................................................................................... 18

*United States v. Nobles*,
   422 U.S. 225 (1975) ................................................................................... 11, 17

*United States v. Rozet*,
   183 F.R.D. 662 (N.D. Cal. 1998) ..................................................................... 44

*Williams & Connolly v. SEC*,
   662 F.3d 1240 (D.C. Cir. 2011) ....................................................................... 12

*Winterstein v. Dep't of Justice*,
   89 F. Supp. 2d 79 (D.D.C. 2000) ..................................................................... 11

*Wolf v. CIA*,
   473 F.3d 370 (D.C. Cir. 2007) ........................................................................... 10, 36

*Wright v. Admin. for Children & Families*,
   No. 15-218, 2016 WL 5922293 (D.D.C. Oct. 11, 2016) ........................................ 39


**Statutes**

5 U.S.C. § 552 ..................................................................................................... *passim*

18 U.S.C. § 1030 .......................................................................................................... 7

Presidential Transition Act of 1963, Pub. L. No. 88-277, *codified as amended* at
   3 U.S.C. § 102 (note) ............................................................................................. 23


**Rules**

Fed. R. Civ. P. 26 ...................................................................................................... 11

Fed. R. Civ. P. 56 ........................................................................................................ 9


**Regulations**

28 C.F.R. § 600.4 ........................................................................................................ 3

28 C.F.R. § 600.6 ........................................................................................................ 3

28 C.F.R. § 600.8 ...................................................................................................... 13

74 Fed. Reg. 4683 (Jan. 21, 2009) ........................................................................... 31


**Other Authorities**

Attorney General Holder's Mem. for Heads of Exec. Dep'ts & Agencies Concerning the
Freedom of Information Act (Mar. 19, 2009),
http://www.usdoj.gov/ag/foia-memo-march2009.pdf ................................................. 31

 H.R. Rep. No. 114-391 ............................................................................................. 31

S. Rep. No. 114-4 ...................................................................................................... 31

### <u>TABLE OF EXHIBITS</u>

Declaration of Bradley Weinsheimer, dated February 24, 2020……..……………....……Exhibit 1

    <u>Exhibits to Weinsheimer Declaration</u>

    DOJ Order No. 3915-2017……………………………...………………..Exhibit A

    Statement Before the House Permanent
    Select Committee on Intelligence by James B. Comey...…….…………..Exhibit B

    "Report On The Investigation Into Russian Interference
    In The 2016 Presidential Election" with FOIA markings………………..Exhibit C

    Special Counsel Robert S. Mueller III Makes Statement on
    Investigation into Russian Interference in the
    2016 Presidential Election …………………………...…………………..Exhibit D

    Letter from Andrew McCabe to Robert Mueller...……...………………..Exhibit E


Declaration of Vanessa R. Brinkmann, dated February 24, 2020………………………Exhibit 2

    <u>Exhibit to Brinkmann Declaration</u>

    *Vaughn* Index………………………………………...………………..Exhibit A


Declaration of David Hardy, dated February 24, 2020……...…………………….……Exhibit 3

    <u>Exhibit to Hardy Declaration</u>

    Jason Leopold and Buzzfeed, Inc. FOIA request.……...………………..Exhibit A

    Cable News Network FOIA request.……...…………………………..Exhibit B

## INTRODUCTION

Plaintiffs in this consolidated Freedom of Information Act ("FOIA") case, Jason Leopold, and BuzzFeed, Inc. (collectively, "Leopold") and Cable News Network ("CNN"), filed FOIA requests with the Federal Bureau of Investigation ("FBI"), for the FD-302 forms memorializing interviews conducted by the Special Counsel's Office ("SCO") during the course of its investigation into Russia's interference in the 2016 presidential election and related matters ("Russia Investigation").

The Department of Justice (the "Department" or "DOJ") has withheld certain FD-302s under FOIA Exemption 5 because they fall squarely within the attorney work product doctrine. During the time period relevant to Plaintiffs' FOIA requests, the Special Counsel was directing the Russia Investigation and organizing the collection of evidence in anticipation of possible criminal charges in connection with the investigation. SCO prosecutors were present for, and actively participated in, the interviews documented in the FD-302s that DOJ has withheld as attorney work product. Those facts confirm that the FD-302s were prepared in anticipation of litigation, and the contents of those FD-302s are thus protected work product.

In addition, DOJ withheld information from certain FD-302s under FOIA Exemption 5 because that information is protected by the presidential communications privilege. During certain interviews, witnesses recounted or summarized confidential communications they had with the President (or President-elect) on matters of presidential decision-making or communications that were made in the course of preparing information or advice for potential presentation to the President (or President-elect) on matters of presidential decision-making. Because these communications were made to advise the President (or President-elect) on matters of presidential decision-making, they are protected by the presidential communications privilege.

Finally, both DOJ and FBI have withheld information from certain FD-302s under FOIA

Exemption 5 because that information is protected by the deliberative process privilege. Throughout the Special Counsel investigation, members of the SCO conducted interviews with various Government employees.  During those interviews, the employees relayed deliberative information to SCO concerning a variety of governmental decisions.  In addition, during one interview, draft talking points were shown to a witness and were thus attached to the FD-302 memorializing that interview.  These communications about governmental decisions and the draft talking points reflect predecisional deliberative information concerning governmental decision-making are thus protected by the deliberative process privilege.

Plaintiffs challenge each and every redaction taken under Exemption 5.  But because the Department's and FBI's declarations establish that the redacted material is protected by Exemption 5, and that, to the extent required, all segregable material has been produced to Plaintiffs, the Department and FBI have fully complied with their obligations under the FOIA.  The Court should therefore grant partial summary judgment for Defendant on the withholdings under Exemption 5.

## BACKGROUND

### I.  The Department of Justice's Investigation into Russian Interference in the 2016 Presidential Election

On March 20, 2017, in testimony before Congress, then-FBI Director James B. Comey publicly confirmed the existence of an investigation of the Russian government's efforts to interfere in the 2016 presidential election, stating:

> [T]he FBI, as part of our counterintelligence mission, is investigating the Russian government's efforts to interfere in the 2016 presidential election, and that includes investigating the nature of any links between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts.  As with any counterintelligence investigation, this will also include an assessment of whether any crimes were committed.

Ex. 1 (Decl. of Bradley Weinsheimer (Feb. 24, 2020)) (hereinafter "Weinsheimer Decl."), Ex. B

(Statement Before the House Permanent Select Committee on Intelligence by James B. Comey).

On May 17, 2017, Acting Attorney General Rod J. Rosenstein appointed Robert S. Mueller, III to serve as Special Counsel for the investigation into Russian interference with the 2016 presidential election.  *See* Weinsheimer Decl. Ex. A (DOJ Order No. 3915-2017) (hereinafter "DOJ Order").  Under the terms of his appointment, the Special Counsel was authorized to

> conduct the investigation confirmed by then-FBI Director James B. Comey in testimony before the House Permanent Select Committee on Intelligence on March 20, 2017, including: (i) any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump; and (ii) any matters that arose or may arise directly from the investigation; and (iii) any other matters within the scope of 28 C.F.R. § 600.4(a).

*Id.*  The Special Counsel was also authorized "to prosecute federal crimes arising from the investigation of these matters," *id.*, and to "investigate and prosecute federal crimes committed in the course of, and with intent to interfere with, the Special Counsel's investigation, such as perjury, obstruction of justice, destruction of evidence, and intimidation of witnesses; and to conduct appeals arising out of the matter being investigated and/or prosecuted," 28 C.F.R. § 600.4(a).  The Acting Attorney General further clarified the scope of the Special Counsel's investigatory authority in two subsequent memoranda, which authorized the Special Counsel to investigate criminal allegations related to specific individuals, such as Carter Page, Paul Manafort, George Papadopoulos, Michael Flynn, Michael Cohen, Richard Gates, and Roger Stone.  *See* Weinsheimer Decl. ¶¶ 8–10; Weinsheimer Decl. Ex. C (Mueller Report, Vol. I, at 11–12) (hereinafter "Mueller Report").

"The Special Counsel structured the investigation in view of his power and authority 'to exercise all investigative and prosecutorial functions of any United States Attorney.'"  Mueller Report, Vol. I, at 12 (quoting 28 C.F.R. § 600.6)).  Thus, the investigation conducted by the Special Counsel's Office was "akin to a prosecutor-directed investigation, similar to an investigation

3

conducted by a U.S. Attorney's Office, or to a task force." Weinsheimer Decl. ¶ 19. "The investigation differed from other FBI field office investigations because the investigation was led by the Special Counsel with the assistance of the FBI." *Id.*; *see also* DOJ Order; Weinsheimer Decl. Ex. E (McCabe to Mueller letter, July 21, 2017) (recognizing that "SCO will determine the course and direction of the investigations under its jurisdiction" and "direct[ing] FBI investigative personnel to follow [the Special Counsel's] instructions regarding those investigations").

The Special Counsel's Office was headed by the Special Counsel, who "was responsible for directing the efforts of a team of attorneys and FBI agents conducting the Russia Investigation." Weinsheimer Decl. ¶ 13. Under the direction and supervision of the Special Counsel, SCO was organized into teams based on the topics of the investigation. *Id.* ¶ 15. Each team consisted of attorneys and FBI investigative personnel and co-led by an attorney and an FBI team leader. *Id.*

The Special Counsel convened a daily meeting with the heads of the teams and his senior staff, including the FBI Senior Executive supervisory special agent. *Id.* ¶ 16. At that meeting, the participants updated the Special Counsel on the matters the investigative teams were investigating and received strategic direction for the ongoing investigation. *Id.* "In addition to daily briefings provided by the teams to the Special Counsel and his senior management team, the Special Counsel and Deputy Special Counsel convened almost weekly meetings to discuss in greater detail the progress of the teams and investigative strategy." *Id.* ¶ 19. These meetings were led by prosecutors, with participation from other prosecutors and FBI investigative personnel. *Id.* "The Deputy Special Counsel would often set the agendas for these meetings based on input from the team leads." *Id.* "Among the topics discussed in these meetings were the witnesses to be interviewed and the topics to be addressed in the interviews." *Id.*

The attorney and FBI team leaders would update the teams on communications with and

decisions made by the Special Counsel during team meetings.  *Id.* ¶ 17.  During those team meetings, the attorneys and FBI investigative personnel would "plan strategy, such as deciding which witnesses to interview, the scope of interviews, determining whether there was sufficient evidence to bring charges, and, if there was insufficient evidence, what evidence was still needed and how to obtain such evidence."  *Id.*  The Special Counsel or the Deputy Special Counsel would occasionally attend these meetings.  *Id.*

During the course of the Special Counsel's investigation, SCO interviewed more than 500 witnesses, some on multiple occasions.  Mueller Report, Vol. I, at 13.  "In conjunction with discussions with the Special Counsel, his management team, and FBI investigative personnel assigned to work under the direction of the Special Counsel, attorneys selected witnesses to interview," and "prosecutors discussed and determined in advance the investigative strategy for witness interviews."  Weinsheimer Decl. ¶ 26.  All the interviews were under the supervision and direction of the Special Counsel in connection with an assessment as to whether to bring criminal charges or further investigate possible criminal conduct.  *Id.*  Attorneys led, participated in, or attended many interviews, including all the interviews for which the Government has asserted the attorney work product doctrine.  *Id.*  "Although preparation for witness interviews varied among teams and individual attorneys, as a general matter, each team would have a strategic discussion among attorneys and FBI investigative personnel before an interview to discuss what topics to cover with the witness."  *Id.* ¶ 27.  "Based on discussion among the team, including FBI investigative personnel, attorneys decided the topics to cover with witnesses, consistent with the strategic direction determined by the Special Counsel."  *Id.*  Outlines typically were prepared prior to the interviews, and, if time permitted, they were circulated among attorneys and FBI investigative personnel for review and comment.  *Id.*  If FBI investigative personnel drafted the

outline, attorneys either would edit or provide comments to the outline or review it to ensure the outline addressed all the pertinent topics to be covered with that witness. *Id.*

As part of the investigation, SCO prosecutors and FBI Special Agents conducted candid interviews with senior presidential advisers, senior transition officials, other employees of the White House Office, and others who had spoken directly with the President or his advisers on matters of presidential decision-making. Ex. 2 (Decl. of Vanessa R. Brinkmann ¶ 20 (Feb. 24, 2020)) (hereinafter "Brinkmann Decl."). "Portions of the FD-302s contain recountings or summaries by these individuals of sensitive confidential communications made in the course of preparing information or advice for potential presentation to the President on matters of presidential decision-making or—in some cases—confidential communications directly with the President on matters of presidential decision-making." *Id.* SCO prosecutors and FBI agents also conducted interviews with other Government employees, and, during those interviews, those employees relayed deliberative information concerning DOJ decision-making on a variety of issues. *See id.* ¶ 11. And certain interviews were conducted after a witness signed a proffer agreement to allow the Government to "receive information from the witness while providing the witness certain protections against self-incrimination." Weinsheimer Decl. ¶ 30. Interviews conducted after a witness proffer agreement was signed "typically include[d] questions from attorneys to assess and further evaluate the witness and the next steps in the investigation." *Id.*

Following each witness interview, FBI investigative personnel present for the interview used their interview notes to draft an FD-302. *Id.* ¶ 31. FD-302s are "interview summaries" that FBI personnel routinely prepare to "document factual information elicited from interviewees (*e.g.*, targets, witnesses, others with pertinent information) during FBI criminal and national security investigations." Ex. 3 (Decl. of David Hardy ¶ 7 n.2 (Feb. 24, 2020)) (hereinafter "Hardy Decl.").

Attorneys would review the draft FD-302s and, if necessary, suggest edits for completeness, though the attorneys stated that their edits should only be incorporated into the FD-302 if they comported with the FBI agent's recollection.  Weinsheimer Decl. ¶ 31.  The FBI retained final approval over the content of the FD-302s.  *Id.* When attorneys or agents questioned witnesses about particular documents, those documents were attached to the FD-302.  *See* Hardy Decl. ¶ 12.

"The attorneys anticipated the potential for filing criminal charges during the [Special Counsel's] investigation and at the time the witness interviews leading to the creation of FD-302s were conducted."  Weinsheimer Decl. ¶ 21.  Potential criminal charges included, among others, charges for making false statements, campaign finance offenses, obstruction, conspiracy, trafficking in or receipt of stolen property under the National Stolen Property Act, violations of the Foreign Agents Registration Act, and violations of 18 U.S.C. § 1030.  *See* Mueller Report, Vol. I, at 174–199 (discussing "prosecution and declination decisions"); *see also* Weinsheimer Decl. ¶ 21.  With regard to the obstruction-of-justice investigation, attorneys anticipated the potential for charges for co-conspirators.  *See* Mueller Report, Vol. II, at 1; *see also* Weinsheimer Decl. ¶ 21.

As a result of the SCO investigation, SCO bought various charges against numerous individuals and entities.  *See* Weinsheimer Decl. ¶ 21.  Twelve criminal cases were filed, some charging numerous defendants.  *See id.*  Of those twelve, five criminal prosecutions are public and ongoing at various stages, other U.S. Attorney's Offices have pending, related prosecutions, and six individuals have been sentenced.  *See id.* ¶ 24.  During or at the conclusion of the Special Counsel's investigation, SCO transferred or referred 25 related matters to U.S. Attorney's Offices or to other Department components for further investigation.  *See* Mueller Report, Appendix D.

## II.    Plaintiffs' FOIA Requests

On March 26, 2019, a reporter for CNN submitted a FOIA request to the FBI.  As relevant to this motion, CNN sought "FBI memoranda, such as 302s, from any and all of the interviews of

the 'approximately 500 witnesses' in the Mueller investigation."  *See* Compl. Ex. A, *Cable News Network v. Fed. Bureau of Investigation*, No. 19-cv-1626 (D.D.C. June 4, 2019), Dkt. 1-1.

On March 27, 2019, Mr. Leopold, who is a reporter for BuzzFeed, Inc., submitted a FOIA request to the FBI seeking "[a]ll FBI 302s maintained/stored/in possession of the FBI relating or referring to all of the individuals who were questioned and interviewed by FBI agents working for the Office of Special Counsel Robert Mueller."  *See* Answer Ex. E, Dkt. 14-5.

## III.    The Instant Litigation

On May 2, 2019, Leopold filed the instant lawsuit.  *See* Compl., Dkt. 1.  Shortly thereafter, CNN filed its complaint.[2]  *See* Compl., *Cable News Network v. Fed. Bureau of Investigation*, No. 19-cv-1626 (D.D.C. June 4, 2019), Dkt. 1.  Both cases were reassigned from other judges to this Court in summer 2019, and the Court consolidated the cases "to the extent that the plaintiffs in the above-captioned matters are seeking the release of FD-302 forms created by the Federal Bureau of Investigation (the 'FBI') in relation to Special Counsel Mueller's investigation into Russian interference in the 2016 United States presidential election."  Order at 1–2, Dkt. 33.

The FBI began releasing FD-302s with the applicable redactions under the FOIA to Plaintiffs on November 1, 2019.  For the November and December releases, the FBI processed, per Plaintiffs' FOIA requests, the typewritten narrative of the FD-302s, the handwritten notes, and the attachments to the FD-302s.  An FD-302 with attachments memorializing the interview of Mary McCord, the former Acting Assistant Attorney General of DOJ's National Security Division, was released to Plaintiffs in December 2019.  *See* Hardy Decl. ¶ 12 n.6.  For each subsequent

---

[2] In their complaint, Mr. Leopold and BuzzFeed, Inc. name the following department, offices, and individual as defendants: "U.S. Department of Justice," "DOJ Office of Attorney General," "DOJ Deputy Attorney General," "DOJ Office of Special Counsel," and "Federal Bureau of Investigation."  Compl. at 1, Dkt. 1.  Because the Office of the Attorney General, the Deputy Attorney General, the Special Counsel's Office, and the FBI are part of the Department, the Department of Justice is the only proper defendant in this matter.

8

release, the FBI processed and produced to Plaintiffs only the typewritten narratives of the FD-302s pursuant to this Court's Orders.  *See* Orders, Dkt. 43, 49.

DOJ and the FBI withheld certain information from the FD-302s under Exemption 5 (as well as other exemptions that are not subject to this motion).  Specifically, DOJ withheld information under the attorney work product doctrine and the presidential communications privilege, and both DOJ and FBI withheld information under the deliberative process privilege.  At Plaintiffs' request, the Court set a briefing schedule for cross-motions for summary judgment only as to Plaintiffs' challenges to withholdings under Exemption 5.  *See* Order at 2, Dkt. 53.

In their motion for partial summary judgment, Plaintiffs have challenged the Defendant's application of FOIA Exemption 5 to the records processed for release through January 17, 2020 (*i.e.*, the first four releases).  Defendant likewise moves for partial summary judgment on the Exemption 5 withholdings for the FD-302s released through January 17, 2020.

## STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  "FOIA cases typically and appropriately are decided on motions for summary judgment."  *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009).  Where, as here, the parties have moved and cross-moved for partial summary judgment, the Court conducts a *de novo* review of the agency's response to the challenged FOIA requests.  *See* 5 U.S.C. § 552(a)(4)(B).

The Department must justify any information withheld subject to FOIA's statutory exemptions.  Congress recognized "that legitimate governmental and private interests could be harmed by release of certain types of information and provided nine specific exemptions under

which disclosure could be refused." *FBI v. Abramson*, 456 U.S. 615, 621 (1982). "Summary judgment is warranted on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007). Here, because DOJ's and FBI's declarations set forth logical and plausible justifications for invoking Exemption 5, the Court should grant partial summary judgment for Defendant.

## ARGUMENT

I. **DOJ AND FBI PROPERLY WITHHELD INFORMATION PURSUANT TO EXEMPTION 5.**

Exemption 5 exempts from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). Thus, as a threshold matter, to invoke this exemption, a record must be of the type intended to be covered by the phrase "inter-agency or intra-agency memorandums." *Id.* "During the pendency of the Special Counsel's investigation, all of the FD-302s protected by Exemption 5 were generated within the Executive Branch—specifically, by FBI investigative personnel assigned to work under the direction of the Special Counsel." Brinkmann Decl. ¶ 9. Thus, the FD-302s clearly meet the "inter-/intra-agency" threshold. *See Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (stating that the "source must be a Government agency").

Exemption 5 applies to records that would normally be protected from disclosure in civil discovery. *See Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008). Among the privileges

10

encompassed by Exemption 5 is the attorney work product doctrine, presidential communications privilege, and deliberative process privilege.  *See id.*  DOJ withheld information under all three privileges, and the FBI withheld information under the deliberative process privilege.[3]

### A. The FD-302s Are Subject to Exemption 5 Because They Constitute Attorney Work Product.

The Department properly asserted FOIA Exemption 5 to withhold information in 31 FD-302s that is protected from disclosure under the attorney work product doctrine.  *See* Brinkmann Decl. ¶¶ 8, 37, Ex. A (*Vaughn* Index); *see also* Weinsheimer Decl. ¶ 5.  In doing so, DOJ did not redact any information that was publicly disclosed in the Mueller Report.  Brinkmann Decl. ¶ 33.

"The work-product doctrine protects materials 'prepared in anticipation of litigation or for trial by or for another party or its representative.'"  *Judicial Watch, Inc. v. Dep't of Homeland Sec.*, 926 F. Supp. 2d 121, 137 (D.D.C. 2013) (quoting Fed. R. Civ. P. 26(b)(3)(A)).  The doctrine covers both "the mental impressions, conclusions, opinions, or legal theories of an attorney" and "factual materials prepared in anticipation of litigation."  *Tax Analysts v. IRS*, 117 F.3d 607, 620 (D.C. Cir. 1997).  Although the attorney work product doctrine applies most frequently when civil litigation is anticipated, the doctrine's "role in assuring the proper functioning of the criminal justice system is even more vital."  *United States v. Nobles*, 422 U.S. 225, 238 (1975).  Accordingly, courts routinely hold that documents prepared in anticipation of criminal prosecution may be withheld as attorney work product.  *See, e.g.*, *Winterstein v. Dep't of Justice*, 89 F. Supp. 2d 79, 79, 81 (D.D.C. 2000) (concluding there was "no question" that a DOJ Office of Special Investigations

---

[3] Certain information protected from disclosure by one of these privileges under Exemption 5 is also protected by another privilege under Exemption 5.  *See Vaughn* Index.  As the D.C. Circuit has found, "the government need prevail on only one exemption; it need not satisfy both."  *ACLU v. Dep't of Def.*, 628 F.3d 612, 623 n.3 (D.C. Cir. 2011); *see also Larson*, 565 F.3d at 862–63 ("[A]gencies may invoke the exemptions independently and courts may uphold agency action under one exemption without considering the applicability of the other.").  And certain information that is protected from disclosure under Exemption 5 is also protected by another exemption that is not the subject of these cross-motions for partial summary judgment.  *See* Order at 2, Dkt. 53 (directing briefing on Exemption 5 only).

memorandum "prepared during the course of an investigation" was prepared in anticipation of litigation given "the contemplated prosecution" of the investigation's target).

In both the civil discovery and FOIA contexts, the D.C. Circuit has advised that the attorney work product doctrine "should be interpreted broadly and held largely inviolate." *Judicial Watch, Inc. v. Dep't of Justice*, 432 F.3d 366, 369 (D.C. Cir. 2005) (citing *Hickman v. Taylor*, 329 U.S. 495, 510–11 (1947)).  But unlike in the civil discovery context, where "work product protection may be overcome for cause," FOIA does not include a "for cause" provision. *Williams & Connolly v. SEC*, 662 F.3d 1240, 1243 (D.C. Cir. 2011).  That is because "any materials disclosed for cause are not 'routinely' or 'normally' discoverable and, for that reason, are exempt under FOIA." *Id.* (citation omitted); *see also FTC v. Grolier Inc.*, 462 U.S. 19, 27 (1983) ("Whether its immunity from discovery is absolute or qualified, a protected document cannot be said to be subject to 'routine' disclosure.").

In light of these principles, the FD-302s at issue here are attorney work product and subject to Exemption 5.  First, as explained in the declaration of Bradley Weinsheimer, an Associate Deputy Attorney General for the Department of Justice, the FD-302s were prepared in anticipation of litigation.  *See* Weinsheimer Decl. ¶¶ 21–24, 35.  Specifically, the FD-302s were prepared during the Special Counsel's investigation into Russia's interference in the 2016 presidential election in order to "gather[] or otherwise assess[] the extent to which evidence could be obtained to support criminal charges and that therefore could be presented to a grand jury and at trial." *Id.* ¶ 25; *see SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1202 (D.C. Cir. 1991) (explaining that "[t]he existence of an active investigation . . . is strong circumstantial evidence" that a document was prepared "with future litigation in mind"); *Bagwell v. Dep't of Justice*, 311 F. Supp. 3d 223, 235 (D.D.C. 2018) (finding that because an attorney with EOUSA attested that "the documents

were created by attorneys during a law enforcement investigation into allegations of specific illegal activity (child sex abuse and concealing such abuse) by specific people (Sandusky and others at the University)," "the Department has adequately justified that the documents were prepared in reasonable anticipation of litigation").  "The attorneys anticipated the potential for criminal charges during the investigation and at the time the witness interviews leading to the creation of FD-302s were conducted."  Weinsheimer Decl. ¶ 21.  The Mueller Report, which sets forth the Special Counsel's "prosecution and declination decisions," 28 C.F.R. § 600.8(c), describes various charges prosecutors considered during the course of the investigation, which included the potential for charges for co-conspirators connected to the obstruction-of-justice investigation, *see* Mueller Report, Vol. I, at 174–199, Vol. II, at 1.  And the investigation resulted in the Special Counsel bringing 12 criminal cases against numerous individuals and entities and transferring or referring 25 related matters to U.S. Attorney's Offices or to other Department Components for further investigation or resolution.  *See Special Counsel's Office*, U.S. Dep't of Justice, *available at* https://www.justice.gov/sco (listing 12 cases brought by SCO); Ex. Mueller Report, Appendix D (listing the transferred and referred matters); Weinsheimer Decl. ¶¶ 21, 24 (listing criminal cases and the charges brought against defendants).

In addition, the fact that the FD-302s are summaries from interviews with potential witnesses shows that the attorney work product doctrine applies.  *See* Hardy Decl. ¶ 7 n.2 (describing an FD-302 as "interview summaries" that "document factual information elicited from interviewees").  Although Plaintiffs erroneously argue that the attorney work product doctrine covers only the "mental impressions of lawyers," *see* Pls.' Mem. 9, the D.C. Circuit has long held that the doctrine covers "the mental impressions, conclusions, opinions, or legal theories of an attorney," as well as "factual materials prepared in anticipation of litigation," *Tax Analysts*, 117

13

F.3d at 620; *see also Martin v. Office of Special Counsel, Merit Sys. Prot. Bd.*, 819 F.2d 1181,

1187 (D.C. Cir. 1987) ("The work-product privilege simply does not distinguish between factual

and deliberative material.").

Both the Supreme Court and the D.C. Circuit have long held that statements made by

potential witnesses in anticipation of litigation are work product.  *See Hickman*, 329 U.S. at 511;

*Martin*, 819 F.2d at 1187.  In *Hickman*, the Supreme Court considered "the extent to which a party

may inquire into oral and written statements of witnesses, or other information, secured by an

adverse party's counsel in the course of preparation for possible litigation after a claim has arisen."

329 U.S. at 497.  The Supreme Court concluded that witness interviews constitute work product

because they are part of the way an attorney "assemble[s] information, sift[s] what he considers to

be the relevant from the irrelevant facts, prepare[s] his legal theories and plan[s] his strategy" in

order to "[p]roperly prepar[e] a client's case."  *Id.* at 511.

In *Martin*, the D.C. Circuit held that the attorney work product component of Exemption 5

"clearly cover[s]" documents like "witness affidavits" and notes from witness interviews.  819

F.2d at 1182.  In reaching that conclusion, the court rejected the reasoning of the district court,

which had found that "the eleven witness statements were not attorney work-product because they

were 'the product of the witness, not of the lawyer.'"  *Id.* at 1183 (citation omitted).  The D.C.

Circuit instead reaffirmed that "witness statements prepared at the request of an attorney are

privileged work product" and concluded that, "[w]ithout [a] doubt," the witness affidavits in

*Martin* were exempt from disclosure under FOIA because the "documents would not 'normally'

and 'routinely' be released in civil discovery."  *Id.* at 1187.

Following *Martin*, district courts have upheld agency withholdings of witness interviews

in criminal cases as attorney work product under Exemption 5.  *See, e.g.*, *Patino-Restrepo v. Dep't*

*of Justice*, 246 F. Supp. 3d 233, 245 (D.D.C. 2017), *aff'd*, 2019 WL 1250497 (D.C. Cir. Mar. 14,

2019) (citing *Martin* and granting summary judgment to agency on Exemption 5 "with regard to

the memoranda and summaries of witness interviews conducted in anticipation of the criminal case

against Plaintiff").   Significantly, two district courts have recently held that FBI FD-302s were

exempt from disclosure under FOIA as attorney work product.  *See N.Y. Times Co. v. Dep't of*

*Justice*, 138 F. Supp. 3d 462, 475–76 (S.D.N.Y. 2015), *aff'd in part, rev'd in part, and remanded*,

939 F.3d 479 (2d Cir. 2019)[4]; *Judicial Watch v. Dep't of Justice*, 391 F. Supp. 3d 43, 49–53

(D.D.C. 2019), *appeal filed*, No. 19-5218 (D.C. Cir. Aug. 14, 2019)[5].

    In *New York Times*, the plaintiffs sought documents from a DOJ investigation into "the

destruction of videotapes of CIA interrogations and into the deaths of detainees in CIA custody,"

including "all FBI FD–302 reports summarizing interviews conducted as part of" the investigation

led by then-Assistant United States Attorney ("AUSA") John Durham.  138 F. Supp. 3d at 466,

469.  The court determined that the FD-302s were work product because they revealed attorney

"mental impressions and strategic decisions about the investigation."[6]  *Id.* at 475.  The court further

found that the "mere selection of whom to interview" was privileged under the attorney work

product doctrine and subject to Exemption 5.  *Id.*  "Similarly, the questions [AUSA Durham] or

---

[4] The plaintiff in the *New York Times* case did not appeal the district court's determination that the FD-302s were exempt from disclosure under Exemption 5 as attorney work product.

[5] The D.C. Circuit has scheduled oral argument for March 23, 2020.

[6] Applying Second Circuit law, the *New York Times* court found that "witness statements are sometimes but not always work product" and "are work product when they reveal an attorney's strategic impressions and mental processes." *N.Y. Times*, 138 F. Supp. 3d at 472.  Under D.C. Circuit law, however, the Court need not determine whether the FD-302s at issue here would reveal attorney mental impressions.  *See Tax Analysts*, 117 F.3d at 620 (rejecting the argument that "the IRS may exclude *only* . . . text concerning the mental impressions, conclusions, opinions, or legal theories of an attorney" because the work-product doctrine "also protects factual materials prepared in anticipation of litigation" (emphasis and alteration in original)).  The fact that the FD-302s were prepared in anticipation of prosecution is sufficient for them to qualify as attorney work product.  *See Competitive Enter. Inst. v. U.S. Envtl. Prot. Agency*, 232 F. Supp. 3d 172, 184 (D.D.C. 2017) ("So long as a document was prepared because of the prospect of litigation, even the factual portions of the document are protected under the work product doctrine.").

his subordinates ask witnesses reveal his thinking about the substance of the case." *Id.* at 475–76. Because "[i]t is impossible for DOJ to disclose the FD-302s without revealing protected information about Durham's case analysis and strategy," the court concluded that the 302s were exempt from disclosure as attorney work product under Exemption 5. *Id.* at 476. Similarly, here, disclosure of the FD-302s would reveal the topics discussed with each witness and thus reveal protected information about the SCO attorneys' strategic decisions concerning the investigation. *See* Weinsheimer Decl. ¶ 38.

In *Judicial Watch*, the plaintiff filed a FOIA request seeking the FD-302s of former President Barack Obama, former presidential Chief of Staff Rahm Emanuel, and former Senior Advisor to the President Valerie Jarrett for interviews taken during the investigation of Rod Blagojevich, the former governor of Illinois. 391 F. Supp. 3d at 47. "FBI agents prepared the Forms 302 after witness interviews for which the AUSAs had selected the subjects, coordinated the questioning and strategy, and had been participants." *Id.* at 53. DOJ withheld the FD-302s in full as attorney work product under Exemption 5. *Id.* at 47. The court upheld the agency's determination, finding that "[b]ecause the Forms 302 were prepared in anticipation of impending litigation by FBI agents acting under the substantial direction of Assistant United States Attorneys," they constituted attorney work product and were properly withheld under Exemption 5. *Id.* at 53.

The facts of this case are very similar to those in *Judicial Watch*. In both cases, the witness interviews were conducted during an active criminal investigation that was led by an attorney who determined the strategic direction of the investigation. *See* Weinsheimer Decl. ¶ 13; *Judicial Watch*, 391 F. Supp. 3d at 52. In both cases, interviews were conducted to gather evidence to assess the extent to which evidence could be obtained to support criminal charges and to present

to a grand jury or at trial. *See* Weinsheimer Decl. ¶ 25; *Judicial Watch*, 391 F. Supp. 3d at 51, 52. As in *Judicial Watch*, at SCO, under the direction of the Special Counsel, "attorneys selected witnesses to interview," "discussed and determined in advance the investigative strategy for witness interviews," and "attorneys either participated in, or in many cases led" the interviews resulting the FD-302s that are the subject of this motion. Weinsheimer Decl. ¶ 26; *see Judicial Watch*, 391 F. Supp. 3d at 52. Also as in *Judicial Watch*, the FD-302s reflect witness responses to attorney questioning, Weinsheimer Decl. ¶ 38; *see Judicial Watch*, 391 F. Supp. 3d at 52— information that places the FD-302s at the core of the attorney work product doctrine, *see Martin*, 819 F.2d at 1182. And both sets of FD-302s were prepared by FBI agents acting under the substantial direction of attorneys.[7] Weinsheimer Decl. ¶ 37; *see Judicial Watch*, 391 F. Supp. 3d at 52–53. Given the similarities between this case and *Judicial Watch*, this Court should likewise conclude that the FD-302s are protected from disclosure as attorney work product under Exemption 5.

For the foregoing reasons, the FD-302s are subject to the attorney work product doctrine and may be withheld in their entirety pursuant to Exemption 5. *See Judicial Watch, Inc. v. Dep't of Justice*, 800 F. Supp. 2d 202, 211 (D.D.C. 2011) (segregability not required for work-product documents under Exemption 5).

---

[7] As the Court in *Judicial Watch* found, the fact that FBI Special Agents prepared the FD-302s, rather than DOJ prosecutors, does not diminish the FD-302s' status as attorney work product. 391 F. Supp. 3d at 52–53. It is well established that "[t]he work product doctrine can apply to preparatory work performed not only by attorneys, but also . . . by nonlawyers." *Toensing v. Dep't of Justice*, 999 F. Supp. 2d 50, 57 (D.D.C. 2013). That is because the attorney work product doctrine is "intensely practical [and] grounded in the realities of litigation," where "[o]ne of th[e] realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial." *Nobles*, 422 U.S. at 238. And although at least some "SCO prosecutors did not personally consider the FD-302s as their work product, they had no occasion or reason to fully evaluate whether the Department could assert the attorney work product doctrine under FOIA Exemption 5 and the applicable case law," Weinsheimer Decl. ¶ 34, and their subjective belief likewise does not diminish the FD-302s' status as attorney work product. Accordingly, the FD-302s, which were prepared by "government personnel working under [a] prosecuting attorney's direction and supervision," would still be considered attorney work product. *Durham v. Dep't of Justice*, 829 F. Supp. 428, 432 (D.D.C. 1993).

**B.  DOJ Properly Withheld Information Conveyed to SCO Because it is Protected by the Presidential Communications Privilege Under Exemption 5.**

The Department properly asserted FOIA Exemption 5 to withhold information in 19 FD-302s that is protected from disclosure by the presidential communications privilege.  *See* Brinkmann Decl. ¶ 8; *Vaughn* Index.[8]

The presidential communications privilege "is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *United States v. Nixon*, 418 U.S. 683, 708 (1974).  The privilege applies to "communications that directly involve the President," as well as "communications authored or solicited and received by [] members of an immediate White House adviser's staff who have broad and significant responsibility for investigating and formulating the advice to be given the President on the particular matter to which the communications relate." *In re Sealed Case*, 121 F.3d 729, 751–52 (D.C. Cir. 1997).  In particular, the privilege applies "to communications in performance of (a President's) responsibilities, . . . and made in the process of shaping policies and making decisions." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977) (citations omitted).  The privilege "preserves the President's ability to obtain candid and informed opinions from his advisors and to make decisions confidentially." *Loving*, 550 F.3d at 37; *see Nixon*, 418 U.S. at 708 (describing the privilege as a "presumptive privilege for [p]residential communications").  Unlike the deliberative process privilege, the presidential communications privilege "applies to documents in their entirety, and covers final and postdecisional materials as well as pre-deliberative ones." *In re Sealed Case*, 121 F.3d at 745.  The presidential communications privilege thus is a broader privilege that provides greater protection against disclosure. *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1114

---

[8] In the FOIA context, the presidential communications privilege need not be invoked only by the President himself, but may be asserted by the agency withholding the record in question.  *See Citizens for Responsibility & Ethics in Wash. v. Dep't of Homeland Sec.*, 514 F. Supp. 2d 36, 48 n.10 (D.D.C. 2007).

(D.C. Cir. 2004).

As explained in the Brinkmann Declaration and the *Vaughn* Index, DOJ has invoked Exemption 5 to withhold information contained within the narratives of the FD-302s that reflect confidential communications made in the course of preparing information or advice for potential presentation to the President (or President-elect) on matters of presidential decision-making or—in some cases—confidential communications directly with the President (or President-elect) on matters of presidential decision-making. To be clear, neither DOJ nor FBI is asserting that the FD-302s themselves are presidential communications and no FD-302s have been withheld in full under this privilege. *See* Pls.' Mem. 22. Rather, DOJ has redacted only information relayed to SCO by senior presidential advisers, senior transition officials, other employees of the White House Office, and others who had spoken directly with the President or his advisers on matters of presidential decision-making. Brinkmann Decl. ¶¶ 20, 31. Thus, Plaintiffs' argument that the FD-302s themselves were not created "to help the President make decisions" misses the mark and can be disregarded in its entirety. *See* Pls.' Mem. 22; *see also Citizens for Responsibility & Ethics in Wash. v. Dep't of Homeland Sec.*, No. 06-0173, 2008 WL 2872183, at *3 (D.D.C. July 22, 2008) (in finding that the agency properly redacted documents that reflected communications with the President or his staff, noting that "the privilege is *not* being claimed over the documents themselves, but rather the communications memorialized within them").

The Department withheld three types of communications under the presidential communications privilege: (1) communications between Government officials or staff during the Administration in connection with presidential decision-making; (2) communications between transition officers or staff which concern potential presidential decisions after the Inauguration; and (3) communications involving private parties concerning presidential decision-making.

**1.  Communications Between Government Officials or Staff During the Administration Concerning Presidential Decision-making**

The Department withheld descriptions of communications between government officials or staff on matters of presidential decision-making, where at least one party to the communication is either the President himself, an immediate adviser to the President, or a member of the staff of an immediate adviser to the President.  Brinkmann Decl. ¶ 21.  These communications are designated as "PCP Category 1" on the *Vaughn* Index.

During interviews, various witnesses described communications with immediate advisers in the Office of the President, and, in some instances, with the President himself.  *Id.*  These communications involved at least one of the following individuals: President Donald Trump; Vice President Michael Pence; Chief of Staff John Kelly; Chief of Staff Reince Priebus; Counsel to the President Donald McGahn; National Security Advisor Michael Flynn; Special Counsel to the President Emmett Flood; Press Secretary Sean Spicer; Deputy Press Secretary (and later, Press Secretary) Sarah Huckabee Sanders; Staff Secretary Robert Porter; Chief Strategist and Senior Adviser to the President Stephen Bannon; Deputy Chief of Staff Richard Dearborn; Deputy Counsel to the President and Legal Adviser to the National Security Council John Eisenberg; Deputy National Security Advisor K.T. McFarland; Deputy Counsel to the President Uttam Dhillon; Chief of Staff to the Counsel to the President Annie Donaldson; Senior Advisor to the President Jared Kushner; Senior Advisor to the President Ivanka Trump; Director of Strategic Communications (and later, Director of Communications) Hope Hicks; and Senior Advisor to the President Stephen Miller.  *Id.* ¶ 22.  There can be no dispute that the presidential communications privilege extends to communications with these individuals.  *See In re Sealed Case*, 121 F.3d at 752 (extending the privilege to "communications made by presidential advisers" and "those members of an immediate White House adviser's staff who have broad and significant

responsibility for investigating and formulating the advice to be given the President on the particular matter to which the communications relate").

Communications described in the FD-302s concern "[p]ossible actions to be taken in the conduct of foreign relations," "[p]ossible actions to be taken with respect to nomination, appointment or removal of presidential appointees," "[p]ossible presidential action documents (whether styled as Executive Orders, Presidential Memoranda, Proclamations, National Security Presidential Memoranda, or other forms)," and "[p]ossible official public statements, which the President personally participated in developing or was anticipated to participate in developing." Brinkmann Decl. ¶ 23.  These communications among immediate White House advisers, and in some instances, with the President himself, were made "in the course of performing their function of advising the President on official government matters." *In re Sealed Case*, 121 F.3d at 752; Brinkmann Decl. ¶ 21.

Disclosing the communications recounted in the FD-302s would not simply reveal sensitive deliberative information; it would, more specifically, reveal information "solicited and received" by the President's "immediate White House advisers" and the members of their staffs "who have 'broad and significant responsibility for investigating and formulating the advice to be given the President.'" *Judicial Watch*, 365 F.3d at 1114 (quoting *In re Sealed Case*, 121 F.3d at 752).  Because those advisers were responsible for advising the President about various aspects of foreign and domestic policy—*i.e.*, the topics the communications recounted in the FD-302s specifically addressed—the information in those FD-302s falls within the presidential communications privilege.

> 2.  **Communications Between Transition Officials or Staff Concerning Potential Presidential Decisions after the Inauguration**

As an initial matter, Plaintiffs argue that DOJ redacted information from the FD-302s

regarding communications that occurred "during the 2016 presidential race—when Donald Trump was merely a candidate for president." Pls.' Mem. 22. Not so. "The Department has not withheld material pursuant to Exemption Five's incorporation of the presidential communications privilege for communications taking place during the campaign period or earlier." Brinkmann Decl. ¶ 24.

Instead, DOJ withheld communications that occurred after the election but before the Inauguration (*i.e.*, the "presidential transition period") between Transition officials or staff that concern potential presidential decisions after the Inauguration, where at least one party to the communication is either the President-elect himself, a Transition official who has been designated to be an immediate adviser to the President-elect, or a member of the staff of such an official. *Id.* These communications are designated as "PCP Category 2" on the *Vaughn* Index.

The communications in this category included one or more of the following individuals: President-elect Donald Trump; Vice President-elect and Transition Chair Michael Pence; Transition Vice Chair Jefferson Sessions; Transition Vice-Chair and National Security Adviser-designate Michael Flynn; Transition Vice-Chair and Deputy National Security Advisor-designate K.T. McFarland; Transition Executive Committee and Chief of Staff-designate Reince Priebus; and members of the Transition Executive Committee, Ivanka Trump, Jared Kushner, Stephen Bannon, and Kellyanne Conway. *Id.* ¶ 25. These communications concerned "[p]ossible actions to be taken in the conduct of foreign relations," "[p]ossible actions to be taken with respect to nomination, appointment or removal of presidential appointees," and "[p]ossible presidential action documents (whether styled as Executive Orders, Presidential Memoranda, Proclamations, National Security Presidential Memoranda, or other forms)." *Id.* ¶ 26. The "principal purpose of the communications was to prepare for potential Presidential decisions that would be made after the Inauguration." *Id.*

The rationales for the presidential communications privilege apply to communications within a presidential transition team.  As Congress has recognized, "orderly transfer of the executive power in connection with the expiration of the term of office of a President and the inauguration of a new President" is of paramount importance, as "[a]ny disruption occasioned by the transfer of the executive power could produce results detrimental to the safety and well-being of the United States and its people."  Presidential Transition Act ("PTA") of 1963, Pub. L. No. 88-277 (codified as amended at 3 U.S.C. § 102 note).[9]  Simply put, the President must be able to make decisions on Inauguration Day.  To make those decisions beginning on Inauguration Day, the President must be able to rely on the candid advice from the transition team.  Communications among the transition team concerning potential presidential decisions are "made in the process of shaping" what will be the "policies" and "decisions" of the President.  *Nixon*, 433 U.S. at 449.  If the privilege did not extend to the transition period, then the President-elect would not be able to benefit from the candid advice from the transition team, which would thus "impede effective functioning of the presidency."  *In re Sealed Case*, 121 F.3d at 751.

Accordingly, the presidential communications privilege extends to communications during the transition period, and DOJ properly redacted this information under Exemption 5.

### 3. Communications Including One or More Private Parties Concerning Presidential Decision-making

The Department withheld descriptions of communications after the Inauguration

---

[9] Other provisions of the PTA recognize that the President-elect and his advisers will prepare for presidential decisions during the transition period. The Act provides the transition team with federal funds, access to non-public governmental information, and access to some federal facilities. *See* PTA §§ 3(a), (b), 4(g)(l); *see also* Exec. Order No. 13727 (2016). Those resources may be used "during the transition" to prepare materials for "key prospective Presidential appointees," and to provide the President-elect, "as soon as possible after" the election, with a "detailed classified, compartmentalized summary . . . of specific operational threats to national security; major military or covert operations; and pending decisions on possible uses of military force." PTA § 3(a)(8)(A)(i), (v). Congress expected that the President-elect and his advisers would use such information to plan for presidential decisions. As the House Committee explained, when the President-elect "make[s] his plans and select[s] his staff," he is engaged in "legitimate functions of Government." H.R. Rep. No. 88-301, at 4 (1963).

concerning presidential decision-making, where at least one party to the communication is either the President himself, an immediate adviser to the President, or a member of the staff of an immediate adviser to the President, but where at least one other party to the communication was a private party at the time of the communication.  Brinkmann Decl. ¶ 27.  These communications are designated as "PCP Category 3" on the *Vaughn* Index.

The communications in this category were between private parties and one or more individuals listed in "PCP Category 1."  *See supra* Part I.B.1 (listing the President and various immediate advisers and their staff); Brinkmann Decl.. ¶¶ 22, 29.  And also like the communications encompassed in "PCP Category 1," the communications in this category concern "[p]ossible actions to be taken in the conduct of foreign relations," "[p]ossible actions to be taken with respect to nomination, appointment or removal of presidential appointees," "[p]ossible presidential action documents (whether styled as Executive Orders, Presidential Memoranda, Proclamations, National Security Presidential Memoranda, or other forms)," and "[p]ossible official public statements, which the President personally participated in developing or was anticipated to participate in developing."  *Id.* ¶ 30.  As such, these communications between private parties and the President or his immediate advisers or their staff were for preparing recommendations for and/or communicating with the President.  *See In re Sealed Case*, 121 F.3d at 750, 752.

"Article II not only gives the President the ability to consult with his advisers confidentially, but also, as a corollary, it gives him the flexibility to organize his advisers and seek advice from them as he wishes."  *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 909 (D.C. Cir. 1993).  As the D.C. Circuit has emphasized, "Presidential advisers do not explore alternatives only in conversations with the President or pull their final advice to him out of thin air."  *In re Sealed Case*, 121 F.3d at 750.  Rather, "in the course of preparing advice for the

President," senior advisers "need . . . sufficient elbow room . . . to obtain information from all knowledgeable sources." *Id.* at 752. As such, the presidential communications privilege applies to communications between the President's immediate advisers or their staff and private parties to prepare recommendations or provide advice to the President, and DOJ properly withheld this information under Exemption 5.

### C. DOJ and FBI Properly Withheld Deliberative Information Contained Within the Narratives of the FD-302s or Attached to the FD-302s Under Exemption 5.

DOJ and FBI withheld information from the FD-302s that is protected from disclosure by the deliberative process privilege under Exemption 5. The deliberative process privilege applies to "decisionmaking of executive officials generally," and protects documents containing deliberations that are part of the process by which government decisions are formulated. *In re Sealed Case*, 121 F.3d 729, 737, 745 (D.C. Cir. 1997). The purpose of the privilege is to "'prevent injury to the quality of agency decisions'" by "encourag[ing] frank discussion of policy matters, prevent[ing] premature disclosure of proposed policies, and avoid[ing] public confusion that may result from disclosure of rationales that were not ultimately grounds for agency action." *Thelen v. Dep't of Justice*, 169 F. Supp. 3d 128, 138 (D.D.C. 2016) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975)) (citing *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982)).

To fall within the scope of the deliberative process privilege, the material must be both pre-decisional and deliberative. *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). Material is pre-decisional if "it was generated before the adoption of an agency policy." *Id.* Material is deliberative if "it reflects the give-and-take of the consultative process." *Id.* The privilege therefore applies broadly to "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the

policy of the agency." *Id.*

As explained in the Brinkmann Declaration, Hardy Declaration, and the *Vaughn* Index, DOJ and FBI have invoked Exemption 5 to withhold information contained within the narratives of the FD-302s and an attachment to the McCord FD-302 that reflect non-final inter- or intra-agency deliberations.  To be clear, neither DOJ nor FBI is asserting that the FD-302s themselves are deliberative or that the FD-302s reflect the deliberative process of SCO prosecutors or agents, *see* Pls.' Mem. 20; rather, DOJ has redacted only information relayed to SCO by Government employees concerning various DOJ decision-making processes.  Brinkmann Decl. ¶ 11.  And FBI has redacted only draft talking points that were attached to the McCord FD-302.  Hardy Decl. ¶¶ 8, 12–20.  Thus, Plaintiffs' argument that the FD-302s themselves are not predecisional and deliberative misses the mark and can be disregarded in its entirety.[10]  *See* Pls.' Mem. 19–21.

### 1.  DOJ Properly Withheld Deliberative Information Conveyed to SCO Personnel by Government Employees During Interviews.

The Department properly asserted FOIA Exemption 5 to withhold information in three FD-302s that is protected from disclosure under the deliberative process privilege.  *See* Brinkmann Decl. ¶ 11; *Vaughn* Index.  Specifically, in the three FD-302s summarizing the interviews of former Deputy Attorney General Rod Rosenstein, former Acting Assistant Attorney General for National Security Mary McCord, and Senior Advisor to the President Stephen Miller, DOJ

---

[10] Plaintiffs allege that Defendant has "not yet produced to Plaintiffs three of the 302s that it claims to have redacted in part pursuant to the deliberative process privilege."  Pls.' Mem. 19 n.9.  These FD-302s have not yet been disclosed because the FBI referred them to one or more members of the Intelligence Community for a determination as to whether those agencies' information should be withheld or released, in compliance with DOJ FOIA regulations.  Hardy Decl. ¶ 8.  Once those agencies have made their determinations, the portions of those FD-302s determined to be non-exempt will be disclosed.  *Id.*; *see also* Def.'s Status Report 2 n.1 (Jan. 7, 2020), Dkt. 51 (explaining that some FD-302s were referred for consultation to members of the Intelligence Community); Def.'s Resp. to Pls.' Mot. 9–12 (Jan. 29, 2020), Dkt. 57 (explaining same); *see generally* Decl. of David Hardy (Jan. 29, 2020), Dkt. 57-1 (explaining the consultation process).  Because DOJ and FBI had finished processing those FD-302s under Exemption 5, defense counsel informed Plaintiffs' counsel that material would be redacted from certain FD-302s as attorney work product and/or under the deliberative process and presidential communications privileges.  *See* Pls.' Mem. Ex. A, Dkt. 59-1.  Because the members of the Intelligence Community have not yet finished their review of those FD-302s, defendant does not address here the redactions to those documents.

withheld the portions of those FD-302s that reflect predecisional, deliberative information related to Departmental decision-making conveyed to SCO personnel by the witness.  Brinkmann Decl. ¶¶ 11–16.

During his interview, then Deputy Attorney General Rosenstein discussed predecisional, deliberative information related to various DOJ decision-making processes, and his recounting of this information was recorded in an FD-302.  *See* Brinkmann Decl. ¶¶ 12–14.  First, Mr. Rosenstein discussed his "deliberative process in drafting the memorandum regarding former FBI Director James Comey referenced in the preceding paragraphs in the FD-302, and describe[d] substantive edits made to the memorandum throughout the drafting process by Mr. Rosenstein and other subordinate [Office of the Deputy Attorney General ("ODAG")] employees."  *Id.* ¶ 12.  In doing so, Mr. Rosenstein described the "actual recommendations made by subordinate ODAG staff for Mr. Rosenstein's consideration in drafting the referenced memorandum," and the FD-302 "identifies the sources of information that Mr. Rosenstein considered throughout this process."  *Id.* Recommendations from subordinates considered during the drafting of a memorandum falls squarely within the deliberative process privilege.  *See Coastal States*, 617 F.2d at 866 (finding that the privilege applies to "recommendations," "proposals," and "suggestions").

Mr. Rosenstein also discussed "internal Department deliberations related to the potential appointment of a special counsel, prior to Mr. Mueller's appointment on May 17, 2017," including information provided to Mr. Rosenstein by various DOJ officials for Mr. Rosenstein's consideration.  Brinkmann Decl. ¶¶ 13.  And Mr. Rosenstein recounted a discussion he had with Mr. Comey when Mr. Comey was the Director of the FBI about whether updates to a longstanding Department policy were warranted.  *Id.* ¶ 14.  Because these discussions reflect "the give-and-take of the consultative process" that occurred, in one instance before the Special Counsel was

27

appointed and in the other instance before a decision was made to update the Department policy, this information falls within the deliberative process privilege. *Coastal States*, 617 F.2d at 866.

Similarly, Ms. McCord relayed predecisional, deliberative information related to DOJ decision-making processes to the SCO interviewers that was memorialized in her FD-302. *See* Brinkmann Decl. ¶ 15.  During her interview, Ms. McCord, who was then the Acting Assistant Attorney General for National Security, recounted "national security related discussions" "among representatives from a small number of Executive Branch agencies, including DOJ," in which "the participants discussed rationales, opinions, and alternatives to specific issues." *Id.*  Courts have routinely found that discussions of alternative courses of action are protected under the deliberative process privilege. *See, e.g.*, *Colorado Wild Horse & Burro Coal., Inc. v. Kempthorne*, 571 F. Supp. 2d 71, 76 (D.D.C. 2008) (concluding that the agency properly withheld emails and memoranda "relating to the alternatives for managing wild horses in the West Douglas Herd Area" under the deliberative process privilege).  Indeed, as the D.C. Circuit has stated, the privilege's "'ultimate purpose . . . is to prevent injury to the quality of agency decisions' by allowing government officials freedom to debate alternative approaches in private." *In re Sealed Case*, 121 F.3d at 737 (quoting *Sears*, 421 U.S. at 151).  Therefore, the discussion of alternatives to national security-related issues as recounted in the McCord FD-302 is protected from disclosure under the deliberative process privilege.

Likewise Mr. Miller relayed predecisional, deliberative information related to a DOJ decision-making process to the SCO interviewers that was memorialized in his FD-302. *See* Brinkmann Decl. ¶ 16.  During his interview, Mr. Miller recounted a discussion he had with then Attorney General Jefferson Sessions about internal Department decision-making concerning a personnel matter. *Id.*  Conversations between White House and agency officials concerning

28

agency deliberations are routinely protected from disclosure under the deliberative process privilege. *See Judicial Watch, Inc. v. CFPB*, 60 F. Supp. 3d 1, 11 (D.D.C. 2014) (finding that a communication between an employee of an agency and White House staff concerning agency deliberations was protected from disclosure under the deliberative process privilege); *Democratic Nat. Comm. v. Dep't of Justice*, 539 F. Supp. 2d 363, 368 (D.D.C. 2008) (finding that "e-mails . . . exchanged between officials in the White House and DOJ" were properly withheld under the deliberative process privilege).

Accordingly, because the FD-302s memorializing the Rosenstein, McCord, and Miller interviews reflect predecisional and deliberative information concerning various DOJ decision-making processes, DOJ properly withheld that information under Exemption 5.

### 2. The FBI Properly Withheld Deliberative Draft Talking Points that were Attached to the McCord FD-302 Under Exemption 5.

The FBI withheld an attachment to the McCord FD-302 as protected by the deliberative process privilege under Exemption 5. Hardy Decl. ¶ 8. This attachment, which was used during the questioning of Ms. McCord, is a draft list of talking points and potential questions and answers that the FBI prepared in early March 2017 to brief Congress about the investigation into the Russian government's efforts to interfere in the 2016 presidential election, including any links or coordination between the Russian government and individuals associated with the Trump campaign (codenamed "Crossfire Hurricane"). *Id.* ¶¶ 8, 12–20.

The talking points are predecisional because they were created in advance of Congressional testimony and are deliberative because they reflect a give-and-take between drafters and editors about what information should be provided to Congress concerning the Crossfire Hurricane investigations and how that information should be provided. *See id.* ¶¶ 8, 12–15. Even final versions of documents like this one, "which are preliminary to testimony before Congress, are

exempt from disclosure under Exemption 5." *Sierra Club v. Dep't of the Interior*, 384 F. Supp. 2d 1, 26 (D.D.C. 2004) (upholding finding that the deliberative process privilege prevented disclosure of "draft letters . . . [that] constitute recommendations from staff as to how agency officials might handle congressional inquiries"); *see also Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1196–97 (D.C. Cir. 1991) (holding that a memorandum written to prepare senior agency officials for Congressional testimony was protected under deliberative process privilege); *Judicial Watch, Inc.*, 60 F. Supp. 3d at 9 (collecting cases holding that discussions regarding how to respond to Congress have been held to be protected under the deliberative process privilege).

Moreover, the talking points are predecisional and deliberative because the document is a draft. Hardy Decl. ¶ 15. The talking points were prepared by the FBI, were "provided to and exchanged with DOJ for review and editing," *id.* ¶ 8, and "went through various rounds of comments and edits within and between DOJ and the FBI," *id.* ¶ 12. The withheld pages "contain electronic and handwritten comments and edits tracking and reflecting the back-and-forth that occurred within and between DOJ and the FBI as employees worked toward a final, agreed-upon position for agency officials to take in briefing Congress." *Id.* ¶ 15. Thus, the draft with its edits and comments "reflect[s] the solicitation and provision of feedback, edits, and recommendations" from individuals within the FBI and DOJ in advance of providing a Congressional briefing and thus "directly reflect[s] the give-and-take process leading to a final agency decision." *Id.*

Moreover, "draft documents, by their very nature, are typically predecisional and deliberative." *Agility Public Warehousing Co. v. Dep't of Defense*, 110 F. Supp. 3d 215, 221 (D.D.C. 2015) (quotation omitted). Indeed, courts have routinely found that draft documents are protected from disclosure under the deliberative process privilege. *See, e.g.*, *Coastal States*, 617 F.2d at 866 (stating that the exemption covers "draft documents").

Accordingly, because the draft talking points are predecisional and deliberative, the FBI properly withheld them under Exemption 5.

## II.   DOJ AND FBI COMPLIED WITH THE FORESEEABLE HARM STANDARD IN THE FOIA IMPROVEMENT ACT OF 2016

Plaintiffs argue that DOJ and FBI have not met their burden to show that release of the withheld information would cause a "foreseeable harm," as articulated in the FOIA Improvement Act of 2016, 5 U.S.C. § 552(a)(8). *See generally* Pls.' Mem. 1–19.  The Act directs agencies to assess "whether an agency has reasonably foreseen a specific, identifiable harm" before making a disclosure determination with respect to certain exemptions.  H.R. Rep. No. 114-391, at 9. Plaintiffs suggest that this amendment worked a significant change to the Government's burden when withholding information under FOIA.  *See* Pls.' Mem. 5–7.  But Congress made clear that the amendment simply codified existing government policy that had been in place for the better part of a decade.  H.R. Rep. No. 114-391, at 9 (noting that the policy was established by executive memoranda in 2009); S. Rep. No. 114-4 at 8 (same); Freedom of Information Act, 74 Fed. Reg. 4683 (Jan. 21, 2009) (presidential memorandum).  And DOJ already employed this standard when defending agency withholdings in litigation.  *See* H.R. Rep. No. 114-391, at 9; *accord* Attorney General Holder's Mem. for Heads of Exec. Dep'ts & Agencies Concerning the Freedom of Information Act, at 1–2 (Mar. 19, 2009), *available at* http://www.usdoj.gov/ag/foia-memo-march2009.pdf.  Further, Congress expressly acknowledged that this amendment "does not alter the scope of information that is covered under an exemption."  H.R. Rep. No. 114-391, at 10. Rather, with respect to certain FOIA exemptions, § 552(a)(8)(A)(i)(I) simply requires agencies to identify a foreseeable harm to an interest protected within the existing scope of certain exemptions, in line with prior policy.

DOJ's and FBI's declarations easily meet this standard with regard to withholdings under

the attorney work product doctrine, the presidential communications privilege, and the deliberative

process privilege.  The attorney work product doctrine aims to "protect the adversary trial process

itself" as "the integrity of our system would suffer if adversaries were entitled to probe each other's

thoughts and plans concerning the case."  *Rockwell Int'l Corp. v. Dep't of Justice*, 235 F.3d 598,

604–05 (D.C. Cir. 2001) (quoting *Coastal States*, 617 F.2d at 864).   The presidential

communications privilege "preserves the President's ability to obtain candid and informed

opinions from his advisors and to make decisions confidentially."  *Loving*, 550 F.3d at 37.

Similarly, the deliberative process privilege aims "to enhance the 'quality of agency decisions,' by

protecting open and frank discussion among those who make them within the Government."

*Klamath*, 532 U.S. at 9 (quoting *Sears*, 421 U.S. at 150).  The deliberative process privilege also

aims to "protect the public from the confusion that would result from premature exposure to

discussions occurring before" a final decision has been made.  *Russell*, 682 F.2d at 1048.  DOJ's

and FBI's declarations explain in detail how disclosure of the information at issue would

foreseeably harm the interests protected by these privileges.

With respect to the attorney work product doctrine, Mr. Weinsheimer explained that,

"[g]iven the unique structure of the Special Counsel's Office, as well as the role of attorneys at

every investigative phase, including witness interviews, disclosing the contents of the FD-302s at

issue here would . . . indirectly reveal the mental impressions, assessments, and thought processes

of the attorneys involved in the investigation and of the Special Counsel in particular, contrary to

the purpose of the attorney work product doctrine."  Weinsheimer Decl. ¶ 38.  Specifically,

attorneys' "decisions on whom to interview, when, and the topics to cover or avoid during the

interview could be revealed by reading and analyzing the FD-302s."  *Id.*  Accordingly, "given the

substantial involvement of the attorneys in the interviews, as well as that the interviews occurred

32

at the direction and instruction of the Special Counsel, revealing the FD-302s would inhibit the flexibility with which future special counsels might structure and pursue investigations." *Id.* Indeed, courts have recognized that "disclosure of information generated during a prosecutor's assessment of particular cases would be extremely detrimental to the prosecutor's free exercise of discretion." *Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*, 485 F. Supp. 1, 14 (D.D.C. 1978).

With respect to the presidential communications privilege, DOJ's declarant, Vanessa Brinkmann, explained that release of "material covered by the presidential communications privilege would do considerable harm to the interests protected by the privilege." Brinkmann Decl. ¶ 32. If communications that were made to advise the President or President-elect on foreign relations, presidential appointees, presidential action documents, or official public statements are "forced to be disclosed, Presidents and their advisers will be unable to confidently engage in confidential decision-making without fear that their deliberations will be open to public view." *Id.* "Candid discussions will naturally be chilled or inhibited, and the efficiency of government policy making would suffer." *Id.* And "disclosing transition deliberations would jeopardize the ability of future Presidents-elect to have full and candid discussions with their advisers" and "would undermine the ability to protect the confidentiality of discussions on the same matters after the President-elect takes office and further damage the quality of presidential decision-making." *Id.*

With respect to the deliberative process privilege, Ms. Brinkmann explained that release of the deliberative information in the Rosenstein, McCord, and Miller FD-302s "would reasonably likely cause harm to DOJ's decision-making processes" in numerous ways. Brinkmann Decl. ¶ 18. Specifically, release of Mr. Rosenstein's discussions concerning the drafting of a memorandum concerning Mr. Comey "risks confusing the relevant issues considered by Mr.

Rosenstein and other DOJ officials and risks misleading the public by suggesting rationales for the information contained in the memorandum which were not in fact the ultimate reasons for Department action." *Id.* ¶ 12.

Release of information Mr. Rosenstein considered when deciding whether to appoint a special counsel could "mislead[] the public concerning the rationale behind appointing a special counsel" and would cause "subordinates within the Department [to] no longer feel free to engage directly with a decision-maker and offer their uninhibited opinions concerning the appointment of a special counsel or other Department personnel." *Id.* ¶ 13.  Similarly, release of deliberative national security-related discussions from the McCord FD-302 would cause "representatives from Executive Branch agencies, including DOJ, [to] no longer feel free to engage directly with a decision-maker and offer their uninhibited opinions," which is particularly important in discussions concerning national security related issues.  *Id.* ¶ 15.

Release of deliberative communications between Mr. Rosenstein and Mr. Comey on whether to update an existing Department policy "could discourage such candor between senior leaders in the Department in future discussions concerning Department policy." *Id.* ¶ 14. Similarly, release of deliberative information provided by the then Attorney General to Mr. Miller "would chill Department employees from offering candid opinions to White House staff without fear of later being subject to public criticism." *Id.* ¶ 16.

The FBI's declarant, David Hardy, explained that the release of the draft talking points that were attached to the McCord FD-302 could chill deliberations among FBI and DOJ employees, which is particularly important when they are "advising about sensitive matters of the utmost significance to our democratic processes and the national security of the country." Hardy Decl. ¶ 16.  Mr. Hardy further explained that the natural tendency of employees to "pull their punches"

in matters of "extreme scrutiny," such as the Crossfire Hurricane investigations, "is mitigated only by assuring employees that recommendations, opinions, and preliminary views they voice during a decision-making process will not be made public." *Id.* In addition, release of the talking points with edits and comments "would risk public confusion" because "[t]hese drafts do not reflect a final agency decision about how and what to brief to Congress and disclosure could lead to a false, incorrect, or incomplete narrative about what actually occurred." *Id.* ¶ 17.

In sum, disclosure of the redacted information falls within the heart of the foreseeable harms protected against by the attorney work product doctrine, the presidential communications privilege, and the deliberative process privilege, and DOJ and FBI thus properly withheld that information pursuant to Exemption 5.

## III.   EXEMPTION 5 IS NEITHER OVERCOME NOR WAIVED

Plaintiffs advance three arguments for why they allege that attorney work product under Exemption 5 is inapplicable in this case.[11] *See* Pls.' Mem. at 10–19. All three arguments—that DOJ waived attorney work product for material officially acknowledged in the Mueller Report, that information provided to SCO pursuant to a witness proffer does not constitute attorney work product, and that government misconduct overrides Exemption 5—fail as a matter of law and fact.

### A.   DOJ Has Not Withheld Information That Has Been Officially Acknowledged in the Mueller Report.

Plaintiffs argue that DOJ has waived its ability to withhold information under the attorney work product doctrine for material officially acknowledged in the Mueller Report. *See* Pls.' Mem. 10–13. But the Department did not withhold information from the FD-302s under Exemption 5

---

[11] Plaintiffs point to an alleged "discrepancy" in the productions, noting that DOJ redacted information from certain FD-302s as attorney work product under Exemption 5 but did not produce them to Plaintiffs. *See* Pls.' Mem. 10 n.4. As explained above, these FD-302s have been referred to one or more members of the Intelligence Community and the non-exempt portions will be released once those agencies have made their determinations, the portions of those FD-302s determined to be non-exempt will be disclosed. *See supra* n.10; Hardy Decl. ¶ 8.

that was released in the public version of the Mueller Report.  As Ms. Brinkmann, Senior Counsel

in DOJ's Office of Information Policy ("OIP") explained,

> Because the Mueller Report has been publicly released in a redacted form, OIP
> conducted a thorough review of each FD-302 to determine whether any information
> in each document was released to the public in the redacted Mueller Report.  To
> accomplish this, two OIP Attorneys cross-referenced the released portions of the
> Report which cited to any of the FD-302s released in this litigation with the text of
> each FD-302.  If the information in a given FD-302 was as specific as that
> information released in the Mueller Report, OIP made the determination that the
> Department waived its ability to assert Exemption 5 of the FOIA over that
> information and thus, that information was released in the FD-302s produced to
> Plaintiffs in this litigation.

Brinkmann Decl. ¶ 39.  After Plaintiffs filed their brief, "OIP Attorneys re-reviewed each FD-302

listed on pages 12, 13, 15, and 18 of Plaintiffs' Memorandum[,] compared each FD-302 to

information in the Report that cites to each FD-302," and determined that, aside from two

instances,[12] "OIP did not withhold any information pursuant to Exemption 5 that is waived by its

release in the Report."  *Id.* ¶ 40.

Ms. Brinkmann further explained that in some instances, the information released in the

Mueller Report did not match the information in a given FD-302 because the language used in the

FD-302 differed from the language used in the Report, such that "releasing a portion of a given

FD-302 would provide the public with new information that was not revealed in the redacted

Mueller Report."  *Id.* ¶ 39.  In those circumstances, OIP properly determined that Department had

not waived its ability to withhold the information pursuant to FOIA Exemption 5 because the

information in the FD-302s did not "match the information previously disclosed" and was not "as

---

[12] As Ms. Brinkmann acknowledged, "[d]ue to human error, certain portions of two FD-302s from two interviews of
Dmitri Simes dated March 8, 2018 and March 27, 2018, were inadvertently withheld even though they were waived
through release of the same information in the Report."  Brinkmann Decl. ¶ 40 n.8.  The affected pages will be
reprocessed and re-released to Plaintiffs in a future production.  *Id.*

specific as the information previously released" in the public version of the Mueller Report.  *Wolf*, 473 F.3d at 378 (quoting *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990)).

Plaintiffs also argue, in a footnote, that "DOJ's presentations at the various criminal trials stemming from the Special Counsel's investigation also represent official acknowledgements of information contained in the 302s at issue."  Pls.' Mem. 13 n.7.  But, as Plaintiffs themselves recognized, *see id.* at 11, it is Plaintiffs' burden to show that the material in the FD-302s was officially acknowledged, *see Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999).  Plaintiffs' vague assertion that some of the material in unnamed FD-302s may have been officially acknowledged during "DOJ's presentations at the various criminal trials stemming from the Special Counsel's investigation," Pls.' Mem. 13 n.7, is much too vague for Plaintiffs to meet their burden, *see Pub. Citizen v. Dep't of State*, 11 F.3d 198, 201 (D.C. Cir. 1993) (stating that "FOIA plaintiffs cannot simply show that similar information has been released, but must establish that a specific fact already has been placed in the public domain").

Because OIP attorneys conducted thorough reviews to determine that no material in the Mueller Report was withheld from the FD-302s under Exemption 5, and because Plaintiffs have failed to meet their burden to show that material in any FD-302s was officially acknowledged in any other circumstance, DOJ has not waived its ability to redact information under Exemption 5.

### B.  The Government Misconduct Exception Neither Applies in FOIA Cases Nor Vitiates DOJ's and FBI's Assertion of Exemption 5.

Plaintiffs argue that government misconduct—in this case, their allegations concerning the "Trump Tower Moscow Project," "the June 9, 2016 Trump Tower meeting," and "President Trump's efforts to prevent disclosure of emails about the June 9, 2016 Trump Tower meeting and his role in creating misleading public statements about that meeting"—renders Exemption 5 inapplicable.  *See* Pls.' Mem. 16–19.  This argument fails because: (1) the prevailing view is that

37

the government misconduct exception does not apply in the FOIA context; and (2) even if the government misconduct exception were applicable, the FD-302s do not reflect any misconduct.

First, it is questionable whether the government misconduct exception can be used to pierce a withholding under Exemption 5. For example, the D.C. Circuit has held that, in the context of a grand jury subpoena, that "[t]he deliberative process privilege is a qualified privilege and can be overcome by a sufficient showing of need," because "where there is reason to believe the documents sought may shed light on government misconduct, the privilege is routinely denied, on the grounds that shielding internal government deliberations in this context does not serve the public's interest in honest, effective government." *In re Sealed Case*, 121 F.3d at 737–38 & n.5. But in the same opinion, the D.C. Circuit disclaimed the applicability of a government misconduct exception in the context of the FOIA, explaining "[t]his characteristic of the deliberative process privilege is not an issue in FOIA cases because the courts have held that the particular purpose for which a FOIA plaintiff seeks information is not relevant in determining whether FOIA requires disclosure." *Id.*; *see also U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 772 (1989) ("The Act's sole concern is with what must be made public or not made public."); *Grolier*, 462 U.S. at 20, 28 ("The test under Exemption 5 is whether the documents would be 'routinely' or 'normally' disclosed upon a showing of relevance" not whether they would be disclosed to a party who shows "substantial need" "sufficient to override the privilege" in a particular case); *Sears*, 421 U.S. at 149 n.16 ("It is not sensible to construe [the FOIA] to require disclosure of any document which would be disclosed in the hypothetical litigation in which the private party's claim is most compelling," *i.e.*, it should not "turn on the extent of the litigant's need").

Numerous courts in this district have agreed that "the government misconduct exception recognized in *In re Sealed Case* cannot overcome an otherwise valid withholding pursuant to Exemption 5." *Judicial Watch, Inc. v. Dep't of State*, 241 F. Supp. 3d 174, 181 (D.D.C.), *amended on reconsideration*, 282 F. Supp. 3d 338 (D.D.C. 2017) (quoting *Wright v. Admin. for Children & Families*, No. 15-218, 2016 WL 5922293, at *11 (D.D.C. Oct. 11, 2016)); *see also Judicial Watch, Inc. v. Dep't of State*, 285 F. Supp. 3d 249, 253 (D.D.C. 2018) ("It is not clear in this circuit whether a government misconduct exception may properly be invoked in a FOIA case."); *Judicial Watch, Inc. v. Dep't of Commerce*, No. 15-cv-2088-CRC, 2017 WL 3822733, at *2 (D.D.C. Aug. 21, 2017) ("[T]he D.C. Circuit has never held that government misconduct can abrogate the deliberative process privilege in a FOIA case."); *Wright*, 2016 WL 5922293, at *11 ("This reading of *In re Sealed Case* is in accordance with an understanding of the FOIA well-established in this Circuit: Exemption 5's protection of privileged materials is not subject to the same exceptions to which the common law privilege is susceptible."); *Neighborhood Assistance Corp. of Am. v. U.S. Dep't of Hous. & Urban Dev.*, 19 F. Supp. 3d 1, 13 (D.D.C. 2013) (observing that the "so-called government misconduct exception," arising from D.C. Circuit dicta, is "much less clearly defined" and "other than these general observations, our Court of Appeals has never squarely applied the exception").

Indeed, the reasons for a misconduct exception to the deliberative process privilege in the grand jury subpoena or civil discovery context turn on the need to investigate wrongdoing. *See In re Sealed Case*, 121 F.3d at 737, 745, 746 (requiring that the party seeking the material make "a focused demonstration of need, even when there are allegations of misconduct by high-level officials" for privileged information and that the Court perform an in camera review to "excise non-relevant material"). This rationale does not apply to the FOIA because Plaintiffs' need for the

information is irrelevant to the Court's analysis of whether disclosure is required under the FOIA. *See id.* at 737 n.5; *see also Reporters Comm. for Freedom of the Press*, 489 U.S. at 771 ("[W]hether [disclosure] is warranted cannot turn on the purposes for which the request for information is made."). There is no D.C. Circuit precedent suggesting that the Court should adopt a government misconduct exception to Exemption 5. For this reason alone, Plaintiffs' misconduct argument fails.

Second, even if the government misconduct exception applied in a FOIA case, Plaintiffs have failed to meet their burden to provide an adequate basis for their belief that these specific records might expose government misconduct. "The party seeking release of withheld documents under this exception must 'provide an adequate basis for believing that [the documents] would shed light upon government misconduct.'" *Nat'l Whistleblower Ctr. v. Dep't of Health & Human Servs.*, 903 F. Supp. 2d. 59, 67 (D.D.C. 2012); *see Judicial Watch of Fla., Inc. v. Dep't of Justice*, 102 F. Supp. 2d 6, 15 (D.D.C. 2000) ("There is no authority before the court, however, to support the proposition that the burden is upon the government to prove a negative, *i.e.*, to prove in the first instance that a document does not reveal any government misconduct."). A narrow application of any hypothetical misconduct exception is essential, because otherwise the Exemption 5 privileges "would soon be meaningless, if all someone seeking information otherwise protected under the privilege had to establish was that there was disagreement within the government entity at some point in the decisionmaking process." *Neighborhood Assistance Corp. of Am.*, 19 F. Supp. 3d at 20; *Nat'l Whistleblower*, 903 F. Supp. 2d. at 69 (warning against allowing the government misconduct exception to "swallow" up the deliberative process privilege).

Plaintiffs allege that the FD-302s will shed light on the Trump Tower Moscow project, June 9, 2016 Trump Tower meeting, and the President's "efforts to prevent disclosure about the

June 9, 2016 Trump Tower meeting and his role in creating misleading public statements about the meeting." *See* Pls.' Mem. at 17–18. As an initial matter, information about the Trump Tower Moscow project and the June 9, 2016 Trump Tower meeting pre-dated the Administration and cannot possibly be considered government misconduct. In any event, a document sheds light on misconduct only when it "reflects any governmental impropriety," but not when it merely reflects a "part of the legitimate government process intended to be protected by Exemption 5." *Judicial Watch, Inc. v. Dep't of State*, 235 F. Supp. 3d 310, 314 (D.D.C. 2017). Here, the FD-302s clearly were created as part of a legitimate government process—the Special Counsel's investigation. *See* DOJ Order; Weinsheimer Decl. ¶¶ 25–31. Plaintiffs make no argument that there was any kind of governmental misconduct by individuals in the Special Counsel's Office. *See generally* Pls.' Mem. Even if they had, the "presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *Latif v. Obama*, 677 F.3d 1175, 1178 (D.C. Cir. 2012) (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007)).

Plaintiffs also appear to argue that OIP attorneys have committed governmental misconduct by engaging in "[s]elective disclosure of favorable information to a government official." Pls.' Mem. 18 (stating that Plaintiffs are "especially concerned by DOJ's pattern of redacting negative information while disclosing to Plaintiffs information favorable or benign to the Trump Administration"). The Court should reject this baseless accusation outright. Plaintiffs cite three examples of supposed "selective disclosures," *see id.*, but even a cursory review of the Mueller Report demonstrates that the material released from the FD-302s was released because it was also in the Mueller Report, not because an OIP attorney determined that information was favorable or benign to the Administration. Specifically, the cited information from the

41

Rtskhilidaze FD-302 is on page 27, footnote 112, of Volume II of the Report; the cited information from the Simes FD-302 (dated March 8, 2018) is on pages 10 and 105 through 107 of Volume I; and the cited information from the Simes FD-302 (dated March 27, 2018) is on page 164 of Volume I.  *Compare* Pls.' Mem. 18, *with* Mueller Report Vol. I 10, 105–07, 164; Vol. II 27 n.112.

More importantly, Ms. Brinkmann attested that two OIP attorneys reviewed the FD-302s and cross-referenced them against the Mueller Report to ensure that all information in the FD-302s that was also in the Mueller Report was released and to ensure that "OIP did not assert Exemption 5 on any portions of the FD-302s for which privilege has been waived."  Brinkmann Decl. ¶ 39. Plaintiffs' baseless allegation that OIP attorneys engaged in "selective disclosure" is patently insufficient to overcome the presumption that OIP attorneys have properly discharged their official duties.  *See Latif*, 677 F.3d at 1178.

For these reasons, the Court should reject Plaintiffs' invitation to use the government misconduct exemption to override DOJ's and FBI's lawful and proper assertions of Exemption 5.

### C.  Interviews Conducted Pursuant to a Witness Proffer Constitute Attorney Work Product.

Plaintiffs argue that interviews conducted pursuant to witness proffers cannot constitute attorney work product because "information provided to investigators pursuant to a proffer agreement does not reflect the attorney work product of those investigators."[13]  *See* Pls.' Mem. 14–16.  Their argument is contrary to the facts of this case and well-established case law.

SCO attorneys and investigative personnel conducted certain interviews after a witness signed a proffer agreement.  Weinsheimer Decl. ¶ 30.  "Typically, a witness proffer allows the

---

[13] Plaintiffs note that "DOJ has not produced to Plaintiffs" the proffer agreements for John Mashburn, Felix Sater, or Dimitri Simes.  Pls.' Mem. 14.  These proffer agreements were not produced to Plaintiffs because the Court ordered Defendant to produce to Plaintiffs only the typewritten narratives of the FD-302s.  *See* Orders, Dkt. 43, 49.  Proffer agreements for Stephen Bannon and Michael Cohen, which were attached to their FD-302s, were processed and produced to Plaintiffs prior to the Court's order to process and produce only the typewritten narratives of the FD-302s.

government to receive information from the witness while providing the witness certain protections against self-incrimination." *Id.* Attorneys decide whether to enter into a proffer agreement, determine the terms of the agreement, and execute the agreement with the witness and their counsel, as occurred in the cases cited by plaintiffs. *See, e.g.*, Weinsheimer Decl. ¶ 30; Letter concerning Stephen Bannon (Jan. 18, 2019), Dkt. 59-8; Letter concerning Michael D. Cohen (Aug. 6, 2018), Dkt. 59-9. "Such agreements are used so that attorneys can weigh the value of the information when making prosecution decisions, including as to the credibility and weight of the witness' testimony in connection with criminal charges under consideration or already charged." Weinsheimer Decl. ¶ 30. "Witness proffer sessions typically include questions from attorneys to assess and further evaluate the witness and the next steps in the investigation." *Id.* At the conclusion of these interviews, FBI personnel would prepare an FD-302 memorializing the interview. *See id.* ¶ 31.

Therefore, as with the interviews conducted without a witness proffer agreement, the FD-302s summarize the statements of potential witnesses, made in the presence of attorneys, under questioning from both attorneys and FBI investigative personnel, and in anticipation of bringing various criminal charges against individuals and entities. *See id.* ¶ 25–31. Such witness statements, when collected in anticipation of litigation, are "classic examples of work product." *Martin*, 819 F.2d at 1187. Indeed, in *Martin*, the D.C. Circuit held that *witness-generated* affidavits were attorney work product and subject to Exemption 5. *See* 819 F.2d at 1182–83; *compare id.* at 1183 (attorney "asked eleven [witnesses] to prepare affidavits on particular factual aspects of the case"), *with* Weinsheimer Decl. ¶ 26 (interviews of potential witnesses at issue here were conducted at the direction of the Special Counsel and SCO attorneys). And here, even when witnesses would provide information pursuant to a proffer agreement, SCO attorneys would

typically ask the witness questions during the interview.  Weinsheimer Decl. ¶ 30.  The FD-302 would therefore reflect information the witness provided as a result of an attorney's questions.  In sum, because the witness interviews were conducted at the direction of attorneys in anticipation of litigation, the FD-302s constitute work product regardless of whether the interview was conducted pursuant to a witness proffer agreement.

Plaintiffs further argue that the Department cannot assert the presidential communications privilege or the deliberative process privilege over any information witnesses recounted to SCO interviewers pursuant to a proffer agreement because by signing a proffer agreement, the witness waives privileges.  *See* Pls.' Mem. 14–15, 22 n.10.  But the presidential communications privilege and the deliberative process privileges are the *Government's* privileges; an individual cannot personally choose to waive them.  *See Overby v. United States Fid. & Guar. Co.*, 224 F.2d 158, 163 (5th Cir. 1955) (stating that "[t]he privilege belongs to the Government and . . . can neither be claimed nor waived by a private party"); *United States v. Rozet*, 183 F.R.D. 662, 665 (N.D. Cal. 1998) (same); *Rush v. Dep't of State*, 748 F. Supp. 1548, 1556 (S.D. Fla. 1990) (same).  And a disclosure to SCO—a part of the Executive Branch—does not result in a waiver.  *See Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice*, 658 F. Supp. 2d 217 236–38 (D.D.C. 2009).  Finally, as the D.C. Circuit has cautioned, for executive privileges, "a waiver should not be lightly inferred."  *In re Sealed Case*, 121 F.3d at 741.  Therefore, the Court should decline to infer that governmental privileges have been waived by an individual providing information concerning governmental decision-making to the Special Counsel's Office pursuant to a proffer agreement.

## IV.   DOJ AND FBI RELEASED ALL REASONABLY SEGREGABLE, NON-EXEMPT INFORMATION.

The FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt."  5 U.S.C.

§ 552(b).  Accordingly, "non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions."  *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).  But this provision does not require disclosure of records in which the non-exempt information that remains is meaningless.  *See Nat'l Sec. Archive Fund, Inc. v. CIA*, 402 F. Supp. 2d 211, 221 (D.D.C. 2005).  And a court "may rely on government affidavits that show with reasonable specificity why documents withheld pursuant to a valid exemption cannot be further segregated."  *Juarez v. Dep't of Justice*, 518 F.3d 54, 61 (D.C. Cir. 2008).

Consistent with this obligation, OIP and FBI have conducted a thorough review of the unredacted FD-302s concluded that there is no additional, non-exempt information that may reasonably be segregated and released without undermining the attorney work product doctrine, the President's right to full and frank discussions with his advisors, or the Department of Justice's deliberative process.  *See* Brinkmann Decl. ¶¶ 17, 31, 37; Hardy Decl. ¶ 20.  This segregability conclusion is borne out by the released FD-302s: redactions have been taken only where specific information protected by exemptions is at issue, and a thorough examination has been made to ensure release of information from the FD-302s that have been officially acknowledged elsewhere (*e.g.*, in the Mueller Report).  Therefore, because Ms. Brinkmann's and Mr. Hardy's declarations establish that all reasonably segregable, non-exempt information has been released, summary judgment should be granted for Defendant.  *See Sussman*, 494 F.3d at 1117 (noting "presumption" that agencies "complied with the obligation to disclose reasonably segregable material").

## CONCLUSION

For the foregoing reasons, the Court should grant partial summary judgment for the Department of Justice.

Dated: February 24, 2020                Respectfully submitted,

ETHAN P. DAVIS
Principal Deputy Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Director
Civil Division, Federal Programs Branch

*/s/ Courtney D. Enlow*
COURTNEY D. ENLOW
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Room 12102
Washington, D.C. 20005
Tel: (202) 616-8467
Email: courtney.d.enlow@usdoj.gov

*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 24, 2020, I electronically transmitted the foregoing to the parties and the clerk of court for the United States District Court for the District of Columbia using the CM/ECF filing system.

*/s/ Courtney D. Enlow*
COURTNEY D. ENLOW
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Room 12102
Washington, D.C. 20005
Tel: (202) 616-8467
Email: courtney.d.enlow@usdoj.gov
