# Exhibit 1

Declaration of Bradley Weinsheimer, with supporting exhibits,

dated February 24, 2020

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JASON LEOPOLD & BUZZFEED, INC.,

      Plaintiffs,

v.

U.S. DEPARTMENT OF JUSTICE *et al.*,

      Defendants.

Civil Action No. 19-cv-1278

CABLE NEWS NETWORK, INC.,

      Plaintiff,

v.

FEDERAL BUREAU OF INVESTIGATION,

      Defendant.

Civil Action No. 19-cv-1626

## DECLARATION OF BRADLEY WEINSHEIMER

I, Bradley Weinsheimer, declare the following to be true and correct:

(1) I am an Associate Deputy Attorney General for the Department of Justice ("Department" or "DOJ"). I am the highest ranking career official in the Department. I have held this position since July 2018. Prior to that time, I served in the Department's National Security Division, from March 2016 to July 2018, serving as Acting Chief of Staff to the Assistant Attorney General from May 2016 until approximately February 2018. I have worked at DOJ since 1991, including twenty years as an Assistant United States Attorney ("AUSA") in Washington, D.C. As an AUSA, I handled a wide variety of narcotics, violent crime, and public corruption cases, and held numerous supervisory positions,

1

including Chief of the Superior Court Division and Chief of the Grand Jury Section. I

participated in numerous witness interview and proffers sessions in conjunction with law

enforcement efforts, including with Federal Bureau of Investigation ("FBI") Special

Agents.

(2) The attorneys who served on the senior management team in the Special Counsel's

Office ("SCO") have left the Department. I did not directly work on or supervise the

Department's investigation into Russia's interference in the 2016 presidential election

and related matters ("Russia Investigation").[1] I do, however, work on issues relating to

disclosure of Russia Investigation documents both to Congress and pursuant to Freedom

of Information Act ("FOIA") requests. I also participated in the review of Special

Counsel Robert S. Mueller III's March 22, 2019 confidential report to the Attorney

General ("Mueller Report") to determine what material should be redacted. I generally

am familiar with the Form FD-302s that were prepared during the Russian Investigation

and with the Mueller Report's contents and redactions. The information I provide is

based on my personal knowledge, as well as my review of FD-302s, the Mueller Report,

underlying documents, and SCO files. The information I provide is also based on

information I have obtained from those who worked on the Russia Investigation.

Specifically, I spoke with the Deputy Special Counsel and attorneys who led or worked

on the various investigative teams and subgroups in the Special Counsel's Office. *See*

*infra* ¶¶ 15–19 (describing the investigative teams). I also spoke with the FBI Senior

Executive supervisory special agent at the Special Counsel's Office who served for all

but the first three months of the SCO investigation.

---

[1] The parameters of the Russia Investigation are described in DOJ Order No. 3915-2017, *see* Exh. A, and two subsequent memoranda issued by the Acting Attorney General, *see infra* ¶¶ 7–10.

2

(3) This declaration is intended to be read together with the declarations of Vanessa Brinkmann, Senior Counsel in the DOJ's Office of Information Policy ("OIP"), and David Hardy, Section Chief of the FBI's Record/Information Dissemination Section ("RIDS"), including any exhibits to those declarations, filed contemporaneously with my declaration.

(4) I understand that Jason Leopold and BuzzFeed, Inc., Plaintiffs in the above-captioned matter, submitted a FOIA request dated March 27, 2019, seeking "[a]ll FBI 302s maintained/stored/in possession of the FBI relating or referring to all of the individuals who were questioned and interviewed by FBI agents working for the Office of Special Counsel Robert Mueller." *See* Answer Exh. E, *Leopold v. Dep't of Justice*, No. 19-cv-1278 (D.D.C. June 13, 2019), Dkt. 14-5. I understand that Cable News Network, another Plaintiff in the above-captioned matter, submitted a FOIA request dated March 26, 2019, seeking "FBI memoranda, such as 302s, from any and all of the interviews of the 'approximately 500 witnesses' in the Mueller investigation," as well as "any and all case files" related to those interviews. *See* Compl. Exh. A, *Cable News Network v. Fed. Bureau of Investigation*, No. 19-cv-1626 (D.D.C. June 4, 2019), Dkt. 1-1.

(5) I submit this declaration to provide detail and context concerning the records sought in Plaintiffs' FOIA requests and DOJ's invocation of FOIA Exemption 5, in conjunction with the attorney work product doctrine, to withhold from public disclosure information in the FD-302s that are responsive to Plaintiffs' requests and were prepared in connection with the Russia Investigation. The Department has produced to Plaintiffs numerous FD-302s that do not contain attorney work product[2] and FD-302s where work product has

---

[2] For example, an FD-302 describing an encounter between FBI special agents and an individual outside of an interview likely would not contain attorney work product.

3

been waived.[3]  The representations in this declaration are focused on the FD-302s for

which the Department has asserted FOIA Exemption 5 in conjunction with the attorney

work product doctrine.

## Appointment of the Special Counsel

(6) On March 20, 2017, in testimony before Congress, then-Director of the FBI James B.

Comey publicly confirmed the existence of the Russia Investigation, stating:

> [T]he FBI, as part of our counterintelligence mission, is investigating the Russian
> government's efforts to interfere in the 2016 presidential election, and that
> includes investigating the nature of any links between individuals associated with
> the Trump campaign and the Russian government and whether there was any
> coordination between the campaign and Russia's efforts. As with any
> counterintelligence investigation, this will also include an assessment of whether
> any crimes were committed.

Exh. B (Statement Before the House Permanent Select Committee on Intelligence).

(7) On May 17, 2017, then-Acting Attorney General Rod J. Rosenstein appointed Robert S.

Mueller, III to serve as Special Counsel for the Russia Investigation.  *See* Exh. A (DOJ

Order No. 3915-2017).  Under the terms of his appointment, the Special Counsel was

authorized to conduct the investigation confirmed by Director Comey in testimony before

the House Permanent Select Committee on Intelligence on March 20, 2017, including:

(i) any links and/or coordination between the Russian government and individuals

associated with the campaign of President Donald Trump; (ii) any matters that arose or

may arise directly from the investigation; and (iii) any other matters within the scope of

28 C.F.R. § 600.4(a).  *Id.*  The Special Counsel also was authorized "to prosecute federal

crimes arising from the investigation of these matters," *id.*, and to "investigate and

prosecute federal crimes committed in the course of, and with intent to interfere with, the

---

[3] The Department may in the future use its discretion to waive work product over FD-302s, even in circumstances
where it would otherwise apply.

4

Special Counsel's investigation, such as perjury, obstruction of justice, destruction of

evidence, and intimidation of witnesses; and to conduct appeals arising out of the matter

being investigated and/or prosecuted," *see* 28 C.F.R. § 600.4(a).

(8)   The Acting Attorney General further clarified the scope of the Special Counsel's

investigatory authority in two subsequent memoranda, one issued on August 2, 2017, and

the other issued on October 20, 2017.

(9)   As described in the Mueller Report, on August 2, 2017, Acting Attorney General

Rosenstein issued a memorandum that

confirmed that the Special Counsel had been authorized since his appointment to
investigate allegations that three Trump campaign officials—Carter Page, Paul
Manafort, and George Papadopoulos—'committed a crime or crimes by colluding
with Russian government officials with respect to the Russian government's
efforts to interfere with the 2016 presidential election.'" The memorandum also
confirmed the Special Counsel's authority to investigate certain other matters,
including two additional sets of allegations involving Manafort (crimes arising
from payments he received from the Ukrainian government and crimes arising
from his receipt of loans from a bank whose CEO was then seeking a position in
the Trump Administration); allegations that Papadopoulos committed a crime or
crimes by acting as an unregistered agent of the Israeli government; and four sets
of allegations involving Michael Flynn, the former National Security Advisor to
President Trump.

Exh. C (Mueller Report, Vol. I, at 11–12).

(10)      As described in the Mueller Report, on October 20, 2017, the Acting Attorney

General issued a memorandum that confirmed "the Special Counsel's investigative

authority as to several individuals and entities," including the authority to investigate "the

pertinent activities of Michael Cohen, Richard Gates," and "Roger Stone,"[4] "leads

relate[d] to Cohen's establishment and use of Essential Consultants LLC to, *inter alia*,

receive funds from Russian-backed entities," "individuals and entities who were possibly

---

[4] The Mueller Report identifies two additional individuals whose names were redacted to protect their privacy. *See*
Exh. C (Mueller Report, Vol. I, at 12).

engaged in jointly undertaken activity with existing subjects of the investigation,
including Paul Manafort," and "allegations that [then-Attorney General Jeff Sessions]
made false statements to the United States Senate." Exh. C (Mueller Report, Vol. I, at
12).

(11)     In describing the considerations that guided the obstruction-of-justice
investigation, the Special Counsel recognized that "if individuals other than the President
committed an obstruction offense, they may be prosecuted at this time." Exh. C (Mueller
Report, Vol. II, at 1). Likewise, the Special Counsel observed that "a President does not
have immunity after he leaves office" and SCO sought to "preserve the evidence when
memories were fresh and documentary materials were available." Exh. C (Mueller
Report, Vol. II, at 1–2). At a press conference in May 2019 announcing the closure of
the Special Counsel's Office, the Special Counsel stated that the evidence gathered
during the investigation of the President "could be used if there were co-conspirators who
could now be charged." *See* Exh. D (Special Counsel Robert S. Mueller III Makes
Statement on Investigation into Russian Interference in the 2016 Presidential Election
(May 29, 2019), *available at* https://www.justice.gov/opa/speech/special-counsel-robert-
s-mueller-iii-makes-statement-investigation-russian-interference).

(12)     As described in the Mueller Report,

The Special Counsel structured the investigation in view of his power and
authority "to exercise all investigative and prosecutorial functions of any United
States Attorney." Like a U.S. Attorney's Office, the Special Counsel's Office
considered a range of classified and unclassified information available to the FBI
in the course of the Office's Russia investigation, and the Office structured that
work around evidence for possible use in prosecutions of federal crimes
(assuming that one or more crimes were identified that warranted prosecution).

Exh. C (Mueller Report, Vol. I, at 12 (quoting 28 C.F.R. § 600.6)).

6

## Structure of the Special Counsel's Office

(13)       The Special Counsel's Office was headed by the Special Counsel. FBI's then-Acting Director Andrew McCabe assigned FBI personnel to assist the Special Counsel in conducting his investigation.[5] The Special Counsel was responsible for directing the efforts of a team of attorneys and FBI agents conducting the Russia Investigation. The Special Counsel's Office was staffed with attorneys; FBI special agents, analysts, and other investigative personnel (collectively, FBI investigative personnel); and administrative staff (including FBI employees). The Special Counsel attorneys were co-located with an average of approximately 40 FBI special agents and other employees at any given time. Exh. C (Mueller Report, Vol. I, at 13). The relationship between FBI investigative personnel and the Special Counsel was set forth in a July 21, 2017 letter from Mr. McCabe to Special Counsel Mueller, which stated:

Designated FBI Special Agents, Intelligence Analysts, and other investigative personnel (collectively, hereinafter, FBI investigative personnel) will work on matters that are within your jurisdiction, but they will remain under FBI supervision at all times. In other words, such personnel will assist you in conducting the investigations that you supervise while at the same time they will remain full-time FBI employees. For example, the FBI investigative personnel will retain all of their lawful authorities—as well as accesses to FBI systems and data—and will adhere to all applicable federal law and all Department and FBI regulations, guidelines, and policies. We expect that FBI investigative personnel will work closely with you and your office on a day-to-day basis much the same way such FBI personnel would work with a United States Attorney's Office. Of course, SCO will determine the course and direction of the investigations under its jurisdiction. To that end, I have directed FBI investigative personnel to follow your instructions regarding those investigations, consistent with applicable law and policy, and assigned a Senior Executive who is co-located with you to supervise directly all FBI investigative personnel.

Exh. E (McCabe to Mueller letter, July 21, 2017).

---

[5] Mr. McCabe was the FBI's Deputy Director and simultaneously served as the Acting Director from May 9, 2017 until August 2, 2017.

7

(14)        At its high point, the Special Counsel's Office included 19 attorneys, five of

whom joined the Office from private practice and 14 of whom were on detail or assigned

from other DOJ components. Exh. C (Mueller Report, Vol. I, at 13). The Special

Counsel assembled this team "[t]o carry out the investigation and prosecution of the

matters assigned to him." *Id.*

(15)        Based on my discussions with SCO personnel, including members of the SCO

senior management team, I have learned how SCO was organized and structured its

investigation. SCO was organized into teams based on topics of the investigation. Each

team was comprised of attorneys and FBI investigative personnel, and co-led by an

attorney and an FBI team leader. Certain teams were further split into subgroups to

investigate various matters. Each subgroup also was co-led by an attorney and an FBI

employee. Both prosecutors and the FBI investigative personnel worked in close

collaboration and received direction and instruction from the Special Counsel and his

management team. Attorneys described their work as a close partnership with the FBI

investigative personnel, under the direction of the Special Counsel.

(16)        The Special Counsel convened a daily meeting with the heads of the teams and

his senior staff, including the FBI Senior Executive supervisory special agent. At that

meeting, the participants updated the Special Counsel on the matters the investigative

teams were investigating and sometimes received strategic direction for the ongoing

investigation. The Special Counsel often communicated his thoughts and decisions

directly to both attorneys and FBI personnel at this meeting.

(17)        The investigative teams had regular meetings in which attorneys and FBI

investigative personnel participated; some meetings were led by the attorney team leader

8

and others were co-led by the attorney and FBI team leaders. These meetings typically

occurred on a weekly basis, and sometimes more frequently. The purpose of the weekly

meetings was to plan strategy, such as deciding which witnesses to interview, the scope

of interviews, determining whether there was sufficient evidence to bring charges, and, if

there was insufficient evidence, what evidence was still needed and how to obtain such

evidence. Although the Special Counsel did not attend every team meeting, the Special

Counsel and the Deputy Special Counsel occasionally would attend these meetings. If

neither the Special Counsel nor the Deputy Special Counsel were present for the team

meeting, the attorney and/or FBI team leaders would update the team on communications

with and decisions made by the Special Counsel.

(18)     The subgroups on the investigative teams also had regular meetings with

attorneys and FBI investigative personnel. Some of the subgroup meetings were led by

attorneys, and some of the subgroup meetings were co-led by attorneys and FBI

investigative personnel. These meetings generally occurred on a daily basis. The

purpose of these meetings was to discuss particular witnesses or evidence collection, as

well as to receive feedback on the information FBI investigative personnel had gathered

(pursuant to legal process, for example).

(19)     The work of the SCO teams was akin to a prosecutor-directed investigation,

similar to an investigation conducted by a U.S. Attorney's Office, or to a task force. The

investigation differed from other FBI field office investigations because the investigation

was led by the Special Counsel with the assistance of the FBI. *See* Exh. A (DOJ Order

No. 3915-2017); Exh. E (McCabe to Mueller letter, July 21, 2017). In addition to daily

briefings provided by the teams to the Special Counsel and his senior management team,

9

the Special Counsel and Deputy Special Counsel convened almost weekly meetings to

discuss in greater detail the progress of the teams and investigative strategy. These

meetings were led by prosecutors, although prosecutors and FBI investigative personnel

participated in the meetings. The Deputy Special Counsel would often set the agendas

for these meetings based on input from the team leads. Among the topics discussed in

these meetings were the witnesses to be interviewed and the topics to be addressed in the

interviews.

### Results of the Investigation

(20)      "During its investigation the Office issued more than 2,800 subpoenas under the

auspices of a grand jury sitting in the District of Columbia; executed nearly 500 search-

and-seizure warrants; obtained more than 230 orders for communications records under

18 U.S.C. § 2703(d); obtained almost 50 orders authorizing use of pen registers; made 13

requests to foreign governments pursuant to Mutual Legal Assistance Treaties; and

interviewed approximately 500 witnesses, including almost 80 before a grand jury." Exh.

C (Mueller Report, Vol. I, at 13).

(21)      The attorneys anticipated the potential for criminal charges during the

investigation and at the time the witness interviews leading to the creation of FD-302s

were conducted. Potential criminal charges included, among others, charges for making

false statements, campaign finance offenses, obstruction, conspiracy, trafficking in or

receipt of stolen property under the National Stolen Property Act, violations of the

Foreign Agents Registration Act, and violations of 18 U.S.C. § 1030. *See* Exh. C

(Mueller Report, Vol. I, at 174–199) (discussing "prosecution and declination

decisions"). With regard to the obstruction-of-justice investigation, attorneys anticipated

10

the potential for charges for co-conspirators. *See* Exh. C (Mueller Report, Vol. II, at 1);
*see also* Exh. D (Special Counsel Robert S. Mueller III Makes Statement on Investigation
into Russian Interference in the 2016 Presidential Election (May 29, 2019), *available at*
https://www.justice.gov/opa/speech/special-counsel-robert-s-mueller-iii-makes-
statement-investigation-russian-interference) (stating that "[i]t was critical for us to
obtain full and accurate information from every person we questioned" because "[w]hen
a subject of an investigation obstructs that investigation or lies to investigators, it strikes
at the core of the government's effort to find the truth and hold wrongdoers
accountable").  The Special Counsel's Office brought the following charges against
individuals and organizations: obstruction of an official proceeding, in violation of 18
U.S.C. §§ 1505, 2; false statements, in violation of 18 U.S.C. §§ 1001, 2; witness
tampering, in violation of 18 U.S.C. § 1512(b)(1); conspiracy to commit an offense
against the United States, in violation of 18 U.S.C. § 371; aggravated identity theft, in
violation of 18 U.S.C. §§ 1028A(a)(1), 2; conspiracy to commit money laundering, in
violation of 18 U.S.C. § 1956(h); conspiracy to obstruct justice, in violation of 18 U.S.C.
§§ 1512(k), 3551; subscribing to false U.S. individual income tax returns, in violation of
26 U.S.C. § 7206(1), 18 U.S.C. §§ 2, 3551; assisting the preparation of false U.S.
individual income tax returns, in violation of 26 U.S.C. § 7206(2), 18 U.S.C. § 3551;
failure to file reports of foreign bank and financial accounts, in violation of 31 U.S.C.
§§ 5314, 5322(a), 18 U.S.C. §§ 2, 3551; conspiracy  to commit bank fraud, in violation of
18 U.S.C. §§ 1349, 3551; bank fraud, in violation of 18 U.S.C. §§ 1344, 2, 3551;
conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; and identity fraud, in
violation of 18 U.S.C. § 1028.   *See* Indictment, *United States v. Stone*, No. 19-cr-00018

(D.D.C. Jan. 24, 2019), Dkt. 1; Superseding Criminal Information, *United States v. Manafort*, No. 17-cr-00201 (D.D.C. Sept. 14, 2018), Dkt. 419; Indictment, *United States v. Netyksho*, No. 18-cr-00215 (D.D.C. July 13, 2018), Dkt. 1; Superseding Indictment, *United States v. Kilimnik*, 17-cr-00201 (D.D.C. June 8, 2018), Dkt. 318; Superseding Criminal Information, *United States v. Gates*, 17-cr-00201 (D.D.C. Feb. 2, 2018), Dkt. 195; Superseding Indictment, *United States v. Manafort*, No. 18-cr-00083 (E.D. Va. Feb. 22, 2018), Dkt. 9; Information, *United States v. van der Zwaan*, 18-cr-00031 (D.D.C. Feb. 16, 2018), Dkt. 1; Indictment, *United States v. Internet Research Agency*, No. 18-cr-00032 (D.D.C. Feb. 16, 2018), Dkt. 1; Information, *United States v. Pinedo*, 18-cr-00024 (D.D.C. Feb. 7, 2018), Dkt. 1; Information, *United States v. Flynn*, No. 17-cr-00232 (D.D.C. Nov. 30, 2017), Dkt. 1; Information, *United States v. Papadopoulos*, No. 17-cr-00182 (D.D.C. Oct. 3, 2017), Dkt. 8; *see also* Information, *United States v. Cohen*, No. 18-cr-850 (S.D.N.Y. Nov. 29, 2018), Dkt. 2; *Special Counsel's Office*, U.S. Dep't of Justice, *available at* https://www.justice.gov/sco (listing 12 cases brought by SCO).

(22)       In the Mueller Report, the Special Counsel described the obstruction investigation as follows:

> While the [Department's Office of Legal Counsel ("OLC")] opinion concludes that a sitting President may not be prosecuted, it recognizes that a criminal investigation during the President's term is permissible. The OLC opinion also recognizes that a President does not have immunity after he leaves office. And if individuals other than the President committed an obstruction offense, they may be prosecuted at this time. Given those considerations, the facts known to us, and the strong public interest in safeguarding the integrity of the criminal justice system, we conducted a thorough factual investigation in order to preserve the evidence when memories were fresh and documentary materials were available.

Exh. C (Mueller Report, Vol. II, at 1–2).

(23)     Prior to interviews, witnesses routinely were warned that the Special Counsel's

Office was conducting a criminal investigation and that pursuant to 18 U.S.C. § 1001, it

was a crime to make false statements during the interview.

(24)     As a result of various investigations, the SCO obtained numerous indictments,[6] of

which the following criminal prosecutions are public and ongoing at various stages:

*United States v. Internet Research Agency, LLC*, No. 1:18-cr-00032 (D.D.C.); *United*

*States v. Netyksho*, No. 1:18-cr-00215 (D.D.C.); *United States v. Flynn*, No. 1:17-cr-

00232 (D.D.C.); *United States v. Kilimnik*, No. 1:17-cr-00201 (D.D.C.); *United States v.*

*Stone*, No. 1:19-cr-00018 (D.D.C.) (although Mr. Stone was sentenced on February 20,

2020, the court is still considering a new trial motion, and the sentence has not yet been

executed).  Other United States Attorney's Offices have pending, related prosecutions,

including *United States v. Khusyaynova*, No. 1:18-mj-00464 (E.D. Va.) and *United States*

*v. Morenets*, No. 1:18-cr-00263 (W.D. Pa.).  The Special Counsel's Office also charged

the following individuals, all of whom have been sentenced: Michael Cohen, Paul

Manafort, George Papadopolous, Richard Pinedo, Richard Gates, and Alex van der

Zwaan.  The Special Counsel's Office during or at the conclusion of its investigation

transferred or referred 25 related matters to U.S. Attorney's Offices or to other

Department Components for further investigation or resolution.  *See* Exh. C (Mueller

Report, Appendix D).

---

[6] An indictment contains only allegations of criminal conduct.  The Department is offering no opinion about the guilt or innocence of any charged defendant.  Every defendant is presumed innocent unless and until proven guilty beyond a reasonable doubt in court.

### Witness Interviews and FD-302s

(25)     The Special Counsel's Office interviewed approximately 500 witnesses. *See* Exh.

C (Mueller Report, Vol. I, at 13). The teams conducted these interviews in connection

with their evaluation of whether criminal prosecutions were warranted and supported by

available evidence. The interviews were conducted for the purpose of gathering or

otherwise assessing the extent to which evidence could be obtained to support criminal

charges and that therefore could be presented to a grand jury and at trial. The Special

Counsel's Office was conducting active criminal investigations, and if attorneys found

sufficient evidence to support charges, consistent with the law and Department policy,

they intended to, and in many cases did, bring criminal charges. As noted above, the

Special Counsel's Office brought numerous criminal charges against various individuals

and entities. *See supra* ¶ 21, 24.

(26)     In conjunction with discussions with the Special Counsel, his management team,

and FBI investigative personnel assigned to work under the direction of the Special

Counsel, attorneys selected witnesses to interview. In addition to participating in the

selection of these witnesses for interviews, prosecutors discussed and determined in

advance the investigative strategy for witness interviews. These interviews, in which

attorneys either participated or in many cases led, were under the supervision and

direction of the Special Counsel in connection with an assessment as to whether or not to

bring criminal charges or further investigate possible criminal conduct. Attorneys led,

participated in, or attended all the interviews for which the Government has asserted the

attorney work product doctrine.

14

(27)     Although preparation for witness interviews varied among teams and individual
attorneys, as a general matter, each team would have a strategic discussion among
attorneys and FBI investigative personnel before an interview to discuss what topics to
cover with the witness.  Based on discussion among the team, including FBI investigative
personnel, attorneys decided the topics to cover with witnesses, consistent with the
strategic direction determined by the Special Counsel.  On some teams, FBI investigative
personnel were responsible for identifying, collecting, and reviewing potentially relevant
documents to use during the interview.  As a general matter, outlines were prepared prior
to the witness interview.  Many attorneys prepared their own outlines.  After preparing a
draft of an outline, and if time permitted, attorneys would circulate outlines to attorneys
and FBI investigative personnel for review and comment.  If FBI investigative personnel
prepared the first draft of an outline for an attorney-led interview, the FBI investigative
personnel would circulate the outline to attorneys for review, and attorneys would edit the
outline or provide comments on the outline to the FBI investigative personnel.  If FBI
investigative personnel prepared an outline for an FBI special agent-led interview, the
FBI investigative personnel would circulate the outline to attorneys for review, and the
attorneys would review the outlines to provide input and ensure the outline addressed the
topics the special agent was to cover with the witness.

(28)     Often, if an attorney was present for an interview, the attorney led the interview.
Sometimes a special agent led the interview when an attorney was present because the
special agent was better suited to conduct the interview or because of time and staffing
constraints.

15

(29)     If an FBI special agent led an interview, those interviews were conducted

pursuant to the direction of the Special Counsel and SCO attorneys.  Attorneys that were

present in agent-led interviews generally asked questions during the interview; similarly

FBI investigative personnel sometimes asked questions during attorney-led interviews.

(30)     Certain interviews were conducted after a witness signed a proffer agreement.

*See, e.g.*, Letter concerning Stephen Bannon (Jan. 18, 2019), Dkt. 59-8; Letter concerning

Michael D. Cohen (Aug. 6, 2018), Dkt. 59-9.  Typically, a witness proffer allows the

government to receive information from the witness while providing the witness certain

protections against self-incrimination.  Attorneys decide whether to enter into a proffer

agreement, determine the terms of the agreement, and execute the agreement with the

witness and their counsel, as occurred in these cases.  Such agreements are used so that

attorneys can weigh the value of the information when making prosecution decisions,

including as to the credibility and weight of the witness' testimony in connection with

criminal charges under consideration or already charged.  Witness proffer sessions

typically include questions from attorneys to assess and further evaluate the witness and

the next steps in the investigation.

(31)     Generally, FBI investigative personnel present for a witness interview took notes

during that interview.  Following the witness interview, FBI investigative personnel

drafted the FD-302s, pursuant to standard FBI policies and procedures.  The FBI special

agent often shared the draft FD-302 with the attorneys who conducted the interview or

who were present during the interview to ensure the draft accurately reflected the

interview and did not inadvertently omit pertinent information.  The attorneys would

review the draft FD-302 and, if necessary, suggest edits.  If the attorneys suggested any

16

edits to the FD-302, the attorneys asked the FBI investigative personnel to make the edits only to the extent that the edits comported with the FBI investigative personnel's recollection of the interview. The FBI investigative personnel retained final approval over the FD-302s.

### Harm that Would Result from Release

(32)      To the best of my knowledge, none of the FD-302s for which the DOJ redacted information as protected by the attorney work product doctrine under Exemption 5 of the FOIA have been disclosed in connection with any judicial or administrative proceedings to any person outside of the government or have otherwise been publicly disclosed.[7]

(33)      If material from the FD-302s for which the Government has asserted the attorney work product doctrine under Exemption 5 of the FOIA is released, as described more fully below, it would reveal the mental impressions and strategy of the prosecutors while investigating the case. In a typical criminal case, FD-302s often are provided to the defense in discovery or pursuant to the Government's disclosure obligation or practice, especially for cases that proceed to trial. Often disclosures of FD-302s to the defense in criminal cases are pursuant to a protective order to further protect the confidentiality of the material disclosed in the FD-302.

(34)      In this matter, according to the former SCO attorneys with whom I spoke, prosecutors treated the FD-302s as the FBI's document in so far as FBI employees prepared the FD-302s based on their notes and recollection from the interviews and retained the FD-302s, all of which occurred pursuant to the FBI's standard procedures.

---

[7] Two FD-302s relating to interviews of Michael Cohen initially were redacted pursuant to the attorney work product doctrine under FOIA Exemption 5. Because the Department learned that those FD-302s were disclosed in criminal litigation, the Department is re-processing the Cohen FD-302s dated August 7, 2018 and September 18, 2018 to remove the attorney work product doctrine redactions.

Prosecutors also assumed that, consistent with their typical practice and criminal discovery obligations, FD-302s would be disclosed in appropriate circumstances in charged cases. Indeed, numerous FD-302s, often redacted, were disclosed during various charged cases, such as *United States v. Stone*, pursuant to a protective order. For the portions properly disclosed to the defense in *Stone* or other charged cases, the Government does not intend to withhold that material under FOIA Exemption 5. While SCO prosecutors did not personally consider the FD-302s as their work product, they had no occasion or reason to fully evaluate whether the Department could assert the attorney work product doctrine under FOIA Exemption 5 and the applicable case law.

(35)   As noted above, however, the witness interviews were the product of direction and instruction from the Special Counsel that reflect strategic considerations formulated and made in anticipation of litigation. Who to interview; when to conduct the interview, in particular in relation to other witnesses; what to ask; what not to ask; and how to confront the witness with information or documents all reveal the mental impressions, assessments, and evaluation of the Special Counsel's investigation and its progress.

(36)   The Special Counsel prepared a more than 400-page confidential report to the Attorney General that the Attorney General largely has made public with relatively few redactions. The Special Counsel's report is carefully crafted to protect raw material from the interviews of witnesses while disclosing information needed for the Attorney General to understand the reasons why certain matters were or were not charged.

(37)   The witness interviews, on the other hand, were the product of strategic decisions from the Special Counsel and his management team. Prior to witness interviews, attorneys led discussions about which witnesses to interview, what to ask, in what order,

18

and what information not to include in the interview; and those discussions were made while considering possible and pending criminal cases and investigations. Thereafter, prosecutors typically prepared an interview outline and then conducted the interview based on their assessment and evaluation of the investigation, the witness, and other available evidence. When FBI investigative personnel prepared the interview outline, it was often reviewed and edited by the attorneys, in light of the strategic considerations and other litigation assessments as noted above. Even when an interview was led by an FBI special agent based on an outline drafted or reviewed by attorneys, the attorneys participated in the interview and asked follow-up questions. At the conclusion of each interview, although FBI investigative personnel drafted the FD-302 to document the interview, attorneys often reviewed and suggested edits to the draft FD-302 to ensure accuracy and completeness.

(38)     Accordingly, the FD-302s reveal the mental impressions, assessments, and thought processes of the attorneys involved in the investigation and of the Special Counsel in particular. The FD-302s are factual recitations of what occurred during the interview, and the specific content does not describe mental impressions of the prosecutors; however, decisions on whom to interview, when, and the topics to cover or avoid during the interview could be revealed by reading and analyzing the FD-302s. Given the unique structure of the Special Counsel's Office, as well as the role of attorneys at every investigative phase, including witness interviews, disclosing the contents of the FD-302s at issue here would also indirectly reveal the mental impressions, assessments, and thought processes of the attorneys involved in the investigation and of the Special Counsel in particular, contrary to the purpose of the attorney work product

19

doctrine.  Moreover, given the substantial involvement of the attorneys in the interviews, as well as that the interviews occurred at the direction and instruction of the Special Counsel, revealing the FD-302s would inhibit the flexibility with which future special counsels might structure and pursue investigations.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24ʳᵏ day of February, 2020.

Bradley Weinsheimer

20

# Exhibit A

DOJ Order No. 3915-2017, dated

May 17, 2017



**Office of the Deputy Attorney General**

Washington, D.C. 20530

ORDER NO. 3915-2017

APPOINTMENT OF SPECIAL COUNSEL
TO INVESTIGATE RUSSIAN INTERFERENCE WITH THE
2016 PRESIDENTIAL ELECTION AND RELATED MATTERS

By virtue of the authority vested in me as Acting Attorney General, including 28 U.S.C. §§ 509, 510, and 515, in order to discharge my responsibility to provide supervision and management of the Department of Justice, and to ensure a full and thorough investigation of the Russian government's efforts to interfere in the 2016 presidential election, I hereby order as follows:

(a)     Robert S. Mueller III is appointed to serve as Special Counsel for the United States Department of Justice.

(b)     The Special Counsel is authorized to conduct the investigation confirmed by then-FBI Director James B. Comey in testimony before the House Permanent Select Committee on Intelligence on March 20, 2017, including:

   (i)     any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump; and

   (ii)    any matters that arose or may arise directly from the investigation; and

   (iii)   any other matters within the scope of 28 C.F.R. § 600.4(a).

(c)     If the Special Counsel believes it is necessary and appropriate, the Special Counsel is authorized to prosecute federal crimes arising from the investigation of these matters.

(d)     Sections 600.4 through 600.10 of Title 28 of the Code of Federal Regulations are applicable to the Special Counsel.

_5/17/17_
Date

Rod J. Rosenstein
Acting Attorney General

# Exhibit B

Statement Before the House Permanent Select Committee on Intelligence

by James B. Comey,

dated March 20, 2017

**James B. Comey**
Director
Federal Bureau of Investigation

Statement Before the House Permanent Select Committee on Intelligence
(HPSCI)
Washington, D.C.
*March 20, 2017*

# HPSCI Hearing Titled Russian Active Measures Investigation

*Statement for the Record*

Mr. Chairman, Ranking Member Schiff, members of the committee, thank you for including me in today's hearing. I'm honored to be here representing the people of the FBI.

I hope we have shown you through our actions and our words how much we at the FBI value your oversight of our work and how much we respect your responsibility to investigate those things that are important to the American people. Thank you for showing that both are being taken very seriously.

As you know, our practice is not to confirm the existence of ongoing investigations, especially those investigations that involve classified matters, but in unusual circumstances where it is in the public interest, it may be appropriate to do so as Justice Department policies recognize. This is one of those circumstances.

I have been authorized by the Department of Justice to confirm that the FBI, as part of our counterintelligence mission, is investigating the Russian government's efforts to interfere in the 2016 presidential election, and that includes investigating the nature of any links between individuals associated with the Trump campaign

and the Russian government and whether there was any coordination between the campaign and Russia's efforts. As with any counterintelligence investigation, this will also include an assessment of whether any crimes were committed.

Because it is an open, ongoing investigation and is classified, I cannot say more about what we are doing and whose conduct we are examining. At the request of congressional leaders, we have taken the extraordinary step in coordination with the Department of Justice of briefing this Congress' leaders, including the leaders of this committee, in a classified setting in detail about the investigation, but I can't go into those details here.

I know that is extremely frustrating to some folks. But it is the way it has to be for reasons that I hope you and the American people can understand. The FBI is very careful in how we handle information about our cases and about the people we are investigating. We are also very careful about the way we handle information that may be of interest to our foreign adversaries. Both of those interests are at issue in a counterintelligence investigation. Please don't draw any conclusions from the fact that I may not be able to comment on certain topics. I know speculating is part of human nature, but it really isn't fair to draw conclusions simply because I say that I can't comment.

Some folks may want to make comparisons to past instances where the Department of Justice and the FBI have spoken about the details of some investigations, but please keep in mind that those involved the details of completed investigations. Our ability to share details with the Congress and the American people is limited when those investigations are still open, which I hope makes sense. We need to protect people's privacy. We need to make sure we don't give other people clues as to where we're going. We need to make sure that we don't give information to our foreign adversaries about what we know or don't know. We just cannot do our work well or fairly if we start talking about it while we're doing it. So we will try very, very hard to avoid that, as we always do.

This work is very complex and there is no way for me to give you a timetable as to when it will be done. We approach this work in an open-minded, independent way and our expert investigators will conclude that work as quickly as they can, but they will always do it well no matter how long that takes. I can promise you,

we will follow the facts wherever they lead. And I want to underscore something my friend Mike Rogers said—leaks of classified information are serious, serious federal crimes for a reason. They should be investigated and, where possible, prosecuted in a way that reflects that seriousness so that people understand it simply cannot be tolerated.

And I look forward to taking your questions.