# Exhibit 2

Declaration of Vanessa Brinkmann, with supporting exhibit,

dated February 24, 2020

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                 )

JASON LEOPOLD, BUZZFEED, INC.,    )
                                 )

          Plaintiffs,      )

                   )

         v.        )      Civil Action No. 19-cv-1278 (RBW)

                   )

UNITED STATES DEPARTMENT OF    )
JUSTICE, et al.                )

                   )

         Defendants.    )
_____ )

                   )

CABLE NEWS NETWORK,      )

                   )

          Plaintiff,     )

                   )

         v.        )      Civil Action No. 19-cv-1626 (RBW)

                   )

FEDERAL BUREAU OF       )
INVESTIGATION,           )

                   )

         Defendant.    )
_____ )

## THIRD DECLARATION OF VANESSA R. BRINKMANN

    I, Vanessa R. Brinkmann, declare the following to be true and correct:

    1.   I am Senior Counsel in the Office of Information Policy (OIP), United States

Department of Justice (Department or DOJ). In this capacity, I am responsible for supervising

the handling of the Freedom of Information Act (FOIA) requests subject to litigation processed

by the Initial Request Staff (IR Staff) of OIP. The IR Staff of OIP is responsible for processing

FOIA requests seeking records from within OIP and from within six senior leadership offices of

the Department, specifically the Offices of the Attorney General (OAG), Deputy Attorney

1

General (ODAG), Associate Attorney General (OASG), Legal Policy (OLP), Legislative Affairs (OLA), and Public Affairs (PAO).  Moreover, the IR Staff is responsible for processing FOIA requests seeking certain records from the Special Counsel's Office (SCO).

2.   The IR Staff of OIP is responsible for conducting searches in response to FOIA requests seeking records of the above-referenced offices, for determining whether records located pursuant to its searches are responsive to those FOIA requests, and, if so, whether such records are appropriate for release in accordance with the FOIA.  In processing such requests, the IR Staff consults with Department personnel in the senior leadership offices, with Department records management staff and/or with other components within the Department, as well as with others in the Executive Branch.

3.   I make the statements herein on the basis of personal knowledge and on information acquired by me in the course of performing my official duties, including my familiarity with OIP's resources and procedures for responding to FOIA requests, my discussions with knowledgeable Department personnel, and my review of and determinations made regarding the request and material at issue in this case.

4.   The Federal Bureau of Investigation's (FBI) contemporaneously-filed declaration of David M. Hardy sets forth the administrative record concerning Plaintiffs' requests for the Form FD-302s and FBI's responses thereto, as well as a description of FBI's Form FD-302.  This declaration should be read in tandem with the Hardy declaration.

5.   My first declaration, dated August 23, 2019, set forth the basis for my determination that one of Plaintiff Jason Leopold's requests to OIP in the instant case is overly broad and unduly burdensome.  See ECF No. 25-4.  My second declaration, dated November 12, 2019,

specifically addressed the questions directed to Defendants in this Court's October 3, 2019

Order, ECF No. 33, regarding Defendants' FOIA resources.  See ECF No. 38-2.

6.    This third declaration will specifically address the Department's application of

FOIA Exemption 5—specifically, the deliberative process privilege, presidential

communications privilege and/or attorney work product doctrine—to thirty-seven of the FD-

302s produced by the FBI between November 1, 2019 and January 17, 2020.[1]  This declaration

should be read in tandem with Bradley Weinsheimer's contemporaneously-filed declaration,

which provides information on the SCO as well as additional context for the Department's

application of the attorney work product doctrine of Exemption 5.

### Explanation of Information Withheld Pursuant to Exemption 5

7.    Exemption 5 of the FOIA exempts from disclosure "inter-agency or intra-agency

memorandums or letters that would not be available by law to a party other than an agency in

litigation with the agency."  5 U.S.C. § 552(b)(5).  All of the information withheld by the

Department pursuant to Exemption 5 of the FOIA within the FD-302s presently at issue is

withheld pursuant to the deliberative process privilege, attorney work product doctrine, or

presidential communications privilege, or a combination of these three privileges.

8.    Attached to this declaration as Exhibit A is a comprehensive Vaughn Index that

provides further details regarding all Exemption 5 withholdings made in the FD-302s that were

included in the FBI's productions on November 1, 2019, December 2, 2019, January 2, 2020,

and January 17, 2020.[2]  For each of the thirty-seven FD-302s from these four productions where

---

[1] While other FOIA Exemptions apply to these records, pursuant to this Court's January 13, 2020 Order, ECF No. 53, I am only addressing the Department's application of Exemption 5 to these records in this declaration.

[2] This declaration and the attached Vaughn Index do not address the Exemption 5 withholdings asserted by the Department on FD-302s which are currently pending consultation with other Executive Branch agencies. Specifically, this declaration and the Vaughn Index do not address the Exemption 5 withholdings for fourteen FD-

Exemption 5 has been asserted, the <u>Vaughn</u> Index identifies which of the three privileges, or the combination thereof, that applies to each FD-302 withholding.  Specifically:

- Fifteen FD-302s have withholdings made pursuant to only the attorney work product doctrine[3]:

  - Newman dated October 16, 2018 (FBI Bates page 621)

  - Beniamiov dated January 6, 2019 (FBI Bates pages 1211-1215)

  - [name withheld in 302] dated April 12, 2018 (FBI Bates pages 1233-1263)

  - Kaveladze dated November 16, 2017 (FBI Bates pages 1264-1275)

  - Mashburn dated August 2, 2018 (FBI Bates pages 1305-1310)

  - Simes dated March 27, 2018 (FBI Bates pages 1329-1348)

  - Simes dated March 8, 2018 (FBI Bates pages 1349-1381)

  - Rtskhiladze May 10, 2018 (FBI Bates pages 1387-1393)

  - [name withheld in 302] dated December 15, 2017 (FBI Bates pages 1394-1400)

  - Sater dated September 19, 2017 (FBI Bates pages 1401-1408)

  - Aven dated August 2, 2018 (FBI Bates pages 1441-1448)

  - Foresman dated October 17, 2018 (FBI Bates pages 1452-1469)

  - Papadopoulos dated August 10, 2017 (FBI Bates pages 1580-1587)

---

302s that are currently pending consultation from FBI's November 1, 2019, December 2, 2019, January 2, 2020, and January 17, 2020 productions.  These FD-302s will be produced to Plaintiffs in future productions.

[3] The Department had withheld information under the attorney work product doctrine from two Michael Cohen FD-302s dated August 7, 2018 and September 18, 2018.  Upon further review, the Department withdraws its withholdings under the attorney work product doctrine of Exemption 5 for those two Cohen FD-302s and will reprocess and re-release the affected pages of those FD-302s no later than in the upcoming April production.

- Papadopoulos dated August 11, 2017 (FBI Bates pages 1588-1598)

- Papadopoulos dated September 19, 2017 (FBI Bates pages 1599-1620)

- Three FD-302s have withholdings made pursuant to only the presidential communications privilege:

  - Cohen dated August 7, 2018 (FBI Bates pages 424-445)

  - McFarland dated October 17, 2017 (FBI Bates pages 1311-1316)

  - McFarland dated September 14, 2017 (FBI Bates pages 1319-1325)

- Fourteen FD-302s have withholdings made pursuant to both the attorney work product doctrine and presidential communication privilege:

  - Bannon dated February 14, 2018 (FBI Bates pages 132-168)

  - Cohen dated November 20, 2018 (FBI Bates pages 522-528)

  - Kelly dated August 2, 2018 (FBI Bates pages 542-549)

  - Hicks dated March 13, 2018 (FBI Bates pages 566-583)

  - Christie dated February 13, 2019 (FBI Bates pages 833-842)

  - Lewandowski dated April 6, 2018 (FBI Bates pages 864-871)

  - Hicks dated December 8, 2017 (FBI Bates pages 891-913)

  - Dearborn dated June 20, 2018 (FBI Bates pages 1010-1014)

  - Porter dated April 13, 2018 (FBI Bates pages 1086-1104)

  - Ruddy dated June 6, 2018 (FBI Bates pages 1105-1112)

  - Porter dated May 8, 2018 (FBI Bates pages 1113-1132)

  - McFarland dated December 22, 2017 (FBI Bates pages 1133-1151)

  - Sanders dated July 3, 2018 (FBI Bates pages 1188-1197)

- Dhillon dated November 21, 2017 (FBI Bates pages 1198-1210)

- One FD-302 has withholdings made pursuant to both the deliberative process and presidential communications privileges:

  - Rosenstein dated May 23, 2017 (FBI Bates pages 643-653)

- One FD-302 has withholdings made pursuant to both the attorney work product doctrine and deliberative process privilege:

  - McCord dated July 7, 2017 (FBI Bates pages 674-685)

- One FD-302 has withholdings made pursuant to the attorney work product doctrine, deliberative process privilege, and presidential communications privilege:

  - S. Miller dated October 31, 201 (FBI Bates pages 1039-1052).

The Vaughn Index is meant to be read in tandem with this declaration.

### Exemption 5: Inter-/Intra-Agency Threshold

9.   Records withheld pursuant to Exemption 5 of the FOIA must be inter- or intra-agency.  Here, the information withheld pursuant to Exemption 5 is located within FBI interview summaries, or FD-302s, which are intra-agency memoranda.  During the pendency of the Special Counsel's investigation, all of the FD-302s protected by Exemption 5 were generated within the Executive Branch—specifically, by FBI investigative personnel assigned to work under the direction of the Special Counsel.[4]  Because all of the FD-302s were generated within the Executive Branch, the documents fall within Exemption 5's inter-/intra-agency

---

[4] The process for witness interviews and for drafting and editing of the resultant FD-302s for the approximately 500 interviews conducted by the Special Counsel's Office is described in detail in the Weinsheimer Declaration, ¶¶ 26-31.

record threshold.  *See* Weinsheimer Decl. ¶ 31 (describing the process for drafting and editing the FD-302s).

<u>Exemption 5: Deliberative Process Privilege</u>

10.  The deliberative process privilege is intended to protect the decision-making process of government agencies from public disclosure in order to enhance the quality of agency decisions and to encourage and facilitate candid discussions among Executive Branch employees.  To be protected by the deliberative process privilege, the information at issue must be both "predecisional" and "deliberative."

11.  FD-302s report and summarize interviews conducted by members of SCO during the course of the investigation.  A small subset of these FD-302s contains predecisional, deliberative information relating to the Department's decision-making process concerning various subjects because Government employees recounted such information to SCO during their interviews.  Specifically, three FD-302s summarizing the interviews of former Deputy Attorney General Rod Rosenstein, former Acting Assistant Attorney General for National Security Mary McCord, and Senior Advisor to the President Stephen Miller each contain, as outlined in more detail *infra*, a narrative account by these individuals of information specifically related to Departmental decision-making.  To be clear, OIP is not asserting that the FD-302s themselves are deliberative; rather, some of the information relayed directly to the SCO investigative personnel and attorneys during the aforementioned three interviews, memorialized by the FD-302s, consisted of descriptions of privileged deliberative information.

*FD-302 of Rod Rosenstein's May 23, 2017 SCO Interview*

12.  OIP withheld certain information pursuant to the deliberative process privilege of Exemption 5 on pages three, six, seven, and eight of Mr. Rosenstein's FD-302 form (FBI Bates

numbers 645, 648, 649, and 650, respectively).  The material withheld on page three discusses

Mr. Rosenstein's deliberative process in drafting the memorandum regarding former FBI

Director James Comey referenced in the preceding paragraphs in the FD-302, and describes

substantive edits made to the memorandum throughout the drafting process by Mr. Rosenstein

and other subordinate ODAG employees.  It also contains the actual recommendations made by

subordinate ODAG staff for Mr. Rosenstein's consideration in drafting the referenced

memorandum and identifies the sources of information that Mr. Rosenstein considered

throughout this process.  Throughout this collaborative and deliberative process in drafting the

memorandum, Mr. Rosenstein necessarily reviewed the universe of facts and possible issues,

and then selected the information most appropriate to include in his final memorandum.  Of

particular note, the decision to include or exclude certain factual information is itself an

important part of the deliberative process.  The Department reasonably foresees that disclosure

of this internal drafting process would reveal alternatives to the memorandum that were

ultimately not adopted and discussions regarding provisions of that memorandum that were

adopted which may not accurately reflect the ultimate rationale for their adoption.  Release of

such information would harm future decision-making processes within the Department by

reducing future officials' willingness to engage in a candid deliberative process.  Moreover,

disclosure risks confusing the relevant issues considered by Mr. Rosenstein and other DOJ

officials and risks misleading the public by suggesting rationales for the information contained

in the memorandum which were not in fact the ultimate reasons for Department action.

13. The material withheld on page six of Mr. Rosenstein's FD-302 relays internal

Department deliberations related to the potential appointment of a special counsel, prior to Mr.

Mueller's appointment on May 17, 2017.  In deciding whether to appoint a special counsel, Mr.

Rosenstein considered information provided to him directly by various DOJ officials, which is described in the redacted portion of page 6. As the Deputy Attorney General and Acting Attorney General for the specific purpose of overseeing the Russia and election-related investigation, any information provided to Mr. Rosenstein during the actual process of Departmental decision-making regarding whether to appoint a special counsel is itself predecisional and deliberative information that represents the varied recommendations and opinions of Departmental personnel. There is foreseeable harm in release of these internal discussions because subordinates within the Department would no longer feel free to engage directly with a decision-maker and offer their uninhibited opinions concerning the appointment of a special counsel or other Department personnel. Additionally, disclosure of rationales, opinions, and alternatives that were not adopted could risk confusing the relevant issues considered and misleading the public concerning the rationale behind appointing a special counsel.

14. The material withheld on page seven of Mr. Rosenstein's FD-302 speaks directly to the development of potential updates to longstanding Department policy memorialized during a discussion between Mr. Rosenstein and Mr. Comey that Mr. Rosenstein shared with SCO employees during the course of Mr. Rosenstein's interview. At the time of the discussion between Mr. Rosenstein and Mr. Comey, Mr. Comey was the Director of the FBI. At the time of the discussion, the Department was in an exploratory phase to determine whether updates to longstanding Department policy were warranted. As such, the deliberative information relayed to SCO employees in Mr. Rosenstein's interview is predecisional. There is foreseeable harm in release because these candid leadership considerations and assessments of current Department policy are essential to furthering the Department's mission. Disclosure of frank opinions about

existing Department policies and ways to improve them could discourage such candor between senior leaders in the Department in future discussions concerning Department policy.

*FD-302 of Mary McCord's July 17, 2017 SCO Interview*[5]

15.   OIP withheld certain information pursuant to the deliberative process privilege of Exemption 5 on pages four, five, eleven, and twelve of former Acting Assistant Attorney General for National Security McCord's FD-302 form (FBI Bates numbers 677, 678, 684, and 685, respectively).  The material withheld pursuant to the deliberative process privilege contained in five sentences on pages four and five consists of information related to national security related discussions that took place exclusively among representatives from a small number of Executive Branch agencies, including DOJ.  The participants discussed rationales, opinions, and alternatives to specific issues and the material is pre-decisional as information considered by agency representatives throughout the course of these discussions.  These discussions took place before a final determination had been made.  There is foreseeable harm in release of the content of these internal discussions because representatives from Executive Branch agencies, including DOJ, would no longer feel free to engage directly with a decision-maker and offer their uninhibited opinions.  Additionally, disclosure of rationales, opinions, and alternatives that were ultimately not adopted could risk confusing the issues and misleading the public.

---

[5] The information withheld by OIP pursuant to the deliberative process privilege of Exemption 5 found in Ms. McCord's FD-302 is classified and as such, is also withheld by the FBI pursuant to Exemption 1 of the FOIA.  The information is also withheld by the FBI pursuant to Exemptions 3 and 7(E) of the FOIA.  Exemption 3 is invoked according to section 102(d)(3) of the National Security Act of 1947 (codified 50 U.S.C. § 3024(i)), which protects national security intelligence sources and methods.  Accordingly, OIP cannot provide any more information to defend its use of Exemption 5 in this declaration without revealing information that is protected by these overlapping FOIA exemptions, most notably Exemptions 1 and 3, which protect against the disclosure of classified information and national security intelligence sources and methods, respectively.

*FD-302 of Stephen Miller's October 31, 2017 SCO Interview*

16. OIP withheld certain information pursuant to the deliberative process privilege of Exemption 5 on page 11 of Mr. Miller's FD-302 form (FBI Bates number 1049). The two sentences withheld pursuant to the deliberative process privilege towards the top of page 11 contain information related to internal DOJ decision-making concerning a personnel matter. More detail cannot be provided in this declaration without revealing the very information underlying the withholding. This information was shared with Mr. Miller by former Attorney General Jefferson Sessions, and subsequently reported to SCO employees during Mr. Miller's interview. The information withheld is predecisional and deliberative and speaks directly to ongoing review of Department decision-making. There is foreseeable harm in release of these subjective opinions and recommendations because disclosure would chill Department employees from offering candid opinions to White House staff without fear of later being subject to public criticism.

*Segregation of Non-Exempt Information and Foreseeable Harm*

17. OIP's review of the FD-302s and application of withholdings made pursuant to Exemption 5's deliberative process privilege was surgical; every effort was made to withhold only that information that is exempted from disclosure pursuant to the deliberative process privilege and thus provide Plaintiffs with all reasonably segregable non-exempt information within the responsive records. As described throughout this declaration *supra*, OIP only withheld discrete portions of each FD-302—typically consisting of only a handful of sentences within each FD-302—that explicitly contained predecisional, deliberative information. Of the three FD-302s described above in paragraphs 12-16, nine out of thirty-seven pages contain discrete withholdings made pursuant to the deliberative process privilege. Release of any

additional information withheld by OIP could reasonably lead to the harms associated with and identified by the deliberative process privilege of FOIA Exemption 5.

18. As also described above, disclosure of the material withheld pursuant to the deliberative process privilege would reasonably likely cause harm to DOJ's decision-making processes. Candid discussions in which decisions are evaluated and/or assessments of policy are made are essential to furthering the Department's mission. If predecisional, deliberative communications were to be released to the public, DOJ and other Executive Branch employees would be much more cautious in their discussions with each other, in engaging in the collaborative back-and-forth essential to decision-making, and in providing all pertinent information and viewpoints in a timely manner to agency decision-makers. This lack of candor would seriously impair the Department's ability to foster forthright, internal discussions necessary for efficient and proper Departmental decision-making. Disclosure of predecisional deliberations, particularly those which contain information related to rationales or alternatives that were ultimately not adopted by the Department, would risk harm to the public's understanding of the Department's mission. OIP's withholding of the material withheld pursuant to the deliberative process privilege protects against public confusion that might result from preliminary disclosure of opinions and information that do not, in fact, reflect the final views or policies of the Department. These foreseeable harms are particularly true when the underlying information that is withheld pursuant to the deliberative process privilege pertains to sensitive matters of the utmost significance to our democratic processes and the national security of the country.

<u>Exemption 5: Presidential Communications Privilege</u>

19. Certain material within the FD-302s is also subject to the presidential communications privilege.  That privilege protects confidential communications that relate to possible presidential decision-making and that involve the President or his advisers.  This privilege preserves the President's ability to obtain frank and informed opinions from his advisers and to make decisions in confidence.  It is not limited to exchanges directly involving the President, but also protects communications with presidential advisers made in the course of formulating advice or recommendations for the President.  The privilege protects such communications in order to ensure that the President's advisers may fully explore options and provide appropriate advice to the President without concerns about compelled disclosure.  Compelled disclosure of such communications could threaten the quality of presidential decision-making by impairing the process in which those decisions are made.

20. Over the course of the Special Counsel investigation, members of the SCO conducted candid interviews with senior presidential advisers, senior transition officials, other employees of the White House Office, and others who had spoken directly with the President or his advisers on matters of presidential decision-making.  Portions of the FD-302s contain recountings or summaries by these individuals of sensitive confidential communications made in the course of preparing information or advice for potential presentation to the President on matters of presidential decision-making or—in some cases—confidential communications directly with the President on matters of presidential decision-making.  Because the rationale for applying the presidential communications privilege is not the same for all of these communications, they are identified here by category.  The following categories correspond to

the columns "PCP-1," "PCP-2," and "PCP-3" in the <u>Vaughn</u> Index of FD-302s attached hereto as Exhibit A.:

*PCP-1: Communications between government officials or staff during the Administration*

21.     Most of the material withheld pursuant to Exemption 5's incorporation of the presidential communications privilege consists of descriptions of communications between government officials or staff on matters of presidential decision-making, where at least one party to the communication is either the President himself, an immediate adviser to the President, or a member of the staff of an immediate adviser to the President.  These communications among immediate White House advisors, and in some instances, with the President himself, were made in the course of performing their function of advising the President on official government matters.

22. Each of these communications include at least one of the following (positions held at the time of the covered communications), in communication with one or more other government officials:

     a.  Donald Trump, President

     b.  Michael Pence, Vice President

     c.  John Kelly, Chief of Staff

     d.  Reince Priebus, Chief of Staff

     e.  Donald McGahn, Counsel to the President

     f.  Michael Flynn, National Security Advisor

     g.  Emmett Flood, Special Counsel to the President

     h.  Sean Spicer, Press Secretary

     i.  Sarah Huckabee Sanders, Deputy Press Secretary; Press Secretary

j.   Robert Porter, Staff Secretary

k.   Stephen Bannon, Chief Strategist and Senior Adviser to the President

l.   Richard Dearborn, Deputy Chief of Staff

m.   John Eisenberg, Deputy Counsel to the President and Legal Adviser to the National Security Council

n.   K.T. McFarland, Deputy National Security Advisor

o.   Uttam Dhillon, Deputy Counsel to the President

p.   Annie Donaldson, Chief of Staff to the Counsel to the President

q.   Jared Kushner, Senior Adviser to the President

r.   Ivanka Trump, Senior Adviser to the President

s.   Hope Hicks, Director of Strategic Communications; Director of Communications

t.   Stephen Miller, Senior Adviser to the President

23. The subjects of these communications related to the following areas of actual or potential presidential decision-making:

a.   Possible actions to be taken in the conduct of foreign relations

b.   Possible actions to be taken with respect to nomination, appointment or removal of presidential appointees

c.   Possible presidential action documents (whether styled as Executive Orders, Presidential Memoranda, Proclamations, National Security Presidential Memoranda, or other forms)

d.   Possible official public statements, which the President personally participated in developing or was anticipated to participate in developing

15

*PCP-2: Communications between Transition officials or staff*

24. Some of the material withheld pursuant to Exemption 5's incorporation of the presidential communications privilege consists of descriptions of communications during the presidential transition period, between Transition officials or staff that concern potential presidential decisions after the Inauguration, where at least one party to the communication is either the President-elect himself, a Transition official who has been designated to be an immediate adviser to the President-elect, or a member of the staff of such an official. For these communications, the "presidential transition period" is defined to include only the period beginning with the day on which transition funds are authorized pursuant to Section 8(b) of the Presidential Transition Act of 1963, codified as amended at 5 U.S.C. § 102 note, *i.e.*, "the day following the date of the general elections held to determine the electors of President and Vice President under section 1 or 2 of title 3, United States Code," and ending upon the Inauguration of the President on January 20, 2017. The term "President-elect" is defined as in Section 8(c) of the Act, *i.e.*, "the apparent successful candidate[] for the office of President . . . as ascertained by the [General Services] Administrator following the general elections held to determine the electors." The Department has not withheld material pursuant to Exemption Five's incorporation of the presidential communications privilege for communications taking place during the campaign period or earlier.

25. Each of these communications include at least one of the following (positions held at the time of the covered communications), in communication with one or more other transition officials or government officials:

    a. Donald Trump, President-elect

    b. Michael Pence, Vice President-elect and Transition Chair

    c.   Jefferson Sessions, Transition Vice-Chair

    d.   Michael Flynn, Transition Vice-Chair and National Security Advisor-designate

    e.   K.T. McFarland, Transition Vice-Chair and Deputy National Security Advisor-designate

    f.   Reince Priebus, Transition Executive Committee and Chief of Staff-designate

    g.   Ivanka Trump, Transition Executive Committee

    h.   Jared Kushner, Transition Executive Committee

    i.   Stephen Bannon, Transition Executive Committee

    j.   Kellyanne Conway, Transition Executive Committee

26. For this category, "potential presidential decision-making" is defined only to include those communications for which the principal purpose of the communications was to prepare for potential Presidential decisions that would be made after the Inauguration.  Although the President-elect was not yet in a position to make Presidential decisions, disclosing transition deliberations would jeopardize the ability of future Presidents-elect to have full and candid discussions with their advisers and would undermine the ability to protect the confidentiality of discussions on the same matters after the President-elect takes office.  The subjects of these communications related to the following areas of actual or potential presidential decision-making:

    a.   Possible actions to be taken in the conduct of foreign relations

    b.   Possible actions to be taken with respect to nomination or appointment of presidential appointees

c.  Possible presidential action documents (whether styled as Executive Orders, Presidential Memoranda, Proclamations, National Security Presidential Memoranda, or other forms)

*PCP-3: Communications including one or more private parties*

27. Finally, some of the material withheld pursuant to Exemption 5's incorporation of the presidential communications privilege consists of descriptions of communications after the Inauguration concerning presidential decision-making, where at least one party to the communication is either the President himself, an immediate adviser to the President, or a member of the staff of an immediate adviser to the President, but where at least one other party to the communication was a private party at the time of the communication.

28. The protection of the presidential communications privilege over the communications of the President, his immediate advisers, and their staffs are not limited to communications within the Government.  Rather, because presidential decision-making requires the President and his advisers to seek and receive candid, expert advice from any source, including individuals outside the Government, the harm to that decision-making process from forced disclosure can be no less significant for those communications with private parties.

29. In addition to the private parties involved in the communications, each of these communications include at least one of the individuals identified above in Category 1 in paragraph 22.

30. The subjects of these communications related to the following areas of actual or potential presidential decision-making:

a.  Possible actions to be taken in the conduct of foreign relations

b.  Possible actions to be taken with respect to nomination, appointment or removal of presidential appointees

c.  Possible presidential action documents (whether styled as Executive Orders, Presidential Memoranda, Proclamations, National Security Presidential Memoranda, or other forms)

d.  Possible official public statements, which the President personally participated in developing or was anticipated to participate in developing

*Segregation of Non-Exempt Information and Foreseeable Harm*

31. Although the presidential communications privilege covers communications in their entirety, the FD-302s are not themselves communications covered by the privilege. Accordingly, the Department has not taken the position that any FD-302 containing information covered by the privilege may be withheld in its entirety.  Rather, the Department has withheld pursuant to the privilege only specific information covered by the privilege and thus taken every effort to provide Plaintiffs with all reasonably segregable non-exempt information in the responsive records.  As described throughout this declaration, the Department only withheld discrete portions of each FD-302 that explicitly contained material describing or recording particular communications subject to the privilege.  Release of any additional information withheld by OIP could reasonably lead to the harms associated with and identified by the presidential communications privilege of FOIA Exemption 5.

32. Disclosure of the material covered by the presidential communications privilege would do considerable harm to the interests protected by the privilege.  The privilege exists, as recognized by the Supreme Court and multiple appellate courts, to protect the President and his advisers' abilities to engage in effective communications and decision-making.  In order to

discharge his duties under Article II of the Constitution, the President must be able to receive confidential advice of all kinds, from a variety of sources.  If such communications are forced to be disclosed, Presidents and their advisers will be unable to confidently engage in confidential decision-making without fear that their deliberations will be open to public view.  Candid discussions will naturally be chilled or inhibited, and the efficiency of government policy-making would suffer.  And disclosing transition deliberations would jeopardize the ability of future Presidents-elect to have full and candid discussions with their advisers.  This would undermine the ability to protect the confidentiality of discussions on the same matters after the President-elect takes office and further damage the quality of presidential decision-making.

<u>Exemption 5: Attorney Work Product Doctrine</u>

33. The attorney work product doctrine encompassed by Exemption 5 of the FOIA shields material prepared by an attorney or at the direction of an attorney, generated in reasonable anticipation of litigation.  5 U.S.C. § 522(b)(5).  This doctrine protects any part of a document prepared in anticipation of litigation, not just the portions concerning opinions and legal theories.  Because of this, records withheld pursuant to the attorney work product doctrine are typically withheld in their entirety.  In the instant litigation, DOJ did not withhold these thirty-seven FD-302s in their entirety because some information contained within the FD-302s was released to the public in the redacted "Report On The Investigation Into Russian Interference In The 2016 Presidential Election" ("the Mueller Report").  OIP Attorneys conducted a thorough review of both the FD-302s and the Mueller Report to identify material contained in both documents, as described below in paragraph 39, where the use of the attorney work product doctrine has been waived by the Department.  The purpose of the doctrine is to

protect the adversarial process by insulating the attorneys' preparation of litigation materials from scrutiny.

34. FD-302s report and summarize interviews conducted by members of SCO during the course of the investigation. These interviews were conducted by FBI agents, DOJ prosecutors, or a combination thereof, and were done so in furtherance of a prosecutor-directed investigation, as described in greater detail in the Weinsheimer Declaration (*see, e.g.*, ¶¶ 25–31). The information within the FD-302s therefore reflects the essential attorney work product that is generated when DOJ attorneys execute one of the Department's core functions of enforcing federal law.

35. FD-302s are summaries of interviews conducted by FBI investigators and, as relevant here, DOJ prosecutors. While these documents do not directly or explicitly contain prosecutors' impressions, opinions, or analyses regarding the conduct of the interviews, prosecutorial strategies and opinions may nonetheless be revealed through disclosure of the topics covered and information elicited from the witnesses.

36. This is particularly so in the interviews led by the prosecutors working in SCO as they were executing the Acting Attorney General's order appointing the Special Counsel. On May 17, 2017, Deputy Attorney General Rod J. Rosenstein, in his capacity as Acting Attorney General,[6] appointed Robert S. Mueller III to serve as Special Counsel for the investigation into Russian interference with the 2016 presidential election. *See* DOJ Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters (May 17, 2017), *available at* https://www.justice.gov/opa/press-

---

[6] Deputy Attorney General Rosenstein was Acting Attorney General for purposes of the investigation due to then-Attorney General Jeff Sessions' March 2, 2017 recusal from "any matters arising from the campaigns for President of the United States." *See* Attorney General Sessions Statement on Recusal (March 2, 2017), *available at* https://www.justice.gov/opa/pr/attorney-general-sessions-statement-recusal.

release/file/967231/download.  Acting Attorney General Rosenstein's appointment order included authorization for the Special Counsel to both investigate this matter and prosecute federal crimes arising from this investigation.  *Id.*  Under the terms of his appointment, Special Counsel Mueller was specifically authorized to "conduct the investigation confirmed by then-FBI Director James B. Comey in testimony before the House Permanent Select Committee on Intelligence on March 20, 2017, including: (i) any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump; and (ii) any matters that arose or may arise directly from the investigation; and (iii) any other matters within the scope of 28 C.F.R. § 600.4(a)."  *Id.*  In addition, the appointment order provided that "[i]f the Special Counsel believes it is necessary and appropriate, the Special Counsel is authorized to prosecute federal crimes arising from the investigation of these matters."  *Id.*  Finally, the appointment order specified that "[s]ections 600.4 through 600.10 of Title 28 of the Code of Federal Regulations are applicable to the Special Counsel."  *Id.*

37. Disclosure of the attorney work product revealed by the thirty-one FD-302s outlined above in paragraph 8 would expose protected information regarding multiple distinct litigation matters (and prospective litigation matters that had the potential to arise from the various investigations conducted by members of the SCO) and would undermine both the Department's core functions as well as the SCO's core functions, as ordered by the Acting Attorney General. Accordingly, these FD-302s have been withheld in full pursuant to FOIA Exemption 5, except to the extent that information within them has been publicly disclosed by the Department.

<u>Waiver Review</u>

38. Of the thirty-seven FD-302s described in OIP's <u>Vaughn</u> Index, four have not been disclosed in any form outside the Executive Branch.[7]  After the conclusion of the Special Counsel's investigation, thirty-two FD-302s described in OIP's <u>Vaughn</u> Index were shared under tightly-controlled circumstances with certain members of Congress as part of accommodation processes between the Department and the House Judiciary Committee (HJC) and House Permanent Select Committee on Intelligence (HPSCI) in furtherance of Congress's oversight responsibilities.  Through these two accommodation processes, committee members and a limited number of staff from one or both of the committees were able to view redacted versions of the FD-302s at DOJ offices in a secure reading room under strict terms of confidentiality.  These committee members were neither given copies of these FD-302s to keep or take outside of DOJ premises nor permitted to share any of the contents with anyone other than committee members and limited staff of the committees.  There was no waiver of Exemption 5 due to these circumstances.

39. Because the Mueller Report has been publicly released in a redacted form, OIP conducted a thorough review of each FD-302 to determine whether any information in each document was released to the public in the redacted Mueller Report.  To accomplish this, two OIP Attorneys cross-referenced the released portions of the Mueller Report which cited to any of the FD-302s released in this litigation with the text of each FD-302.  If the information in a given FD-302 was as specific as that information released in the Mueller Report, OIP made the determination that the Department waived its ability to assert Exemption 5 of the FOIA over

---

[7] The four FD-302s that have not been disclosed in any form outside the Executive Branch are: Bannon (dated February 14, 2018), Hicks (dated March 13, 2018), Newman (dated October 16, 2018), and Hicks (dated December 8, 2017).

that information and thus, that information was released in the FD-302s produced to Plaintiffs in this litigation.  If the information released in the Mueller Report did not match the information in a given FD-302, then OIP determined that the Department had not waived its ability to withhold the information pursuant to FOIA Exemption 5.  For example, if releasing a portion of a given FD-302 would provide the public with new information that was not revealed in the redacted Mueller Report, OIP withheld the information in the FD-302.  Through this review, OIP did not assert Exemption 5 on any portions of the FD-302s for which privilege has been waived.

40. Plaintiffs allege in their Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment, ECF No. 59, that DOJ improperly redacted information in a number of FD-302s.  OIP Attorneys re-reviewed each FD-302 listed on pages 12, 13, 15, and 18 of Plaintiffs' Memorandum and compared each FD-302 to information in the Mueller Report that cites to each FD-302.  DOJ did not withhold any information pursuant to Exemption 5 that is waived by its release in the Mueller Report.[8]  The information in the FD-302s are not a match to the information in the Mueller Report, as described above in paragraph 39.  Therefore, Department's ability to withhold that information pursuant to Exemption 5 has not been waived.

---

[8] Due to human error, certain portions of two FD-302s from two interviews of Dmitri Simes dated March 8, 2018 and March 27, 2018, were inadvertently withheld even though they were waived through release of the same information in the Report.  Defendant will reprocess the affected pages to correct the errors and will re-release the affected pages to Plaintiffs in the upcoming March production.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____
Vanessa R. Brinkmann
Senior Counsel

Executed this 24th day of February, 2020.

25

Exhibit A

Jason Leopold, Buzzfeed, Inc. v. DOJ, 19-cv-1278 (RBW)
CNN v. FBI, 19-cv-1626 (RBW)

OIP Vaughn Index

This index contains descriptive information related to portions of records withheld by DOJ pursuant to FOIA Exemption 5. It is meant to be read in tandem with OIP's Declaration of Vanessa R. Brinkmann, filed contemporaneously. Material withheld pursuant to the presidential communications privilege encompassed by Exemption 5 has been coded to explain the withholdings in more detail. The codes correspond to the following categories, which are discussed in detail in OIP's Declaration:

- **PCP-1**: Communications between government officials or staff during the Administration in connection with presidential decision-making
- **PCP-2**: Communications between Transition officials or staff which concern potential presidential decisions after the Inauguration
- **PCP-3**: Communications including one or more private parties concerning presidential decision-making

Acronyms & Abbreviations:
AWP: attorney work product doctrine
DPP: deliberative process privilege
PCP: presidential communications privilege

| November 1, 2019 Production | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | **Privileges Used** | | | | |
| **FBI Bates Numbers** | **Name** | **Interview Date** | **Pages** | **AWP** | **DPP** | **PCP-1** | **PCP-2** | **PCP-3** |
| 132-168 | Bannon | 2/14/2018 | 37 | Yes | | Yes | Yes | Yes |
| 424-445 | Cohen | 8/7/2018 | 22 | | | | | Yes |

| December 2, 2019 Production | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | **Privileges Used** | | | | |
| **FBI Bates Numbers** | **Name** | **Interview Date** | **Pages** | **AWP** | **DPP** | **PCP-1** | **PCP-2** | **PCP-3** |
| 522-528 | Cohen | 11/20/2018 | 7 | Yes | | | | |
| 542-549 | Kelly | 8/2/2018 | 8 | Yes | | Yes | | |
| 566-583 | Hicks | 3/13/2018 | 18 | Yes | | Yes | | |
| 621 | Newman | 10/16/2018 | 1 | Yes | | | | |
| 643-653 | Rosenstein | 5/23/2017 | 11 | | Yes | Yes | Yes | |
| 674-685 | McCord | 7/7/2017 | 12 | Yes | Yes | Yes | | |
| 833-842 | Christie | 2/13/2019 | 10 | Yes | | | | Yes |
| 864-871 | Lewandowski | 4/6/2018 | 8 | Yes | | | | Yes |
| 891-913 | Hicks | 12/8/2017 | 23 | Yes | | Yes | Yes | |

| January 2, 2020 Production | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Privileges Used | | | | |
| **FBI Bates Numbers** | **Name** | **Interview Date** | **Pages** | **AWP** | **DPP** | **PCP-1** | **PCP-2** | **PCP-3** |
| 1010-1014 | Dearborn | 6/20/2018 | 5 | Yes | | Yes | | Yes |
| 1039-1052 | S. Miller | 10/31/2017 | 14 | Yes | Yes | Yes | | |
| 1086-1104 | Porter | 4/13/2018 | 19 | Yes | | Yes | | |
| 1105-1112 | Ruddy | 6/6/2018 | 8 | Yes | | | | Yes |
| 1113-1132 | Porter | 5/8/2018 | 20 | Yes | | Yes | | |
| 1133-1151 | McFarland | 12/22/2017 | 19 | Yes | | Yes | Yes | |
| 1152-1167 | Cohen | 9/12/2018 | 16 | Yes | | | | |
| 1188-1197 | Sanders | 7/3/2018 | 10 | Yes | | Yes | | |
| 1198-1210 | Dhillon | 11/21/2017 | 13 | Yes | | Yes | | |
| 1211-1215 | Beniaminov | 1/6/2018 | 5 | Yes | | | | |
| 1233-1263 | [Name withheld in 302] | 4/12/2018 | 31 | Yes | | | | |
| 1264-1275 | Kaveladze | 11/16/2017 | 12 | Yes | | | | |
| 1305-1310 | Mashburn | 8/2/2018 | 6 | Yes | | | | |
| 1311-1316 | McFarland | 10/17/2017 | 6 | | | Yes | Yes | |
| 1319-1325 | McFarland | 9/14/2017 | 7 | | | Yes | Yes | |
| 1329-1348 | Simes | 3/27/2018 | 20 | Yes | | | | |
| 1349-1381 | Simes | 3/8/2018 | 33 | Yes | | | | |
| 1387-1393 | Rtskhiladze | 5/10/2018 | 7 | Yes | | | | |
| 1394-1400 | [Name withheld in 302] | 12/15/2017 | 7 | Yes | | | | |
| 1401-1408 | Sater | 9/19/2017 | 8 | Yes | | | | |

| January 17, 2020 Production | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Privileges Used | | | | |
| **FBI Bates Numbers** | **Name** | **Interview Date** | **Pages** | **AWP** | **DPP** | **PCP-1** | **PCP-2** | **PCP-3** |
| 1441-1448 | Aven | 8/2/2018 | 8 | Yes | | | | |
| 1450-1451 | Cohen | 10/8/2018 | 2 | Yes | | | | |
| 1452-1469 | Foresman | 10/17/2018 | 18 | Yes | | | | |
| 1580-1587 | Papadopoulos | 8/10/2017 | 8 | Yes | | | | |
| 1588-1598 | Papadopoulos | 8/11/2017 | 11 | Yes | | | | |
| 1599-1620 | Papadopoulos | 9/19/2017 | 22 | Yes | | | | |