# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JASON LEOPOLD and**<br>**BUZZFEED, INC.,**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**UNITED STATES DEPARTMENT OF**<br>**JUSTICE, <u>et al.</u>**<br><br>    **Defendants.** | **Case No: 1:19-cv-01278-RBW** |
| **CABLE NEWS NETWORK, INC.,**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**FEDERAL BUREAU OF INVESTIGATION,**<br><br>    **Defendant.** | |

## REPLY MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION
## <u>TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ....................................................................................................................1

I.  DOJ HAS NOT SHOWN THE WITHHOLDINGS PREVENT
    REASONABLY FORESEEABLE HARM TO THE INTERESTS
    PROTECTED BY EXEMPTION 5....................................................................................3

II. APPLYING THE ATTORNEY WORK PRODUCT PRIVILEGE TO THE
    302 REPORTS IS INAPPROPRIATE ...............................................................................6

III. DOJ HAS WAIVED WORK PRODUCT PROTECTION FOR ALL
     INFORMATION RELEASED IN THE MUELLER REPORT...........................................9

IV. THE GOVERNMENT MUST PRODUCE THE WITHHELD RECORDS
    UNDER THE GOVERNMENT MISCONDUCT EXCEPTION ....................................13

V.  THE PRESIDENTIAL COMMUNICATIONS PRIVILEGE DOES NOT
    APPLY...........................................................................................................................16

    a.  The President Waived Any Presidential Communications Privilege ...................16

    b.  DOJ Failed to Show These 302 Report Are Protected by the
        Presidential Communications Privilege................................................................18

VI. DOJ HAS PROVIDED INSUFFICIENT SUPPORT FOR ALL OF ITS
    WITHHOLDINGS UNDER THE DELIBERATIVE PROCESS PRIVILEGE ..............22

CONCLUSION.......................................................................................................................23

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                    **Page(s)**

*Bernegger v. Exec. Office for U.S. Attys.*,
  334 F. Supp. 3d 74 (D.D.C. 2018) ............................................................................14

*Citizens for Responsibility & Ethics in Wash. v. DHS*,
  648 F. Supp. 2d 152 (D.D.C. 2009) ..........................................................................19

*Citizens for Responsibility & Ethics in Wash. v. DOJ*,
  658 F. Supp. 2d 217 (D.D.C. 2009) ..............................................................16, 17, 18

*Coastal States Gas Corp. v. Dep't of Energy*,
  617 F.2d 854 (D.C. Cir. 1980) ..............................................................................7, 22

*COMPTEL v. FCC*,
  910 F. Supp. 2d 100 (D.D.C. 2012) ..........................................................................19

*Cottone v. Reno*,
  193 F.3d 550 (D.C. Cir. 1999) ........................................................................9, 11, 12

*Ctr. for Effective Gov't v. Dep't of State*,
  7 F. Supp. 3d 16 (D.D.C. 2013) ..........................................................................18, 19

*Ctr. for Investigative Reporting v. Customs & Border Prot.*,
  No. 18-2901 (BAH), 2019 U.S. Dist. LEXIS 223077 (D.D.C. Dec. 31, 2019)..............3, 7, 22

*DOJ v. Reporters Comm. for Freedom of the Press*,
  489 U.S. 749 (1989) ..................................................................................................2

*Elec. Privacy Info. Ctr. v. DOJ*,
  No. 19-cv-810 (RBW) (Mar. 5, 2020) .......................................................... *passim*

*EPA v. Mink*,
  410 U.S. 73 (1973)....................................................................................................19

*Fitzgibbon v. CIA*,
  911 F.2d 755 (D.C. Cir. 1990) ..................................................................................12

*Food Marketing Institute v. Argus Leader Media*,
  139 S. Ct. 2356 (2019)..............................................................................................21

*Fortson v. Harvey*,
  407 F. Supp. 2d 13 (D.D.C. 2005) ..............................................................................8

*Garside v. Webster*,
  733 F. Supp. 1142 (S.D. Ohio 1989) ...........................................................................8

*Judicial Watch, Inc. v. Dep't of Commerce*,
   375 F. Supp. 3d 93 (D.D.C. 2019) .................................................................3, 4

*Judicial Watch v. DOJ*,
   365 F.3d 1108 (D.C. Cir. 2004) ........................................................................21

*Kissinger v. Reporters Comm. for Freedom of the Press*,
   445 U.S. 136 (1980) ..........................................................................................21

*Mobley v. CIA*,
   806 F.3d 568 (D.C. Cir. 2015) ............................................................................9

*Morley v. CIA*,
   508 F.3d 1108 (D.C. Cir. 2007) ........................................................................22

*Nat'l Day Laborer Org. Network v. Immigration & Customs Enf't Agency*,
   811 F. Supp. 2d 713 (S.D.N.Y. 2011) .................................................................9

*Nat'l Whistleblower Ctr. v. HHS*,
   903 F. Supp. 2d 59 (D.D.C. 2012) ....................................................................14

*NLRB v. Robbins Tire & Rubber Co.*,
   437 U.S. 214 (1978) ..........................................................................................14

*Pizzuti v. United States*,
   809 F. Supp. 2d 164 (S.D.N.Y. 2011) .................................................................8

*Public Citizen v. Dep't of State*,
   11 F.3d 198 (D.C. Cir. 1993) ............................................................................13

*Raphael v. DOJ*,
   No. 02-CV-3808, 2003 U.S. Dist. LEXIS 6515 (E.D. Pa. Mar. 31, 2003) .............8

*Rockwell Int'l Corp. v. DOJ*,
   235 F.3d 598 (D.C. Cir. 2001) ............................................................................7

*In re Sealed Case*,
   121 F.3d 729 (D.C. Cir. 1997) ...........................................................16, 17, 20, 21

*In re Sealed Case*,
   676 F.2d 793 (D.C. Cir. 1982) ...................................................................17, 18

*Tax Reform Research Grp. v. IRS*,
   419 F. Supp. 415 (D.D.C. 1976) .......................................................................15

*United States v. Burr*,
   25 F. Cas. 187 (D. Va. Cir. Ct. 1807) ................................................................21

*United States v. Reynolds*,
    345 U.S. 1 (1953) ..................................................................................................21

*Vaughn v. Rosen*,
    484 F.2d 820 (D.C. Cir. 1973) ............................................................................19

*Wash. Post Co. v. HHS*,
    690 F.2d 252 (D.C. Cir. 1982) ..............................................................................9

*Wolf v. CIA*,
    473 F.3d 370 (D.C. Cir. 2007) ............................................................................12

**Statutes**

Freedom of Information Act ..................................................................... *passim*

**Other Authorities**

162 Cong. Rec. H3714-01, H3717162 (2016) ...............................................................4

Fed. R. Civ. P. 26(b)(3) ...................................................................................................7

H.R. Rep. No. 114-391 (2016) ........................................................................................3

## INTRODUCTION

Just yesterday, in a FOIA case involving the Mueller Report, this Court found that the Department of Justice's ("DOJ's") justifications for withholding materials under the Freedom of Information Act ("FOIA") were "tainted."  The Court expressed grave concern at the possibility that Attorney General William P. Barr engaged in "a calculated attempt to influence public discourse about the Mueller Report in favor of President Trump despite certain findings in the redacted version of the Mueller Report to the contrary."  *Elec. Privacy Info. Ctr. v. DOJ* ("*EPIC*"), No. 19-cv-810 (RBW), slip op. at 19-20 (Mar. 5, 2020) (Dkt. 111).  To guard against the prospect that DOJ has improperly invoked FOIA exemptions to mislead the public about the Mueller investigation or its underlying facts, the Court denied DOJ's motion for summary judgment, ordering *in camera* disclosure of all material the Government redacted from the Mueller Report.

Those concerns are just as present in this case, especially in light of DOJ's conduct of this litigation.  As Plaintiffs have repeatedly noted here, the public version of the Mueller Report indicates that DOJ has consistently withheld negative information about the Trump Administration and released only neutral or positive details about the President.  Just as the Court reflected in yesterday's ruling in *EPIC*, DOJ has litigated this case in defiance of its FOIA obligations in order to "create a one-sided narrative about the Mueller Report—a narrative that is clearly in some respects substantively at odds with the redacted version of the Mueller Report."  *Id.* at 18.

In its attempt to justify the extensive withholdings of pages and pages of information under Exemption 5—an exemption described by Representative Mark Meadows as the "withhold it because you want to" exemption in the 2016 amendments to FOIA intended to curb abuse—

DOJ has advanced privilege arguments that are contrary to the law, contrary to the Special Counsel's Office's sworn testimony, and even contrary to President Trump's own public statements. DOJ also wrongly claims that there is no government misconduct exception to FOIA's exemptions or that the exception does not apply in this case—even though it involves a Special Counsel investigation that, as this Court noted, "does not exonerate" the President of obstruction of justice. *See, e.g.*, *id.* at 17.

Moreover, DOJ ascribes to "human error" yet another set of improper redactions of information[1] while continuing to vouch for the legitimacy of all other withholdings. DOJ makes this sworn certification despite the clear record before the Court that the Government continues to withhold portions of the FD-302 reports directly cited and described in the Mueller Report.

In a FOIA case such as this, the *Government* shoulders the burden of justifying its claims that information is exempt from disclosure and the Court reviews those justifications *de novo*. *DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 755 (1989). DOJ has fallen short of meeting the burden to show that its Exemption 5 withholdings are proper or that the Government has not waived them.

Therefore, Plaintiffs respectfully request that this Court grant their motion, deny the Government's motion, and enter an order requiring DOJ to release the information it has

---

[1] Plaintiffs have cited numerous examples of DOJ's withholding of information released in the Mueller Report with specific citations to 302 reports. For example, in early January, Plaintiffs pointed out that DOJ redacted the portion of a 302 report for presidential adviser Stephen Miller that the Mueller Report cited for Miller's statement that he informed then-White House Chief of Staff Reince Priebus about President Trump's intention to fire FBI Director James Comey. *See* Dkt. 50 at 3. Plaintiffs have similarly objected to DOJ's improper invocation of other privileges to withhold even the names of interviewees who testified at the various criminal trials resulting from the Special Counsel's investigation. *See* Dkt. 55 at 2-3.

improperly withheld and comply with its obligations going forward to withhold only that information that is properly privileged under Exemption 5.

Alternatively, Plaintiffs respectfully request that the Court conduct an *in camera* review of the withholdings to ensure that DOJ's Exemption 5 claims are legitimate.

## I.   DOJ HAS NOT SHOWN THE WITHHOLDINGS PREVENT REASONABLY FORESEEABLE HARM TO THE INTERESTS PROTECTED BY EXEMPTION 5

As explained in Plaintiffs' opening brief, boilerplate assertions of foreseeable harm under the 2016 FOIA amendments, and the DOJ's claim that these abuse-correcting amendments were not "significant," have been repeatedly rejected in this District. Dkt. 59 at 6-9 (citing, *inter alia*, *Ctr. for Investigative Reporting v. Customs & Border Prot.*, No. 18-2901 (BAH), 2019 U.S. Dist. LEXIS 223077, at *20 (D.D.C. Dec. 31, 2019)).

Nearly all of DOJ's claims of foreseeable harm are the kind of conclusory boilerplate that courts have repeatedly held are insufficient to meet the Government's heightened burden. *See, e.g.*, Dkt. 62 at 32-33. As the court noted in a case rejecting similar claims:

> In Mr. Graff's first declaration he explained that release of the withheld information "could have a chilling effect on the discussion within the agency in the future" and "discourage[ ] a frank and open dialogue among agency employees." See Graff Decl., ECF No. 14-2 at 4. He further explained in his second declaration that the "foreseeable harm" in releasing the withheld information was that it "could have a chilling effect on the discussions within the agency" and added that these "deliberations are essential to ensuring that the right information is delivered to [the] public" and that failure "to have these frank deliberations could cause confusion if incorrect or misrepresented climate information remained in the public sphere." Second Graff Decl., ECF No. 17-2 at 2-3. These general explanations of the possibility of a "chilling effect" fall short of articulating "a link between the specified harm and specific information contained in the material withheld." *See* H.R. Rep. No. 114-391, at 9 (2016).
>
> ***
>
> The question is not whether disclosure could chill speech, but rather if it is reasonably foreseeable that it will chill speech and, if so, what is the link between this harm and the specific information contained in the material withheld. In other

words, the Act requires more than speculation, which is all that Commerce has
provided through its declarations and Vaughn indexes.

*Judicial Watch, Inc. v. Dep't of Commerce*, 375 F. Supp. 3d 93, 100-101 (D.D.C. 2019).

Here, DOJ's declarant simply parrots the legal justification for the presidential
communications privilege in contending that if the withheld information were released, "[c]andid
discussions will naturally be chilled or inhibited, and the efficiency of government policy making
would suffer."  Brinkmann Decl. (Dkt. 63-8) ¶ 32.  Similarly, DOJ argues the boilerplate legal
conclusion that releasing the withheld information would harm the interests protected by the
work product doctrine because it would "indirectly reveal the mental impressions, assessments
and thought processes of the attorneys involved in the investigation."  Dkt. 62 at 32 (quoting
Weinsheimer Decl. [Dkt. 63-3] ¶ 38).[2]  These arguments, as *Judicial Watch* illustrates, do not
meet the heightened standard under the current FOIA.

DOJ's claims also reflect exactly the kind of abuse Congress intended to stop through the
foreseeable-harm amendment.  375 F. Supp. 3d at 100 (amendment was "based on the
recognition that 'from the beginning, agencies have taken advantage of these exemptions to
withhold any information that might technically fit' [and] although some agencies 'have made an
effort to comply with the letter of the law, very few have complied with the spirit of the law'"
(quoting 162 Cong. Rec. H3714-01, H3717162 (2016))).  DOJ has failed to explain how it is that
these allegedly foreseeable harms would occur from release of *these specific 302 reports*, but not
from the others it has already released.

For example, the following is an excerpt from the Steve Bannon 302 report:

---

[2] DOJ does provide specifics to support its claims of foreseeable harm caused by the release of
the limited amount of information for which it claims the deliberative process privilege.  *See*
Dkt. 62 at 33-35.  Plaintiffs therefore do not challenge DOJ's deliberative process withholdings
on this basis.

> Trump wanted a lawyer like Roy Cohn. He wanted an Attorney General like
> Bobby Kennedy. [redacted] He thought of them as **b5 per l**
> people who really protected their President. Trump thought Holder always
> stood up for Obama and said Holder even took a contempt charge for Obama
> and that Bobby Kennedy always had JFK's back. [redacted]

Bannon 2/14/18 302, attached hereto as Exhibit 1, at Bates No. 136.  DOJ does not say how these statements can be safely made public without chilling presidential communications or the work of attorneys, but the redacted passages must remain secret.  The same is true of many other passages, such as these:

> In the Oval Office meeting, the President asked if McGahn had seen and
> read the article and told McGahn that he did not recall any discussion **b5 per**
> about firing Mueller. [redacted]
> [redacted] Kelly described the conversation
> as "a little tense." [redacted]
> [redacted] The President may
> have asked McGahn to correct the record, but McGahn was insistent that it
> had happened the way he remembered. The President said it was not the way
> he remembered it. Kelly assumed "correct the record" meant for McGahn to
> call the New York Times to correct the story.

John Kelly 8/2/18 302, attached hereto as Exhibit 2, at Bates No. 543.



> Kelly reviewed a copy of his notes bearing Bates stamp WH000017684, dated
> Monday, 5 Feb 2018. [redacted]
> [redacted] **b5 per**
> [redacted] The notes read in part: "POTUS – Don McGahn letter – Mueller +
> resigning." [redacted]
> [redacted] He did not recall what the notes
> meant.   Kelly did not recall whether the President asked McGahn to write
> a letter. He thought the President may have "mused" about it. [redacted]

*Id.* at Bates No. 544.

```
Sanders was provided a copy of the transcript from her August 1, 2017
press briefing (not Bates stamped) in which she said, "the President
weighed in, as any father would, based on the limited information he had"
and "he certainly didn't dictate" the statement. She talked to the
President immediately before the press briefing and distinctly remembered
he said he "weighed in, as any father would."                       b5 P.
                                                 Sanders said when she asked
the President questions before doing a press briefing, he knew she
intended to tell the press what he said.
```

Sarah Huckabee Sanders 7/3/18 302, attached hereto as Exhibit 3, at Bates No. 1196.

DOJ has failed to show foreseeable harm as to its Exemption 5 withholdings pursuant to either the work product doctrine or the presidential communication privilege. Plaintiffs therefore respectfully request that the Court order the release of information DOJ has withheld pursuant to these privileges under Exemption 5. The Court also should order DOJ to confine future withholdings under the exemption to material that would foreseeably harm the interests protected by the exemption and end its practice of selectively asserting this exemption in an effort to control the flow of information about this important issue in the months leading up to a presidential election.

## II.    APPLYING THE ATTORNEY WORK PRODUCT PRIVILEGE TO THE 302 REPORTS IS INAPPROPRIATE

The Government's own evidence in this case shows that these 302 reports are not subject to work product protection.

Although DOJ asserts that the 302 reports constitute the work product of attorneys in the Special Counsel's Office, Dkt. 62 at 13-17, DOJ's declarant states that the Special Counsel prosecutors themselves "did *not* consider FD-302s as their work product." Weinsheimer Decl. ¶ 34 (emphasis added). Further, the 302s were prepared by FBI agents who had the final say regarding their contents, and the Special Counsel prosecutors "treated the FD-302s as the FBI's document[s]," and not the lawyers.' *Id.* ¶¶ 31, 34. The prosecutors also expected that the 302

reports would be provided to criminal defendants in discovery and many were, including in the prosecution of Roger Stone.  *Id.* at ¶ 34; *see also* Hardy Decl. ¶ 7 n. 2.  (302s are drafted "with the expectation that they will be disclosed in criminal discovery").  And although the questioning of the witnesses was often directed by government attorneys, the FBI agents responsible for the content of the 302 reports were specifically required to exclude prosecutors' "impressions, opinions or analyses."  Hardy Decl. (Dkt. 63-9) ¶ 7 n.2; *see also* Brinkmann Decl. ¶ 35.

As discussed *supra* and as Chief Judge Howell recently noted, FOIA's foreseeable harm requirement "imposes an independent and meaningful burden on agencies"—in other words, a "heightened standard."  *Ctr. for Investigative Reporting*, 2019 U.S. Dist. LEXIS 223077, at *23-24 (internal marks and citations omitted).  Here, DOJ cannot meet its burden to show any foreseeable harm to the interests protected by the work product doctrine—the very attorneys whose "work product" DOJ now seeks to protect attest that they foresaw no harm in the documents' release, and took steps to eliminate any possible harm prior to creating the records.

Beyond the testimony of the Special Counsel's Office here, the nature of the 302 reports shows that their release would not harm any interest protected by the work product doctrine.  As DOJ acknowledges, the work product doctrine "aims to 'protect the adversary trial process itself' as 'the integrity of our system would suffer if adversaries were entitled to probe each other's thoughts and plans concerning the case.'"  Dkt. 62 at 32 (quoting *Rockwell Int'l Corp. v. DOJ*, 235 F.3d 598, 604-05 (D.C. Cir. 2001)); *see also Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 864 (D.C. Cir. 1980) (work product doctrine prevents adversaries from gaining insight into "the mental impressions, conclusions, opinions or legal theories of an attorney." (quoting Fed. R. Civ. P. 26(b)(3))).  But where, as here, the materials are explicitly intended to be produced to litigation adversaries, and designed to exclude any mental impressions of any

attorney, the justification for protecting them as work product simply is not present and the privilege cannot apply.

Indeed, while DOJ cites two recent district court rulings upholding work product arguments regarding 302 reports, *DOJ has repeatedly released 302 reports and other witness statements under FOIA*, either voluntarily or under direction by a court.  *See, e.g.*, *Pizzuti v. United States*, 809 F. Supp. 2d 164, 168 (S.D.N.Y. 2011) (noting a plaintiff received a redacted FD-302 report via FOIA); *Fortson v. Harvey*, 407 F. Supp. 2d 13, 17-18 (D.D.C. 2005) (notes on witness statements compiled by the Chief Trial Judge of the U.S. Army Trial Judiciary during an investigation into an equal opportunity complaint ordered produced pursuant to a FOIA request); *Raphael v. DOJ*, No. 02-CV-3808, 2003 U.S. Dist. LEXIS 6515, at *2 (E.D. Pa. Mar. 31, 2003) (noting plaintiff was provided a partially redacted version of 302 report and ordering defendant to produce an unredacted version for review at a pretrial conference); *Garside v. Webster*, 733 F. Supp. 1142, 1151 (S.D. Ohio 1989) (ordering the FBI to process and release a 302 report to FOIA plaintiff).

The political impact that the release of these documents could have is clear and inescapable.  Equally clear are the tensions between the Special Counsel's Office, which refused to declare that the President had been cleared of wrongdoing, and the President and his Attorney General, who have falsely declared the investigation cleared the President of obstruction of justice.[3]  *See EPIC*, slip op. at 18-19.  FOIA, however, leaves no room to block the release of

---

[3] The tensions between former SCO prosecutors and the political leadership of DOJ were on prominent display recently when all of the line prosecutors in the Roger Stone case withdrew when the Attorney General intervened to countermand their sentencing recommendation, which President Trump had criticized as too harsh.  *See, e.g.*, David Shortell, Evan Perez, Katelyn Polantz, *et al.*, *All 4 federal prosecutors quit Stone case after DOJ overrules prosecutors on sentencing request*, CNN.COM (Feb. 12, 2020), https://www.cnn.com/2020/02/11/politics/roger-stone-sentencing-justice-department/index.html.

information the Government dislikes.  "The purpose of FOIA is to shed light on the operation of government, not to shield it from embarrassment." *Nat'l Day Laborer Org. Network v. Immigration & Customs Enf't Agency*, 811 F. Supp. 2d 713, 758 (S.D.N.Y. 2011); *see also EPIC*, slip op. at 21 ("Congress was all too aware of the [i]nnumerable times that agencies had withheld information under prior law only to cover up embarrassing mistakes or irregularities[,] [and the] FOIA was designed to prevent such incidents[.]" (quoting *Wash. Post Co. v. HHS*, 690 F.2d 252, 264 (D.C. Cir. 1982))).

Plaintiffs therefore respectfully request that the Court enter an order precluding DOJ from claiming work product protection for the 302 reports at issue in this case and to remove the redactions from any material previously withheld inappropriately on work product grounds.[4]

### III.   DOJ HAS WAIVED WORK PRODUCT PROTECTION FOR ALL INFORMATION RELEASED IN THE MUELLER REPORT

DOJ makes a formalistic argument that attempts to distract the Court from the numerous instances where the Government has waived Exemption 5 in previous disclosures of the same information contained in 302 reports.  Plaintiffs have shown that the Mueller Report's descriptions of the specific information learned in the FBI's witness interviews—which Special Counsel Robert Mueller footnoted to each specific page of each specific 302 report—constitutes an official acknowledgement of the witness's identity and the information they provided.  *See* Dkt. 59 at 10-13 (citing, *inter alia*, *Mobley v. CIA*, 806 F.3d 568, 583 (D.C. Cir. 2015) and *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999)).  In making these official, public

---

[4] Because DOJ has clarified that it is not claiming information provided under a proffer agreement is the privileged work product of the witness's attorney, Plaintiffs' argument on that issue is moot.

pronouncements, the Government waived any claim of work product privilege under Exemption 5. The DOJ's conclusory response through its declarant, Vanessa Brinkmann, that the Government "did not withhold any information pursuant to Exemption 5 that is waived by its release in the [Mueller] Report",[5] fails to address the numerous pinpoint examples Plaintiffs provided.[6]

DOJ simply does not directly address most of the examples Plaintiffs provided of information that the Mueller Report attributes to 302s but has been withheld from the records produced to Plaintiffs. For example:

- The Mueller Report repeatedly cites the 302 report for Ike Kaveladze, an official with the Russian development company Crocus Group and the deputy for Russian oligarch Aras Agalarov in the United States. *See* 1 Mueller Report at 67, 111, 117. The Mueller Report ascribes to Kaveladze the information that "Donald J. Trump, Jr. served as the primary negotiator on behalf of the Trump Organization" for the Trump Tower Moscow project. *Id.* at 67 (citing Kaveladze 302 at 2, 4-6). In disclosing the 302 report of the FBI interview with Kaveladze, however, DOJ has redacted this information—and any other describing Donald J. Trump, Jr.'s role in the Moscow project. *See* Dkt. 59-6.

- The Mueller Report also cites the 302 report for Russian real estate developer Roman Beniaminov as a source for the information that publicist Robert Goldstone "facilitated the ongoing contact between the Trumps and the Agalarovs—including an invitation that Trump sent to Putin to attend the 2013 Miss Universe pageant in Moscow." *See* 1 Mueller Report at 111. Nothwithstanding this official public disclosure, DOJ produced to Plaintiffs a version of the 302 report of the FBI interview with Beniaminov that is almost entirely redacted. The only information cited in this portion of the Mueller Report contained in the Beniaminov 302 released to Plaintiffs is one sentence:

---

[5] Dkt. 62 at 36 (quoting Brinkmann Decl. ¶ 40).

[6] This Court expressed its deep skepticism of DOJ's similar claims in *EPIC*, questioning whether the redactions to the Mueller Report itself "are self-serving and were made to support, or at the very least to not undermine, Attorney General Barr's public statements and whether the Department engaged in post-hoc rationalization to justify Attorney General Barr's positions." *EPIC*, Slip Op. at 20. Again, those same concerns are present in this case, which involves the information underlying the Mueller Report.

"GOLDSTONE primarily did 'PR' work for EMIN [Agalarov] in the United States." *See* Dkt. 59-5 at 3.

- Citing statements from both of these men, the Mueller Report also states that President Trump's former attorney Michael Cohen contacted businessman Giorgi Rtskhiladze about the Trump Tower Moscow project because "Rtskhiladze had pursued business ventures in Moscow, including a licensing deal with the Agalarov-owned Crocus group." 1 Mueller Report at 70. DOJ produced to the Plaintiffs a version of the 302 report referenced by Special Counsel Mueller that redacted from the cited page all of the information Rtskhiladze provided. *See* Dkt. 59-7 at 1.

- The Mueller Report states that Richard Gerson, a longtime friend of presidential son-in-law and adviser Jared Kushner, had contact with Kirill Dmitriev, the head of Russia's sovereign wealth fund. 1 Mueller Report at 156-58. Citing one of Gerson's 302 reports, the Mueller Report states that Dmitriev "asked Gerson 'who he should meet with in the incoming Administration" to talk about "improved economic cooperation between the United States and Russia." *Id.* at 157 (citing Gerson 06/05/18 302 at 3). This 302 report was produced on March 2, and although the version of the cited page includes the information that Dmitriev "wanted economic cooperation with the United States," it does not include Dmitriev's query regarding to whom in the Trump Administration he should speak. Gerson 06/05/2018 302, attached hereto as Exhibit 4, at Bates No. 1223.

Brinkmann's declaration makes clear that DOJ has improperly narrowed its release to exclude every instance where "the language used in the FD-302 differed from the language used in the Report." Dkt. 62 at 36 (citing Brinkmann Decl. ¶ 39). Where the words "are not a match," DOJ decided not to release that information, Brinkmann Decl. ¶ 40, regardless of whether the Mueller Report contained the same substance. DOJ's narrow, word-for-word filter violates FOIA's official acknowledgment waiver doctrine.

The test for waiver of exemptions based on public disclosures has been litigated in this Circuit chiefly in the national security context, which is not at issue in this instance. In the non-national security context, the law does not follow the "empty formalism" that DOJ asserts here. *Cottone*, 193 F. 3d at 555. In *Cottone*, for example, the FOIA requester sought copies of audio recordings from wiretaps that would otherwise be exempt from disclosure but had been played in open court in a criminal trial. *Id.* The D.C. Circuit rejected as "an empty formalism" the

Government's argument that, to establish a waiver, the FOIA plaintiff must "produce a hard-copy, verbatim transcription of the audio tapes to prove which tapes were played at trial" *Id.* Rather, the court held, the plaintiff had met his burden by showing "which tapes have entered the public domain and which have not." *Id.*

Here, it is beyond question that the Government has made all the information in the Mueller Report part of the public record. It does not serve the interests of FOIA or of any exemption to shield the same information already widely disseminated in a government report, simply because it is not identically phrased. By showing examples of the information in the Mueller Report that is redacted from the portions of the 302s the Special Counsel cited, Plaintiffs have "pointed to specific information in the public domain that appears to duplicate that being withheld." *Id.* at 555-56 (citation omitted). Official acknowledgement of, for example, Rtskhiladze's statement that he communicated with Michael Cohen "about the Trump Moscow proposal" on several occasions in the fall of 2015 means that information on the cited page of his 302 report must be disclosed. *See* Dkt. 59 at 12.

Moreover, even under the analysis in the national security context, Plaintiffs have made a sufficient showing. Under that framework, the government acknowledgement (1) "must be as specific as the information previously released," (2) "the information requested must match the information previously disclosed," and (3) "the information requested must already have been made public through an official and documented disclosure." *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007) (quoting *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990)). Here, the specific wording in the Mueller Report citing specific pages in specific 302 reports shows that the withheld information matches what was officially and publicly disclosed in the Mueller Report. DOJ relies only on its *ipse dixit*, not any actual evidence, that the cited statements in the

302 reports do not match the Mueller Report's characterization of them.  DOJ's argument rests

on the unstated assumption that the Mueller Report frequently misquoted the 302 reports it cites,

a contention that is dubious at best.

At bottom, the Government asks this Court to expand drastically the D.C. Circuit's

holding, that an agency official's discussion of "the general subject matter of documents" does

not waive the exemption, *Public Citizen v. Dep't of State*, 11 F.3d 198, 201 (D.C. Cir. 1993), to

all circumstances where the words the Government releases "are not a match" to the withheld

documents.  This is precisely the "empty formalism" the D.C. Circuit has disapproved, and it is

contrary to FOIA's goal of government transparency.  Plaintiffs therefore respectfully request

that the Court issue an order directing DOJ to release *all* information in the 302 reports described

and cited in the Mueller Report, regardless of whether the precise wording in a 302 matches the

precise wording in the Mueller Report.  Further, Plaintiffs respectfully request that the Court

perform an *in camera* review of the Kaveladze, Beniaminov, Rtskhiladze, and Gerson 302

reports cited *supra* to determine whether the substance of the withheld material aligns with the

information published in the Mueller Report.

## IV.    THE GOVERNMENT MUST PRODUCE THE WITHHELD RECORDS UNDER THE GOVERNMENT MISCONDUCT EXCEPTION

DOJ also has failed to overcome the government misconduct exception to Exemption 5.

*See* Dkt. 59 at 16-19.  Moreover, DOJ's contention that the 302 reports in this case "do not

reflect any misconduct" is simply not credible.  These reports contain potential evidence of

extreme government misconduct—not just possible obstruction of justice by the President and

his advisers but also of DOJ's efforts to keep secret information in the 302 reports about those

potential crimes.  *See EPIC*, slip op. at 20 (stating that DOJ's contentions regarding redactions to

the Mueller Report "cannot be credited without the Court's independent verification in light of

Attorney General Barr's conduct and misleading public statements about the findings in the Mueller Report.").

Indeed, DOJ challenges the very existence of the government misconduct exception, claiming that under "the prevailing view" it does not apply in FOIA cases.  Dkt. 62 at 37-38. But DOJ "ignores several decisions from this District that did consider the government-misconduct exception in the context of FOIA." *Nat'l Whistleblower Ctr. v. HHS*, 903 F. Supp. 2d 59, 66-67 (D.D.C. 2012) (collecting cases).  After all, the basic purpose of FOIA is "to ensure an informed citizenry, vital to the functioning of a democratic society, *needed to check against corruption and to hold the governors accountable to the governed*."  *NLRB v. Robbins Tire & Rubber Co*., 437 U.S. 214, 242 (1978) (emphasis added). And while a court in this district has found that the exception should be construed as a "high bar," *Bernegger v. Exec. Office for U.S. Attys.*, 334 F. Supp. 3d 74, 92 (D.D.C. 2018), the Mueller Report itself provides plenty of evidence that Plaintiffs have cleared that bar.

As this Court recognizes, *see EPIC*, slip op. at 12, 17, Volume II of the Mueller Report states:  "[W]hile this report does not conclude that the President committed a crime, it also does not exonerate him." 2 Mueller Report at 182.  The Mueller Report further states that "if we had confidence after a thorough investigation of the facts that the President clearly did not commit obstruction of justice, we would so state." *Id.*[7]  The factual documents forming the basis of the Special Counsel's suspicion that the President and his associates obstructed justice—chief among them, the 302 reports at issue here—certainly shed light on government misconduct.

---

[7] In his testimony before the House Judiciary Committee, Special Counsel Mueller reaffirmed the investigation's conclusion was that "[t]he president was not exculpated for the acts that he allegedly committed." *See* House Committee on the Judiciary Hearing With Former Special Counsel Robert S. Mueller, III at 53:00-54:01 (July 24, 2019), https://www.youtube.com/watch?v=g58MjV528Ws&feature=emb_logo.

For example, DOJ has withheld from its FOIA production information in the 302 report of former Deputy Attorney General Rod Rosenstein about the memo the White House cited as justification for President Trump's firing of FBI Director James Comey.  Dkt. 62 at 27. Similarly, DOJ has redacted a passage of a 302 report of an interview with presidential adviser Stephen Miller about "a discussion he had with then Attorney General Jefferson Sessions about internal Department decision-making concerning a personnel matter."  *Id.* at 28.  As is clear from the surrounding portions of the Mueller Report, the "personnel matter" Miller and Sessions discussed was the President's firing of Comey.  *See* 2 Mueller Report at 64-68.  Given the resources the Special Counsel's Office devoted to this aspect of investigating whether the President obstructed justice—and the Congressional review of that aspect of the investigation— these portions of the 302 reports clearly chronicled serious potential government misconduct. Reports of witness interviews indicating potential obstruction of justice by the President "simply cannot be construed as being part of any proper governmental process." *Tax Reform Research Grp. v. IRS*, 419 F. Supp. 415, 417, 426 (D.D.C. 1976) (deliberative process privilege did not apply to recommendations that IRS use its powers against "enemies" of President Nixon in a FOIA case).

In this case, the 302 reports were generated during an investigation that, among other things, probed whether the President obstructed justice and pointedly declined to exonerate him of such misconduct.  Moreover, in its *EPIC* ruling, the Court has expressed its grave concerns that Attorney General Barr has misled the public about the Special Counsel's findings.  If the government misconduct exception applies anywhere, it applies here.  For this reason as well, the Court should order DOJ to release, at a minimum, all portions of the 302s that discuss incidents or issues the Mueller Report cites as examples of potential obstruction of justice.

## V.  THE PRESIDENTIAL COMMUNICATIONS PRIVILEGE DOES NOT APPLY

### a.  The President Waived Any Presidential Communications Privilege

There is no dispute that the information DOJ claims to be secret under the presidential communications privilege was shared with the independent Special Counsel's Office in the course of an investigation into the President and his advisors.  DOJ correctly notes that under D.C. Circuit precedent, the presidential communications privilege can be waived in appropriate circumstances.  Dkt. 62 at 44; *see also In re Sealed Case*, 121 F.3d 729, 741 (D.C. Cir. 1997) ("*Espy*") (executive privileges can be waived).  Yet the entirety of DOJ's non-waiver argument consists of a single statement in the section of its brief discussing proffer agreements: "And a disclosure to SCO—a part of the Executive Branch—does not result in a waiver. *See Citizens for Responsibility & Ethics in Wash. v. DOJ*, 658 F. Supp. 2d 217, 236–38 (D.D.C. 2009)."  Dkt. 62 at 44.  DOJ cites no other authority and ignores the facts that show the privilege does not apply.

The President himself specifically and publicly waived any executive privilege during the Mueller investigation, and has repeatedly said that although he could have claimed the privilege, he decided not to do so and instead allowed his subordinates to provide information to investigators.  2 Mueller Report at 82 n. 546 ("This Office made the notification to give the White House an opportunity to invoke executive privilege in advance of the interviews.");  Twitter, @realDonaldTrump, April 18, 2019, https://twitter.com/realdonaldtrump/status/1118990550235877376 ("I had the right to end the whole Witch Hunt if I wanted. I could have fired everyone, including Mueller, if I wanted. I chose not to. ***I had the RIGHT to use Executive Privilege. I didn't!***" (emphasis added));  Twitter, @realDonaldTrump, May 21, 2019, https://twitter.com/realdonaldtrump/status/1130947086739025920 ("So even though I didn't

have to do it with Presidential Privilege, I allowed everyone to testify, including White House

Counsel Don McGahn (for over 30 hours), to Robert Mueller and the 18 Angry Trump-Hating

Democrats[.]").  Further, as this Court noted, Attorney General Barr said that the President's

"directing senior aides to testify freely, and asserting no privilege claims," was evidence of his

lack of intent to obstruct justice.  *EPIC*, Slip Op. at 8 (citing Barr statement in April 18, 2019

news conference).  President Trump, having decided to forego its protection in the Special

Counsel's investigation, cannot now have his DOJ invoke presidential privilege to block the

public release of information gathered pursuant to that waiver.

  As a result, this case stands in sharp contrast to *Espy*, on which *CREW* relied.  In *Espy*,

the statement on which the alleged waiver was based "did not explicitly declare that the White

House would forego any and all claims of privilege that might apply to the documents."  121

F.3d at 740.  That is what the President "explicitly declare[d]" here.  And because the President

waived privilege by permitting his advisors to disclose this information to the Special Counsel's

Office, this Court need not apply an "all-or-nothing" subject-matter-waiver approach to the

presidential communications privilege to find waiver here.  *Espy*, 121 F.3d at 741; *see id.* at 741-

42 ("[T]he White House has waived its claims of privilege in regard to the specific documents

that it voluntarily revealed to third parties outside the White House, namely the final report itself

and the typewritten text of document 63, which was sent to Espy's Counsel.").

  Finally, while *CREW* is distinguishable, it is also not binding on this Court.  D.C. Circuit

precedent holds that attorney-client privilege is automatically waived upon disclosure to third

parties, but *CREW* found that the presidential communications privilege is not, because it

involves "different interests."  *CREW*, 658 F. Supp. 2d at 236 n.13 (citing *In re Sealed Case*, 676

F.2d 793, 808-09 (D.C. Cir. 1982)).  But both the presidential communications privilege and the

attorney-client privilege are meant to protect certain communications that generally require confidentiality to be effective.[8]  By contrast, the work product privilege, which, unlike attorney-client privilege, "looks to the vitality of the adversary system rather than simply seeking to preserve confidentiality," is "not limited to communications," and therefore "is not automatically waived by any disclosure to a third party."  *In re Sealed Case*, 676 F.2d at 809.  Thus, because it is more attorney-client privilege than it is work product, the presidential communications privilege can be waived, as the President did here in deciding not to invoke it.

### b. DOJ Failed to Show These 302 Reports Are Protected by the Presidential Communications Privilege

Even if the privilege were retained after disclosing the allegedly privileged information to the Special Counsel's Office while it investigated the President and his advisors, DOJ has failed in multiple ways to establish that the privilege applies.

First, DOJ makes the blanket claim all of these communications involve "matters of presidential decision-making." Dkt. 62 at 19 (citing Brinkmann Decl. ¶¶ 20, 31).   But DOJ must establish that the subject matter of each of these communications is a legitimate part of official presidential decision-making, because "no court has suggested that the mere fact that a President's direct involvement in a communication, either as an author or a recipient, renders it automatically protected." *Ctr. for Effective Gov't v. Dep't of State*, 7 F. Supp. 3d 16, 28 (D.D.C. 2013).

---

[8]   Indeed, *CREW* noted that (as with attorney-client privilege) the "purpose of the presidential communications privilege is to protect presidential decisionmaking by ensuring that the President continues to receive candid advice." 658 F. Supp. 2d at 236 n.13.  Attorney General Barr himself claimed that President Trump's actions as reflected in the Mueller Report came about because the President "was frustrated and angered by a sincere belief that the investigation was undermining his presidency, propelled by his political opponents, and fueled by illegal leaks." *EPIC*, Slip Op. at 8 (citing Barr statement in April 18, 2019 news conference).

In her declaration, Ms. Brinkmann addresses the subjects of these alleged presidential communications.  While most of these subjects are adequately specific, one of them, which occurs in both categories PCP-1 and PCP-3, is simply described as "[p]ossible official public statements, which the President personally participated in developing or was anticipated to participate in developing."  Brinkmann Decl. ¶¶ 23, 30.  This tells the Court nothing about what these "official public statements" are, and is simply too conclusory to meet DOJ's burden or to allow Plaintiffs or the Court to determine whether they are actually the kinds of official decisions that the privilege protects. *See, e.g.*, *EPA v. Mink*, 410 U.S. 73, 93 (1973) (agency in FOIA case must provide "detailed affidavits or oral testimony"); *Vaughn v. Rosen*, 484 F.2d 820, 826-28 (D.C. Cir. 1973) (courts may not "accept conclusory and generalized allegations of exemptions" but must require "a relatively detailed analysis" that allows for "adversary testing"); *COMPTEL v. FCC*, 910 F. Supp. 2d 100, 127 (D.D.C. 2012) (agency "cannot rely on bare and conclusory assertions to demonstrate" that information was properly redacted); *Citizens for Responsibility & Ethics in Wash. v. DHS*, 648 F. Supp. 2d 152, 157-58 (D.D.C. 2009) (submission deficient where it was "vague, conclusory and inadequate" and reflected "a dearth of 'reasonably specific detail'" (citation omitted)).

Further, reading many of the redactions in context strongly suggests that DOJ has withheld information unrelated to any presidential decisions or "official" presidential public statements.  For example, in the Bannon 302, DOJ redacted substantial amounts of information under the heading "June 2016 Trump Tower Meeting," which occurred long before the election, Bannon 2/14/18 302 (Bates Nos. 142-147), along with a section sandwiched between Trump's debate preparations and how Bannon and Eric Prince first met, Bannon 2/14/18 302 at Bates Nos. 149-150.  In the 302 for Trump's personal attorney and "fixer," Michael Cohen, the vast

19

majority of information is redacted, and what little information has been released references the campaign.  Cohen 8/7/18 302, attached hereto as Exhibit 5, at Bates Nos. 424-491.  In Hope Hicks' 302, DOJ has redacted portions (selectively, and without explanation as to why) of the interview that, while dated after the President took office, relate only to the pre-election Trump Tower meeting and messaging about that non-presidential activity, and therefore have nothing at all to do with any presidential decision-making.  Hicks 6/11/18 302, attached hereto as Exhibit 6, at Bates Nos. 566-575.  The same is true for portions of the Sarah Huckabee Sanders 302 summarizing her July 3, 2018 interview.  Ex. 3 at Bates Nos. 1195-97.  These kinds of discussions are not about "official public statements" and do not "take place in the President's performance of his official duties."  *Espy*, 121 F.3d at 742 (internal marks and citation omitted).

In addition, DOJ's Vaughn Index attached to the Brinkmann declaration makes it exceedingly difficult to understand exactly what privilege categories even apply to which redactions, which Plaintiffs and the Court need to understand in order to test the validity of the claims by viewing the redactions and claims in context.  For example, DOJ has redacted wide swaths of information from the Bannon 302 based on work product and all three of the presidential communication privilege categories over the course of 37 pages without specifying which pages rely on which exemption categories.  Dkt. 63-8.

The inadequacies of these descriptions are amplified in the context of the third category: communications involving third parties.  The DOJ has not identified these third parties, which alone is insufficient to allow for the necessary adversary testing, but as discussed in Plaintiffs' opening brief, context indicates that they include people like Cohen and the CEO of Newsmax, Dkt. 59 at 22, and it is simply implausible that the President's former personal lawyer or the head of a news organization are "members of an immediate White House adviser's staff who have

broad and significant responsibility for investigating and formulating the advice to be given the President on the particular matter to which the communications relate." *Espy*, 121 F.3d at 751-52.

Finally, contrary to DOJ's assertion, Dkt. 62 at 18 n.8, the privilege cannot apply because the President has not personally asserted it (and in fact specifically disavowed it, as discussed *supra*). Plaintiffs acknowledge that D.C. Circuit case law has held that Exemption 5 includes the presidential communication privilege as one of its privileges. *Judicial Watch v. DOJ*, 365 F.3d 1108, 1113 (D.C. Cir. 2004). The Supreme Court overturned longstanding D.C. Circuit precedent in *Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019), however, and mandated a plain-language FOIA approach that means communications with the White House are not "inter-agency or intra-agency memorandums or letters" as required under the plain text of Exemption 5 because the President and his immediate advisors "whose sole function is to advise and assist the President" are not "agencies" under FOIA, regardless of any policy reasons it might make sense to include the privilege under the exemption (which Plaintiffs do not concede). *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980) (citation omitted). As a result, any presidential communication privilege claim in response to a FOIA request must derive from the Constitution itself, not Exemption 5, and in that context, Supreme Court precedent suggests that "the President must assert the presidential communications privilege personally." *Espy*, 121 F.3d at 744 n.16 (citing *United States v. Reynolds*, 345 U.S. 1, 7-8 (1953)); *see also United States v. Burr*, 25 F. Cas. 187, 192 (D. Va. Cir. Ct. 1807) (President Jefferson required to identify personally the passages in document he deemed confidential and could not leave this determination to the U.S. Attorney).

Because the presidential communications privilege has been waived and would not apply in any event, the Court should order DOJ to release all materials withheld pursuant to that privilege and to forego reliance on the privilege in future productions.

## VI.    DOJ HAS NOT PROVIDED SUFFICIENT SUPPORT FOR ALL OF ITS WITHHOLDINGS UNDER THE DELIBERATIVE PROCESS PRIVILEGE

DOJ has narrowed its deliberative process privilege claim to shield only information *about DOJ's decision-making* that was provided by witnesses.  DOJ, however, still has not provided sufficient information for the Court to determine whether the privilege applies.  *See, e.g.*, *Morley v. CIA*, 508 F.3d 1108, 1127 (D.C. Cir. 2007).

To show that the information being withheld is both predecisional and deliberative, agencies generally must provide sufficient detail for the Court to understand what decision was made and when.  *See Ctr. for Investigative Reporting*, 2019 U.S. Dist. LEXIS 223077, at *17-18 (deliberative process privilege did not apply where agency failed to identify relevant decisions or when they were made).  The description of Miller's conversation with then-Attorney General Sessions is insufficient to show that the information is protected by the deliberative process privilege.  The Mueller Report's citations to the redacted page of Miller's 302 show that it recounts events on May 8, 2017, shortly before Comey's firing.  2 Mueller Report at 65-66.  Miller and other witnesses told the FBI that President Trump had already decided to fire Comey by then, and in Miller's telling, had explicitly told his advisers: "Don't talk me out of this."  *Id.* at 66 (citing Miller 302 at 11).  It appears, then, that this information is not privileged because it does not reflect any "give-and-take of the deliberative process by which the decision itself is made."  *Coastal States*, 617 F.2d at 868 (citation omitted).

DOJ also vaguely asserts that the information withheld from the 302 of then-Acting Assistant Attorney General for National Security Mary McCord involved discussions among

select Executive Branch employees of "rationales, opinions and alternatives to specific issues."
Dkt. 62 at 28.  That is insufficient to meet the Government's burden.  Because DOJ has not made
the required showing, the Court should not allow these redactions, and it should require DOJ to
confine its deliberative process privilege withholdings to information that the Government can
show is predecisional and deliberative.

## **CONCLUSION**

For all of the foregoing reasons, and for all of the reasons set forth in the Memorandum in
Support of Plaintiff's Motion for Partial Summary Judgment, Plaintiffs respectfully request that
the Court grant their motion, deny DOJ's cross-motion, and enter an order directing DOJ to
release all records and redacted information improperly withheld pursuant to Exemption 5 and to
conform all of the withholdings and redactions in future productions to the requirements of
Exemption 5.  Alternatively, Plaintiffs respectfully request that the Court conduct an *in camera*
review of the withholdings to ensure that DOJ's Exemption 5 claims are legitimate.

Dated: March 6, 2020                    Respectfully submitted,

                                        _/s/ Charles D. Tobin_
                                        Charles D. Tobin (D.C. Bar No. 455593)
                                        tobinc@balladspahr.com
                                        Matthew E. Kelley (D.C. Bar No. 1018126)
                                        kelleym@ballardspahr.com
                                        BALLARD SPAHR LLP
                                        1909 K Street, NW
                                        Washington, D.C. 20006-1157
                                        T: (202) 661-2200
                                        F: (202) 661-2299
                                        *Counsel for Cable News Network, Inc.*

                                        _/s/ Matthew V. Topic_
                                        Matthew Topic
                                        (E-Mail:  foia@loevy.com)
                                        LOEVY & LOEVY
                                        311 N. Aberdeen, Third Floor
                                        Chicago, Illinois 60607
                                        Tel.: (312) 243-5900
                                        Fax: (312) 243-5902
                                        DC Bar No. IL0037
                                        *Counsel for Leopold and BuzzFeed, Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on this date, I caused the foregoing to be filed and served electronically via the Court's ECF System upon counsel of record.


Dated:  March 6, 2020                          <u>/s/ *Charles D. Tobin*        </u>
                                               Charles D. Tobin