## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JASON LEOPOLD & BUZZFEED, INC.,<br><br>      Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF JUSTICE *et al.*,<br><br>      Defendants. | Civil Action No. 19-cv-1278-RBW |
| CABLE NEWS NETWORK, INC.,<br><br>      Plaintiff,<br><br>v.<br><br>FEDERAL BUREAU OF INVESTIGATION,<br><br>      Defendant. | Civil Action No. 19-cv-1626-RBW |

## SECOND DECLARATION OF MICHAEL G. SEIDEL

I, Michael G. Seidel, declare as follows:

(1)      I am currently the Section Chief of the Record/Information Dissemination Section ("RIDS"), Information Management Division ("IMD"), Federal Bureau of Investigation ("FBI"), Winchester, Virginia. I joined the FBI in September 2011, and prior to my current position, I was the Acting Section Chief from May 26, 2020 to July 26, 2020; Assistant Section Chief of RIDS from June 2016 to May 25, 2020; Unit Chief, RIDS Litigation Support Unit from November 2012 to June 2016; and an Assistant General Counsel, FBI Office of General Counsel, Freedom of Information Act ("FOIA") Litigation Unit, from September 2011 to November 2012.

1

In those capacities, I had management oversight or agency counsel responsibility for FBI FOIA and Privacy Act ("PA") litigation cases nationwide. Prior to my joining the FBI, I served as a Senior Attorney, U.S. Drug Enforcement Administration ("DEA") from September 2006 to September 2011, where among myriad legal responsibilities, I advised on FOIA/PA matters and served as agency counsel representing the DEA in FOIA/PA suits nationwide. I also served as a U.S. Army Judge Advocate General's Corps Officer in various assignments from 1994 to September 2006 culminating in my assignment as Chief, General Litigation Branch, U.S. Army Litigation Division where I oversaw FOIA/PA litigation for the U.S. Army. I am an attorney registered in the State of Ohio and the District of Columbia.

(2)     In my official capacity as Section Chief of RIDS, I supervise approximately 243 FBI employees, supported by approximately 91 contractors, who staff a total of twelve (12) Federal Bureau of Investigation Headquarters ("FBIHQ") units and two (2) field operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA as amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and the FOIA Improvement Act of 2016; the Privacy Act of 1974; Executive Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the consultation process mandated by DOJ FOIA regulation 28 C.F.R. § 16.4; the FBI's implementation of that regulatory requirement and interactions with other government agencies ("OGAs") regarding consultations

of records during FOIA processing both at the administrative stage and in litigation; the processing of the records responsive to Plaintiffs' FOIA requests at issue in the consolidated litigation cases referenced above; and the resources available to the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a.

(4)    This declaration is submitted in support of Defendants' Opposition to Plaintiffs' Motion to Modify Orders of February 5, 2020 and June 9, 2020 (ECF No. 81), and to provide an explanation of the FBI's consultation/coordination process, as well as the current status of consultations/coordinations in this case. This declaration supplements and incorporates information provided in the Second Declaration of David M. Hardy (hereinafter, "Second Hardy Decl.") dated January 29, 2020 (ECF No. 58-1) and the declaration of Michael G. Seidel (hereinafter, "Seidel Decl.") dated March 19, 2020. (ECF No. 71-2.)

(5)    The FBI's investigative files regularly contain information and records obtained from OGAs or otherwise implicate OGA equities. National security-related investigations regularly involve information or equities of other agencies within the Intelligence Community ("IC") and such information/equities are often classified. DOJ has promulgated a FOIA regulation that specifically addresses how OGA information and records are to be handled during the processing of a FOIA request, including classified information.

### DOJ'S FOIA REGULATION GOVERNING RESPONSIBILITY FOR RESPONDING TO FOIA REQUESTS

(6)    DOJ's FOIA regulation at 28 C.F.R. § 16.4 addresses the "[r]esponsibility for responding to [FOIA] requests." In this regulation, DOJ recognizes that the agency that received and is processing a FOIA request may not be in the best position to make disclosure determinations about information in its possession originating from an OGA and/or involving

3

OGA equities.  Accordingly, at § 16.4(d), DOJ established procedures for handling such information through the referral and consultation/coordination process.

(7)     According to DOJ's FOIA regulation, "the component [processing a FOIA request] shall determine whether another agency in the Federal Government is better able to determine whether the record is exempt from disclosure under the FOIA," and if so, employ one of the three processes – referral, consultation, or coordination – to determine the disposition of the record.  28 C.F.R. § 16.4(d).

a.     Under the **referral** process, the processing agency applies whatever redactions it deems appropriate for its information and then sends it to the OGA, which will process it for the OGA's equities and then respond directly to the FOIA requester.  This process is typically used when the processing agency locates a document that originated from an OGA. *See, e.g.,* 28 C.F.R. § 16.4(d)(2).  For example, if the U.S. Park Police ("USPP") located an FBI FD-302 in its files, it would process the record to address USPP equities and then refer the record to the FBI.  The FBI would then process the record to address FBI equities and the FBI – not USPP – would respond directly to the FOIA requester by releasing that FD-302 in whole or in part, or withholding it in full.[1]

b.     The **consultation** process is similar to the referral process except once the OGA finishes processing a record for its equities, it returns the record to the processing agency, which will then respond directly to the requester.  Consultations can involve (i) records originating from the processing agency that contain or implicate OGA equities, and/or (ii) records originating from an OGA where both agencies agree that the processing agency will handle the record as a consultation rather than a referral.  *See* 28 C.F.R. § 16.4(d)(1), (d)(2)(i).

---

[1] Referrals are not at issue in this case at this point.

For example, if the FBI located a USPP record in its files – or located an FBI record discussing USPP equities – the FBI would send the record to USPP for consultation; USPP would make any redactions necessary and return the record to the FBI; the FBI would implement any USPP redactions as well as any FBI redactions; and then the FBI would respond to the requester.  Any given record may involve consultations to multiple OGAs.  That is, a single record may include information from and/or implicate the equities of multiple OGAs.  It is also possible that an OGA receiving a consultation will determine that another agency also has equities in and should review the record, and so the OGA could recommend further consultation.

        c.     The **coordination** process is a variation on the consultation process where the OGA whose records or equities are involved is not disclosed to the requester because that could, itself, reveal classified or otherwise exempt information, or cause harms protected against by FOIA exemptions.  *See* 28 C.F.R. § 16.4(d)(3).

      (8)     DOJ's FOIA regulation governing the responsibility for responding to FOIA requests also specifically addresses the handling of OGA classified information:

> Whenever a request involves a record containing information that has been classified or may be appropriate for classification by another component or agency under any applicable executive order concerning the classification of records, the receiving component shall refer the responsibility for responding to the request regarding that information to the component or agency that classified the information, or that should consider the information for classification.  Whenever a component's record contains information that has been derivatively classified (for example, when it contains information classified by another component or agency), the component shall refer the responsibility for responding to that portion of the request to the component or agency that classified the underlying information.

28 C.F.R. § 16.4(e).

(9)     These processes are not unique to DOJ and its components.  Most agencies' FOIA regulations contain similar provisions governing the handling of OGA information that generally mirror these processes.

### FBI's Procedures for Handling OGA Equities Generally

(10)    The FBI processes its records in compliance with this DOJ FOIA regulations, including 28 C.F.R. § 16.4.  The referral and consultation/coordination procedures outlined in Section 16.4 are followed both at the administrative phase as well as for cases in litigation.

(11)    The FBI typically follows the coordination version of the consultation process for OGA equities in our records.  That is, we do not identify the agency or agencies to which we are sending records as part of our processing of a FOIA request.  The coordination process is critical to the resolution of Intelligence Community equities in particular because an IC agency's connection to a specific individual, activity, program, or FBI investigation can often be classified or prohibited from disclosure under a withholding statute.  Unless/until the IC agency has had a chance to review the records and determine whether its equities in them can be publicly acknowledged, the FBI must rely on the coordination process.  But coordination can also be key in resolving non-IC equities in our investigative records.  For example, if the FBI were to consult with the Securities and Exchange Commission ("SEC") about a particular matter, and were to disclose that it was doing so, the FBI runs the risk of exposing SEC law enforcement interest in a person or activity that may not otherwise be known in a way that adversely affects a pending SEC investigation.  Accordingly, given the FBI's dual law enforcement and national security/intelligence mission, the FBI has concluded that the coordination process, whereby consultations are made without publicly identifying the OGA, is the only reasonable method to

avoid potential inadvertent disclosure of classified and/or law enforcement sensitive information that would otherwise be exempt under the FOIA.[2]

  (12) In implementing the consultation/coordination procedures from 28 C.F.R. § 16.4, the FBI processes records to identify classified and other exempt information, and marks information to be redacted. During that process, we identify any OGA records or information, by bracketing the information and notating which OGA needs to review it, and prepare consultation/coordination packages to be sent to the OGA(s).

  (13) It is the FBI's long-standing practice to send consultation/coordination requests only after a work item has been fully processed by the FBI.[3] Records must be fully processed to identify any classified information before they can be sent for consultation/coordination because that will govern how they are handled both by the FBI and by the OGA. Additionally, from a technology standpoint, pages identified as requiring consultation cannot be extracted while processing is still occurring within the work item where the record is located without altering the work item and consequently, interfering with the preparation of the non-consultation records for release to the requester.[4] RIDS has not been able to identify a way around this technical limitation of its FOIA Document Processing System ("FDPS") that would allow creation of the OGA consultation package in FDPS prior to the finalization of the relevant work item.

---

[2] The FBI is the primary investigative agency of the federal government with authority and responsibility to investigate all violations of federal law not exclusively assigned to another agency; conduct investigations and activities to protect the United States and its people from terrorism and threats to national security; and further the foreign intelligence objectives of the United States.

[3] Within the FBI's FOIA Document Processing System ("FDPS"), records responsive to a FOIA request are grouped into "work items" for processing. Generally, work items are approximately 500 pages or less (if there are not 500 pages to put together in a work item, such as when there are fewer than 500 pages to process in response to any given request).

[4] For example, a classified consultation package to an OGA must be packaged and handled differently than an unclassified package.

(14)    Regardless of whether an entire record or only a portion of it requires consultation/coordination, the FBI removes the entire record from the work item that is part of its current monthly production. Releasing any non-OGA portions of a record prior to finalization of the consultation/coordination process runs the risk of an inadvertent release of unidentified OGA equity within the same record. There are both substantive and logistical reasons for withholding the entire record rather than bracketed portions of a record, until the OGA consultation/coordination process is complete.

        a.      First, there are instances when more information than what the FBI identified initially contains OGA equities, such that releasing other portions of the record prematurely risks disclosing OGA equity information before that agency has a chance to advise how it should be handled. Classified, law enforcement sensitive, or otherwise exempt information could be released.

        b.      Second, there are certain actions within FDPS that must be taken in order to incorporate another agency's recommendations once a document has already been finalized for disclosure: 1) the document must be returned to a draft form in FDPS; 2) boxes and/or brackets initially placed on the record to indicating the OGA information must be removed; 3) new redaction blocks must be added (as recommended by the OGA); and 4) finalization (or "sealing") of all redactions must occur in order to implement solid blocks over redacted information and information technology security protocols (required by FBI policy) must be completed before any releases can be made. Given that many records sent for consultation/coordination involve the equity of more than one OGA, performing all of these steps and multiple versions of the same document would be inefficient and risky. If the FBI were to release multiple different versions of the same record, this would cause confusion. As a

8

result, the FBI waits for all OGAs with equities in a particular record to respond, and resolves any conflicting recommendations, before it applies the recommendations to the record.

(15) The consultation/coordination process outlined above is a long-standing one followed by the FBI. That is, the FBI processes the specified number of pages per month (typically 500 pages), releases the non-exempt portions of any pages not requiring consultation, coordination, or referral, and then sends the specific records requiring consultation/coordination to the OGAs. Once OGAs send consultation/coordination responses back, the FBI finalizes those records for release of any reasonably segregable, non-exempt information and includes them in the next-scheduled interim response. RIDS follows up on outstanding consultation/coordination requests with OGAs on a regular basis; the frequency with which this occurs will vary depending on a variety of factors such as the number of outstanding consultation/coordination requests and how long they have been outstanding but is quite frequent when in litigation. The FBI has followed this process in responding to numerous other requests (at the administrative stage and/or in litigation).

(16) There is no statutory or regulatory mechanism by which one agency can compel another agency that is not a party to the litigation, to respond to a consultation/coordination request by a certain date. However, when the FBI receives a consultation/coordination request from an OGA regarding a request that is in litigation, the FBI prioritizes it to the extent possible in light of litigation deadlines in cases to which the FBI is a party. In my experience, this practice is usually reciprocated in a similar manner by OGAs receiving consultation requests from the FBI for cases in litigation. That is, they too will prioritize the FBI litigation consults, but only to the extent doing so does not impede their ability to meet their own litigation deadlines. This process relies on good will and cooperation among agencies to function;

9

however, there is no statutory or regulatory mechanism requiring another agency to respond by a specific date.

### FBI's PROCEDURES FOR HANDLING OGA EQUITIES IN THIS CASE

(17)    The FBI has followed its standard, long-standing consultation/coordination process in this case. After identifying all potential OGA equities within each work item processed as part of a 800-page interim release, the resulting consultation/coordination requests have been sent to the OGAs, including federal law enforcement partners and members of the IC, requesting the OGA review the records for their equities and provide recommendations to the FBI as to how they wish their information to be handled (*i.e.*, disclose or redact).[5]

(18)    The FBI has sent one hundred ninety-four (194) consultation/coordination requests to twenty-two (22) agencies thus far in this litigation. The total 194 consultation/coordination requests involve one hundred twenty-nine (129) 302s. Because some of the 302s contain overlapping equities of more than one OGA, some of the 302s have been sent to multiple OGAs for consultation/coordination. If a 302 was sent to more than one OGA, the FBI cannot include the 302 in a production to Plaintiffs until the FBI receives response from all of the OGAs in order to prevent inadvertent disclosure of an OGA's equities.

(19)    Seventy-eight (78) of the total 194 consultation/coordination requests were sent to the OGAs in August 2020 and have therefore been pending less than one month. Another twenty (20) of the total 194 consultation/coordination requests were sent to the OGAs in June or July

---

[5]  At the time the FBI sends out consultation/coordination requests – in this case or any other – it has completed its processing of the records for its own information and equities and is waiting only for OGAs to make disclosure determinations about their records/equities. However, when the FBI receives responses from OGAs, the FBI must have adequate time to complete the processing of the records. *See supra* ¶ 14(b).

2020, and have thus been pending less than three months. Forty (40) consultation/coordination requests have been pending for more than three months.[6]

(20)    To date, the FBI has received final responses from OGAs concerning sixteen (16) 302s and has completed or will soon complete the processing of those 302s for production to Plaintiffs. Five (5) 302s were produced to Plaintiffs on March 2, 2020. The FBI anticipates that eleven (11) 302s will be produced to Plaintiffs in the September 1, 2020 release.

(21)    When the FBI sent consultation/coordination requests in this case, the FBI requested that OGAs respond within two weeks of receipt, so that any 302s with fully resolved responses can potentially be included in the next scheduled interim response.[7] Also, as part of the first consultation/coordination request to each OGA, RIDS has requested each agency to provide a central point of contact for receipt of future consultation/coordination requests in this case to promote efficiency. That way, the RIDS employee can directly consult with that same agency point of contact for any future consultation/coordination requests. RIDS has confirmed receipt by the OGAs for each consultation/coordination package and whenever possible, sought confirmation of the estimated completion date.

(22)    All twenty-two (22) OGAs have verified receipt of the consultation/coordination requests. Upon receipt and review of the 302s, several OGAs have indicated additional information from the records warranted further consultation/coordination than the FBI originally identified. The FBI has responded, and the additional information is now pending resolution in a

---

[6] The FBI has received a total of fifty-six (56) consult responses from OGAs. Not all of the 302s at issue with those consult responses have been produced to Plaintiffs because a consultation/coordination request concerning that same 302 remains pending with another OGA, there are outstanding classification issues, or the FBI recently received the response from the OGA, which left insufficient time to include the response in the September 1 production. See supra ¶ 14(b).

[7] As previously described, upon receipt of a response from the OGA, the FBI must take further steps for processing, see supra ¶ 14(b), and some 302s require further consultation with that OGA or with another OGA with equities in the record.

separate request to the newly identified OGA. This back-and-forth between the FBI and the

OGA is necessary to provide sufficient information to the OGA so the OGA can properly assess

whether any of its material in the 302 is exempt from release under the FOIA. In some instances,

OGAs have recognized another OGA's equities within the consult and recommended the FBI

also consult to that OGA concerning its equities. Thus, the consultation/coordination process

could take more than the two weeks allocated to complete the process. For example, when the

FBI has to engage in either a back-and-forth with the original OGA or has to send

consultation/coordination requests to multiple OGAs for the same 302. Certain OGAs have

indicated they are unable to meet RIDS' requested two-week deadline due to staffing issues

related to the COVID-19 Pandemic and multiple competing priorities, including other litigation

deadlines. The FBI has received the following responses from OGAs concerning the FBI's

requested two week response: (a) OGAs will need more time to process the

consultation/coordination request sent to it due to their multiple competing priorities, including

other litigation deadlines; (b) OGAs will respond as soon as possible; (c) OGAs are diligently

working toward meeting the requested two week deadline the FBI provided; and (d) OGAs

acknowledged receipt, but have not determined if they will be able to meet the requested two

week deadline provided by FBI.

(23)    RIDS has and will continue to follow up on each outstanding OGA

consultation/coordination request every month. This means that a RIDS employee has emailed

and/or called each his or her contact at each OGA every month the consult has been pending and

will continue to do so. During those follow-up communications, RIDS employees have emailed

the OGAs for an update on the status of the consultation/coordination response. For those

agencies that did not originally acknowledge receipt of the consultation/coordination requests,

12

RIDS has elevated the issue to senior officials who do not regularly get involved in these types of requests in order to reach a resolution. Specifically, I personally emailed contacts at two (2) agencies that had not previously acknowledged the receipt of the packages sent by RIDS. Since my email communications to those agencies, they have now acknowledged receipt and provided additional points of contact. Accordingly, consultations/coordinations emails were resent to those points of contact.

(24)    Once the consultation/coordination request for any particular record is fully resolved – *i.e.*, all affected OGAs provide recommendations – RIDS has been and will continue to finalize the records and release of any reasonably segregable, non-exempt information and include the record in the next scheduled interim response.

### INTERRUPTIONS TO OGA & FBI PROCESSING DURING THE PENDENCY OF THIS CASE

(25)    On March 11, 2020, the World Health Organization publicly characterized COVID-19 as a pandemic.[8]  On March 13, 2020, the President declared a National Emergency in an effort to address the spread of COVID-19,[9] and on March 16, 2020, the President announced new guidance to slow the spread of the virus, including avoiding groups of more than 10 people and working or schooling from home whenever possible.[10]  This guidance follows

---

[8]  Centers for Disease Control and Prevention. "Coronavirus Disease 2019 (COVID-19): Situation Summary," https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html (last accessed Mar. 19, 2020).

[9]  *See* https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerningnovel-coronavirus-disease-covid-19-outbreak/ (last accessed Mar. 19, 2020).

[10]  *See* The President's Coronavirus Guidelines for America, https://www.whitehouse.gov/wpcontent/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf (last accessed Mar. 19, 2020).

recommendations by the Centers for Disease Control ("CDC") to engage in social distancing, and, in some circumstances, to close schools.[11]

(26)   The United States Office of Personnel Management ("OPM") has been issuing guidance to address how the Federal Government can implement measures to protect its workforce and the American public. Specifically, on March 7, 2020, OPM recommended the "incorporation of telework and 'social distancing' in COOP [Continuity of Operations] and emergency planning [to] allow the Federal Government to continue functioning efficiently and effectively, while ensuring the health and safety of employees."[12]   Further, on March 15, 2020, the Acting Director of Office of Management and Budget ("OMB") issued guidance to Federal agencies in the National Capital Region to implement maximum telework flexibilities.  OMB's guidance asked agencies "to offer maximum telework flexibilities to all current telework eligible employees, consistent with operational needs of the departments and agencies as determined by their heads."[13]   RIDS had stopped FOIA processing on March 17, 2020, resumed FOIA operations in a limited fashion on April 29, 2020, and fully reopened for FOIA processing in June 2020.[14]   However, I understand that not all other governmental agencies have resumed FOIA processing on the same timetable or on the same staffing levels as RIDS.  Given that many

---

[11] *See* Centers for Disease Control and Prevention. "Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission, https://www.cdc.gov/coronavirus/2019-ncov/downloads/community-mitigationstrategy.pdf (last accessed Mar. 19, 2020).

[12] United States Office of Personnel Management Memorandum "Coronavirus Disease 2019 (COVID-19); Additional Guidance" (March 7, 2020), https://www.chcoc.gov/content/coronavirus-disease-20 I 9-covid-19-additional-guidance (last accessed Mar. 17, 2020); *see also* United States Office of Personnel Management Memorandum "Updated Guidance on Telework Flexibilities in Response to Coronavirus" (Mar. 12, 2020), https://www.chcoc.gov/sites/default/files/M-20-13.pdf (last accessed Mar. 17, 2020).

[13] *See* Memorandum from the Acting Director of The Office of Management and Budget to the Heads of Departments and Agencies "Updated Guidance for National Capital Region on Telework Flexibilities in Response to Coronavirus" (Mar. 15, 2020), https://www.whitehouse.gov/wp-content/uploads/2020/03/M20-15-TeleworkGuidance-OMB.pdf (last accessed Mar. 19, 2020).

[14] *See* Decl. of Michael Seidel ¶ 8 (Mar. 19, 2020), Dkt. 71-2; Decl. of David Hardy ¶ 17 (Apr. 24, 2020), Dkt. 77-1.

14

of the consultation/coordination requests involve classified or extremely sensitive information that cannot be reviewed remotely, and that Federal agencies are currently implementing measures to promote telework, these factors have significantly delayed some agencies' responses to classified FBI consultations.

## CONCLUSION

(27)    Given the sensitivities of these records and significant law enforcement, national security, and/or intelligence concerns implicated by the presence of particular OGA's information in them, it is critical to solicit and incorporate the input of these agencies before releasing the records.

(28)    As explained above, the FBI generally relies on the coordination version of the consultation process for OGA equities in our investigative records; therefore, it does not identify the agencies with which we are coordinating.  The regulations governing coordination with other agencies specifically permit the withholding of the "identity of the component or agency to which the referral would be made" if such disclosure "could harm an interest protected by an applicable exemption, such as the exemptions that protect personal privacy or national security interests."  28 C.F.R. § 16.4(d)(3).  In recognition of the sensitivities of the records and information involved, the FBI concluded that the coordination process was the appropriate one to use here to resolve OGA equities, consistent with our standard practice and with 28 C.F.R. §§ 16.4(d) and 16.4(e).  The FBI follows up on outstanding consultations on at least a monthly basis, and upon return of OGA recommendations, promptly processes the record releasing all non-exempt, segregable information in the next monthly release.  The FBI has no authority to require other agencies, many of which are facing litigation demands and personnel shortages of their own, to respond to its consultation/coordination requests by a requested date.

15

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed this _28th_ day of August, 2020.


Michael G. Seidel
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia

16