## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JASON LEOPOLD & BUZZFEED, INC., Plaintiffs, v. U.S. DEPARTMENT OF JUSTICE *et al.*, Defendants. | Civil Action No. 19-cv-1278-RBW |
| CABLE NEWS NETWORK, INC., Plaintiff, v. FEDERAL BUREAU OF INVESTIGATION, Defendant. | Civil Action No. 19-cv-1626-RBW |

## THIRD DECLARATION OF MICHAEL G. SEIDEL

I, Michael G. Seidel, declare as follows:

(1)     I am the Section Chief of the Record/Information Dissemination Section ("RIDS"), Information Management Division ("IMD"), Federal Bureau of Investigation ("FBI"), Winchester, Virginia.  I joined the FBI in September 2011, and prior to my current position, I was the Assistant Section Chief of RIDS from June 2016 to July 2020; Unit Chief, RIDS Litigation Support Unit from November 2012 to June 2016; and an Assistant General Counsel, FBI Office of General Counsel, Freedom of Information Act ("FOIA") Litigation Unit, from September 2011 to November 2012.  In those capacities, I had management oversight or agency

1

counsel responsibility for FBI FOIA and Privacy Act ("FOIPA") litigation cases nationwide.

Prior to my joining the FBI, I served as a Senior Attorney, U.S. Drug Enforcement

Administration ("DEA") from September 2006 to September 2011, where among myriad legal

responsibilities, I advised on FOIPA matters and served as agency counsel representing the DEA

in FOIPA suits nationwide. I also served as a U.S. Army Judge Advocate General's Corps

Officer in various assignments from 1994 to September 2006 culminating in my assignment as

Chief, General Litigation Branch, U.S. Army Litigation Division where I oversaw FOIPA

litigation for the U.S. Army. I am an attorney registered in the State of Ohio and the District of

Columbia.

(2)     In my official capacity as Section Chief of RIDS, I supervise approximately 235

FBI employees, supported by approximately 94 contractors, who staff a total of twelve (12)

Federal Bureau of Investigation Headquarters ("FBIHQ") units and two (2) field operational

service center units whose collective mission is to effectively plan, develop, direct, and manage

responses to requests for access to FBI records and information pursuant to the FOIA as

amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and the FOIA

Improvement Act of 2016; the Privacy Act of 1974; Executive Order 13526; Presidential,

Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and

Congressional directives. My responsibilities also include the review of FBI information for

classification purposes as mandated by Executive Order 13526, 75 Fed. Reg. 707 (Dec. 29,

2009) and the preparation of declarations in support of Exemption 1 claims asserted under the

FOIA. The Section Chief, RIDS has been designated by the Attorney General of the United

States as an original classification authority and a declassification authority pursuant to

Executive Order 13526, §§ 1.3 and 3.1. The statements contained in this declaration are based

2

upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     Because of the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552.  Specifically, I am aware of the FBI's handling of Plaintiffs' FOIA request and the consultations at issue in this lawsuit.

(4)     The FBI submits this declaration in support of Defendants' Motion for Clarification and Partial Reconsideration of the Court's Amended Order and Request for Expedited Ruling.

(5)     On September 4, 2020, the Court ordered "that, on or before October 9, 2020, the government agencies to which the Department [of Justice] has sent typewritten narratives of the FD-302s for consultation shall complete their review of such documents." ECF No. 88, Order. To the extent that "any agency cannot comply with the Court's deadline," the Court directed that "a representative from that agency and the Department shall appear before the Court for an *ex parte* hearing on October 7, 2020, at 9:00 a.m." Id. The Court further ordered "that on or before October 30, 2020, the Department shall produce to the plaintiffs the non-exempt portions of the typewritten narratives of all the FD-302 forms created by the FBI in conjunction with Special Counsel Robert Mueller's investigation into Russian interference in the 2016 United States presidential election, including the typewritten narratives of the FD-302s that were provided to other government agencies for consultation." Id. On September 8, 2020, the Court amended its Order in part, by converting the *ex parte* hearing on October 7 into a status conference with the parties. ECF No. 90, Amended Order.  Specifically, the Court ordered that "[i]n the event that any agency cannot comply with the Court's deadline, a representative from that agency and the

3

parties shall appear before the Court for a status conference on October 7, 2020, at 9:00 a.m. If necessary, an agency's representative may request to make *ex parte* representations to the Court during the hearing." Id.

(6)     Defendant completed processing of and made its most recent monthly production of responsive records on September 1, 2020. During the processing of the tranche of records for that production, Defendant identified additional records requiring consultation with multiple other agencies, including several agencies that have not previously received consultation requests in these cases.

(7)     The consultation requests associated with the September production were sent to the other agencies on September 11, 2020. It is RIDS's normal process to send consultation packages after it has made its monthly production of records. As RIDS reviews and processes a tranche of records for a particular monthly production, it identifies and marks other agencies' equities in addition to marking any FBI information that will be redacted as exempt. A single document can contain multiple agencies' equities, often overlapping, and any given tranche may contain multiple records requiring consultation with the same agency.

(8)     It is critical for the FBI to identify its own information that is exempt and conduct a classification review before distributing the information outside of the FBI to ensure that any sensitive information (including classified, law enforcement sensitive, and personal privacy information) is handled properly.[1] Procedures for sending classified records to other government agencies differs from unclassified records. Classified information requires that government personnel receiving and handling the information be properly cleared, and that the information

---

[1] Processing is completed prior to consultations being sent to any other OGA so that any classified information is identified prior. This allows the FBI to send the consultation on the appropriate enclave, minimizing the risk of compromising classified information by improper handling.

4

can be properly stored by the other agency in a GSA-approved container or SCIF upon receipt. Without conducting a review of the records prior to sending to another agency, the FBI cannot determine the proper procedure to follow to provide the records to the other agency.

(9)     RIDS has also determined, after decades of experience, that sending a single comprehensive package to each agency every month containing all records requiring consultation with the agency from that month's tranche of records is far more efficient than sending packages of individual pages or documents as they are identified in processing, given the strict procedural rules that must be followed in sending records to another agency.

(10)    RIDS's top priority in cases involving interim responses is to produce all non-exempt information available for release.  Accordingly, RIDS first completes production to requesters/plaintiffs of all information reviewed that month and not requiring consultation with other agencies.  It then prepares consultation packages to each agency that needs to review the records.  Those packages include a cover memorandum providing context for the request and copies of the relevant FOIA requests, the Complaint (for cases in litigation), and the records requiring review.

### PROCEDURAL SAFEGUARDS FOR RECEIVING, HANDLING, AND STORING CLASSIFIED INFORMATION

(11)    Certain procedural safeguards are taken depending on the highest classification level of the package of records sent to each agency that month.[2]  Classified information must be properly safeguarded to mitigate the risks associated with threats and vulnerabilities such as foreign intelligence services or other malicious actors gaining access to Classified National Security Information ("CSNI"); compromised investigations or operations; espionage by

---

[2] Not all consultations contain classified information, however the same procedures are taken during processing to make sure that the information is in fact unclassified as identified by the FBI.

malicious insiders; unintentional data spills; unauthorized disclosure of classified information; and non-compliance with federal laws or policy.

(12)     Access to classified information is limited only to authorized individuals, not necessarily every employee of another agency.  When packaging and preparing classified consultations to other agencies, RIDS must be certain that the receiver is eligible for the access and has a "need to know" the information.  Especially in cases such as this one, where there are a large number of agencies with which the FBI needs to consult and a large number of records requiring consultation (some of them requiring consultation with multiple agencies), preparation of consultation packages can be time consuming.  In addition, records containing classified information may have overlapping equities with both an intelligence agency that regularly receives classified information and a law enforcement agency that may not regularly handle classified information.  Due to the intertwined nature of the classified information in many of these records, it is essential that RIDS ensure any receiving agencies that do not regularly handle classified information are prepared to receive, handle and store that same classified information.

EFFORTS TO STREAMLINE CONSULTATION PROCESSES WITH EACH AGENCY

(13)     Typically, other agencies treat consultations from other agencies on a "first in-first out" basis.  Often, other agencies will give deference to the date of receipt of the request by the originating agency or prioritize litigation consultations.  Here, RIDS has attempted to further streamline the process.  Each time RIDS encounters the equity of an agency it has not yet consulted with in this case, RIDS has attempted to obtain a singular point of contact with that agency for the duration of this litigation (including contacts prepared to accept classified information).  For those agencies able to provide specific points of contact and instructions, RIDS has followed those procedures to better streamline the consultation process.    Further

6

exacerbating matters, is the impact COVID-19 has had on personnel in other agencies. The FBI is not alone in experiencing an ever-changing flux in productivity due to periodic changes in availability of personnel as a result of COVID-19. Generally, the FBI has been made aware through its consultation and referral process that many of the agencies it normally sends records to for consultation or referral have been unable to fully return to their offices and have had significant losses in productivity due to COVID-19. Many of these agencies have personnel teleworking, and therefore they have a very limited number of personnel on site that can access any classified records sent to it by the FBI. Due to the security measures in place for handling and storage of classified information, only those employees with office access can review the materials. This significantly reduces the volume of records these agencies are able to review.

(14)    Finally, sending a single comprehensive consultation package to each OGA every month is far more efficient than sending records on a daily basis as they are identified during review. Sending records for consultation in a piecemeal fashion creates an additional administrative burden on both the sending agency (FBI) and receiving agency to open and track each of the requests. It also increases the likelihood of requests being missed or overlooked.

(15)    Because the FBI completes processing of a tranche of records and prepares comprehensive consultation packages each month only after it produces non-exempt information to requesters/plaintiffs for the reasons discussed above, there is regularly a delay between the monthly production of records to a requester/plaintiff and the sending of consultation requests to other agencies. Here, given the number of agencies, the volume of records requiring consultation, and the need to locate points of contacts for any agencies not already encountered in processing records for this litigation, and as a result of personnel shortages due to COVID-19 absences and/or or the need to expand telework options in order to reduce the number of

7

personnel on site in close proximity at a given time, there generally has been approximately a one to two week delay in sending the consultation requests.

(16)     Accordingly, the FBI expects that it will not send consultation packages associated with the tranche of records being processed for the October 1st release until the week of October 5th. That would give the other agencies almost no time to review the consulted records prior to the October 9th processing deadline set by the Court or the October 7th status hearing. Given the impact of COVID-19 on other agencies and access to classified enclaves for reviewing information, and the push to extend telework options for federal employees in this unprecedented time, Defendant previously requested that the other agencies have at least two weeks to review consulted records. Even if the consulted records could be provided to the other agencies simultaneously with the October 1st production, the agencies still would not have two weeks to review them because, in some instances, OGAs have recognized another OGA's equities within the consult and recommended the FBI also consult with that OGA concerning its equities. Thus, the consultation/coordination process could take more than the two weeks allocated to complete the process. Under the current court ordered deadline, the new OGA being consulted would have to appear in court, even if they just received the documents for their review.

<h2 style="text-align:center">NON-ATTRIBUTION ORIGINATING AGENCIES</h2>

(17)     If an agency locates within its files material originating with an Intelligence Community agency, and the mere involvement of that agency in the matter, is a classified fact that has not been publicly acknowledged, then to disclose or give attribution to the involvement of that Intelligence Community agency could cause national security harms. See Exec. Order No. 13,526, § 3.6(b), 3 C.F.R. 298 (2009).   Furthermore, the FBI is unable to make

8

classification decisions concerning information classified by another agency without consultation. It is to the Plaintiffs' benefit to wait for such determinations, in the event the other agency determines the information no longer warrants classification.

(18) The FBI has previously reported generally that consultation requests have been sent to other Intelligence Community agencies but it has not specifically identified which agencies have received consultation requests, because in some instances, such agencies' involvement in a particular matter is itself classified or sensitive. It is therefore necessary to protect that information. If such an agency is unable to meet the October 9th processing deadline, the Amended Order requires a representative of that agency to appear at the October 7th hearing. However, to the extent that agency's involvement is classified or sensitive, appearing at the hearing would reveal this information, resulting in disclosure of classified information.

HARM TO FBI RELATIONSHIPS

(19) The FBI relies heavily on assistance from its state, local, foreign, law enforcement and intelligence community partners in pursuing its law enforcement and intelligence gathering missions. In order to maintain such cooperative relationships, and the ability to receive from such agencies critical investigative and intelligence information, the FBI must continue to honor requests for confidentiality by these agencies. If the FBI were to ignore requests for confidentiality from and/or neglect its own assurances of confidentiality provided to these agencies, these agencies would be less likely to freely share sensitive information with the FBI in the future. It could also harm the FBI's ability to seek support and/or assistance from these agencies during joint investigations. Furthermore, such a disclosure would also have a chilling effect on the FBI's relationships with other law enforcement agencies that have shared their

9

information with the FBI.  Thus, release of these agencies' identities, the identities of their staff, and/or the information they provided in confidence could greatly harm the FBI's effectiveness in investigating/preventing criminal acts and harm national security.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this _____ day of September, 2020.

Michael G. Seidel
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia

10